IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ORLANDO BAEZ, CB-3721 | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF CORRECTIONS, S.C.I. GREENE COUNTY PRISON, STANLEY FALOR, DIANE MANSON, JOHN MCANANY, M.S. REESE, SHIRLEY HICKMAN, MICHELLE DIGGS, NANCY ZIEGLER, UNBANTI TALABI, LOUIS FOLINO, DIANE THOMAS, DAN DAVIS, SHARON BURKS, CLIFFORD O'HARA, DONALD VAUGHN, JEFFERY BEARD, BRENDA MARTIN, BYUNCHAK JIN, DEBRA GRESS, MARY BALESTRIERI, TAMMY HOOKER, ROBERT DIETZ, KRISTIN KERSING, THOMAS JAMES, MAJORIE J. FOX, FRANCIS SUPPOK, S.C.I. GRATERFORD PRISON, FELIPE ARIAS, KOSERIOWSKI, EAKIN, CUSICK, STEFANIC, MYRON STANSHEFSKI, JULIE KNAUER, WENDY MOYER, THOMAS STACHELEK, J. MURRY, GARY OLINGER, CHERIAN JOSEPH, RICHARD VOTYKO, HARMON CRUP, FRANK MASINO, DAVID DIGUGLIELMO, JAMES OPALKA, J. BAKER | : | 2:06-CV-04923 |

**MEMORANDUM**

**NORMA L. SHAPIRO, S.J.**                                                          **MAY 4, 2009**

Plaintiff, Orlando Baez, a prisoner incarcerated at SCI-Greene, filed a civil rights action under 28 U.S.C. § 1983 alleging deliberate indifference to his medical needs in violation of the Fourteenth and Eighth Amendments to the United States Constitution. Baez claims that defendants, various prison officials and doctors at SCI-Greene and SCI-Graterford, failed to

provide him with necesssary treatment for lupus and rectal bleeding. Baez moves for a preliminary injunction requiring defendants to provide him with a dermatology consultation to evaluate his symptoms of lupus and a gastroenterology consultation to determine the reason for his rectal bleeding. Baez' motion will be denied.

I.  **FACTUAL BACKGROUND**

Baez is a prisoner previously incarcerated at SCI-Graterford and currently incarcerated at SCI-Greene. Defendant Dr. Byunghak Jin, a general surgeon at SCI-Greene, is employed by Prison Health Services. (Hr'g Tr. 72-73, May 6, 2008). Defendant Dr. Stanley Falor, a general practitioner employed by Prison Health Services, has worked at SCI-Greene since January, 1994. (Hr'g Tr. 171-73, May 6, 2008.) Baez testified Dr. Falor took his complaints seriously and treated him better than the other physicians. (Hr'g Tr. 67, May 6, 2008.) Dr. Falor has not been involved in Baez's care since August, 2006. (Hr'g Tr. 38, May 7, 2008.)

Baez alleges that since 2004, he has had constant pain in his stomach, chest, and heart. (Hr'g Tr. 33-34, 131, May 6, 2008.) Baez testified he submitted sick call slips to SCI-Greene staff, but they ignored him, laughed, or walked away. (Hr'g Tr. 32, May 6, 2008). The pain medication provided to Baez was ineffective. (Hr'g Tr. 32, May 6, 2008.) Dr. Jin acknowledged Baez had complained about stomach and abdominal pain, and ineffectiveness of pain medication, since arriving at SCI-Greene. (Hr'g Tr. 134-35, May 6, 2008.)

A.  **Lupus**

After evaluating Baez's symptoms, Dr. Falor referred Baez to Dr. David E. Seaman, a rheumatologist who specializes in lupus. (Pl.'s Ex. P-1-F; Hr'g Tr. 174-75, May 6, 2008.) Lupus is a chronic, inflammatory systemic disease that can affect different organs in the body. (Seaman Dep. 8.) There are two types of lupus: skin lupus, causing skin rashes, and systemic

2

lupus, affecting the nervous, circulatory, lung and cardiovascular, and gastrointestinal systems. (Seaman Dep. 9-10.) Skin lupus can become systemic lupus. (Hr'g Tr. 89, May 6, 2008.) Systemic lupus can be fatal. (Hr'g Tr. 77, 170, May 6, 2008; Seaman Dep. 64.)

There is no single diagnostic test for lupus; diagnosis depends on evaluating a number of symptoms and test results. (Seaman Dep. 11-12.) Symptoms of lupus include: malar rash, discoid rash, photosensitivity, oral ulcers, arthritis, serositis, renal disorder, neurologic disorder, hematologic disorder, immunologic disorder, high anti-double strain DNA level, and high antinuclear antibody level. (Seaman Dep. 13; Pl.'s Ex. P-10.) Lupus has both latent and active stages, and symptoms can appear and recede. (Hr'g Tr. 78-79, 174, May 6, 2008.)

Lupus has no cure, but treatment can slow progression of the disease. (Seaman Dep. 58.) Skin lupus is treated with topical creams and oral medication. (Seaman Dep. 73.)

Dr. Seaman saw Baez on June 29, 2006, and April 16, 2008. Dr. Seaman was not provided with Baez's medical records prior to the June, 2006 examination, and did not speak with Dr. Falor or Dr. Jin prior to or after examining Baez. (Seaman Dep. 23.) Dr. Seaman observed excoriated, or "scabby," lesions on Baez's arms, back, trunk, and legs. (Seaman Dep. 33-34.) In his June 29, 2006, report, Dr. Seaman stated he doubted Baez had systematic lupus but wanted to rule it out; he planned the following:

(1) Will obtain CBC, CR, LFT, TSH, ANA, DNA, ENA, C3, C4-SSA/B, CR, U/A.
(2) X-ray C spine and LS spine.
(3) CT of the abdomen.
(4) Suggest referral to GI, cardiology and dermatology. This will be deferred to Dr. Falor.
(5) Follow-up in one month in the Waynesburg office.

(Pl.'s Ex. P-6.) The cervical lumbar x-rays and CT scan of the abdomen were performed. (Hr'g Tr. 30, May 7, 2008.) In a July 11, 2006, progress note, Dr. Jin deferred any dermatology, cardiology, or gastrointestinal consult. (Pl.'s Ex. P-1-Q.)

Baez was not returned to see Dr. Seaman one month after the first visit. (Seaman Dep. 39-40; Hr'g Tr. 149-50, May 6, 2008.) According to the file Dr. Seaman maintained for Baez, "Vicki" from SCI-Greene called Dr. Seaman to schedule a one month follow up visit on July 26, 2006. (Seaman Dep. 78.) The visit was rescheduled for September 6, 2006, because Dr. Seaman had ordered a "DES test" for Baez in August. (Seaman Dep. 78.) A note in Baez's file stated Vicki from SCI-Greene called to cancel the September 6, 2006, office visit because Baez refused a CT scan. (Seaman Dep. 78.) The note stated that if Baez decided to have the CT scan done, the visit would be rescheduled. (Seaman Dep. 78-79.) Baez signed a consent form for a CT scan on September 11, 2006; the CT scan was performed on November 8, 2006. (Hr'g Tr. 156, May 6, 2008.) Baez was not returned for a second visit with Dr. Seaman until one and a half years after the CT scan was performed. (Hr'g Tr. 158, May 6, 2008.)

Baez's second visit with Dr. Seaman was on April 16, 2008. Dr. Seaman did not have an opportunity to review complete medical records before Baez's second visit. (Pl.'s Ex. P-6.) Dr. Seaman did not receive Baez's laboratory results until the second visit. (Seaman Dep. 37.) Baez complained of arthralgia, abdominal pain, and heart pains. (Seaman Dep. 44.) After examination, Dr. Seaman suspected Baez had subacute cutaneous lupus, or skin lupus. (Pl.'s Ex. P-6.) Dr. Seaman wanted Baez to see a dermatologist for further evaluation, because there are multiple forms of skin lupus. (Seaman Dep. 74.) At deposition, Dr. Seaman testified he could not state with any certainty that a delay in seeing a dermatologist would cause Baez injury in the future. (Seaman Dep. 75.)

Baez's symptoms of a photosensitive skin rash, arthralgia, abnormal double strain DNA test results, high anti-nuclear antibody ("ANA") test results, and positive SS-A / SS-B test results are consistent with lupus. (Seaman Dep. 56-59.) Dr. Seaman testified that as of the medical examination on April, 2008, Baez did not have a malar (butterfly-shaped cheek) rash, which is another symptom of lupus. (Seaman Dep. 62.) Dr. Seaman has not received test results for the SS-A and SS-B antibodies, which might support a diagnosis of subacute cutaneous lupus or Sjogren's syndrome. (Seaman Dep. 67, 87-89.) Baez has had a recurring non-malar rash for approximately a year while at SCI-Greene, but has not been seen by a dermatologist at SCI-Greene. (Hr'g Tr. 146-47.) Dr. Seaman recommended that Baez see a dermatologist for his skin condition. (Pl.'s Ex. P-6.)

Dr. Seaman testified at his deposition that he had not determined whether Baez had lupus. (Seaman Dep. 56, 64.) After the April, 2008, medical examination, Dr. Seaman received x-rays of Baez; Dr. Seaman did not make any further diagnosis as a result. (Seaman Dep. 66.) Dr. Seaman had not yet received SS-A or SS-B antibody tests, to help him determine whether Baez has skin lupus or Sjogren's syndrome. (Seaman Dep. 67-68.) Dr. Seaman suggested a second rheumatology opinion. (Seaman Dep. 66.)

Dr. Jin, who does not specialize in lupus, became medical director at SCI-Greene on October 1, 2006. (Hr'g Tr. 74-77, May 6, 2008.) Dr. Jin did not know for certain whether Baez has lupus. (Hr'g Tr. 19-20, 109, May 6, 2008.) Lupus Erythematosis is listed on Baez's "problem list" dated March 22, 2006, and on Baez's progress notes of July 20, 2006. (Hr'g Tr. 99, 107, May 6, 2008.) "Systemic lupus" is noted on May 8, 2006. (Pl.'s Ex. P-1-D.) Duplicate testing for lupus on May 8, 2006, returned positive results; anti-double strain DNA and anti-nuclear antibody tests returned positive; lab reports from March 21, 2006, and May 8, 2006,

5

were positive for double strain DNA; and a lab report from July 8, 2006, showed high anti-nuclear antibody, elevated ESR, and high anti-double strain DNA results. (Hr'g Tr. 100, 122-23, May 8, 2006; Pl.'s Ex. P-1-F.) Dr. Jin noted elevated anti-nuclear antibody and elevated ESR levels in 2008, (Pl.'s Ex. 7), but stated in an April 23, 2008, letter that "no clinical traits of lupus" were shown. Pl.'s Ex. P-7.

Dr. Jin first decided not to follow Dr. Seaman's recommendations to refer Baez to gastroenterology and dermatology specialists because he did not agree it was necessary. (Hr'g Tr. 164-65, May 6, 2008.) Dr. Jin concluded Baez did not have lupus because he did not see any symptoms during an April 8, 2008, examination. (Hr'g Tr. 55, May 7, 2008.) Baez testified he did not disrobe during examinations by Dr. Jin, and Dr. Jin has never seen Baez's skin, other than his face and head. (Hr'g Tr. 70-71, May 6, 2008.) Dr. Falor agreed with Dr. Jin's initial decision not to send Baez for a dermatology consult after reviewing Baez' medical chart and because of his familiarity with Dr. Jin. (Hr'g Tr. 25, 38, May 6, 2008.) As prison doctors, Dr. Falor and Dr. Jin have been instructed to take cost into consideration when evaluating whether to follow a consultant's recommendation. (Hr'g Tr. 175, May 6, 2008.)

Dr. Jin later changed his mind and arranged a dermatology consult for Baez. Baez was seen by Dr. Stephen Schleicher, via teledermatology on August 18, 2008. Dr. Schleicher was not able to detect any rashes but noted that Baez was "belligerent and uncommunicative" during the exam; Baez reportedly said, "I will not communicate unless my lawyer is present." (Ex. PSupp-1.) Dr. Schleicher recommended an ANA test every quarter, as well as a lupus band test, but did not state definitively that Baez had systemic lupus or Sjogren's syndrome.

Dr. Jin sent Baez to a second dermatological consult off-site on December 8, 2008. The December 15, 2008 lab report analyzing tests taken during that consult stated that the results

6

were non-specific for lupus or other ANA-related autoimmune disorders. (Ex. PSupp-2.) After Dr. Jin forwarded these results to him, Dr. Seaman would not state conclusively that Baez had lupus or any other systemic autoimmune disorder. (Ex. PSupp-4.) However, on Dr. Seaman's recommendation, Dr. Jin arranged for Baez to be seen by a rheumatology specialist at the University of Pittsburgh's Lupus Center of Excellence.

On February 20, 2009, Baez was seen by Dr. Fotios Koumpouras at the University of Pittsburgh, who diagnosed him as having systemic lupus, and possibly secondary Sjogren's syndrome. Dr. Koumpouras recommended courses of medication and tests to treat Baez' lupus, as well as his secondary joint pain and dry mouth. Dr. Koumpouras also requested repeat follow-up visits with Baez every six months. (Ex. PSupp-5.)

**B.      Rectal bleeding**

Baez complained of rectal pain while at SCI-Greene, but medical staff did not respond to his first sick call slip regarding rectal bleeding. (Hr'g Tr. 37, 136-37, May 6, 2008.) Baez's complaints of rectal bleeding have been documented in progress notes. (Hr'g Tr. 137-38, May 6, 2008.) On June 18, 2007, Baez tested positive for blood in the stool that cannot be detected by the naked eye. (Hr'g Tr. 138-139, May 6, 2008.) Blood in the stool can result from internal bleeding. (Hr'g Tr. 142, 178, May 6, 2008.) Dr. Falor testified the hemoccult test showed the extent of Baez's bleeding was not serious because the blood counts did not change appreciably. (Hr'g Tr. 179, May 6, 2008.) Dr. Jin conceded further investigation must be done to determine why Baez is experiencing rectal bleeding. (Hr'g Tr. 144-45, May 6, 2008.)

Baez also complained of rectal bleeding during his second visit with Dr. Seaman. (Seaman Dep. 52.) Dr. Seaman recommended that Baez see a gastroenterology specialist for the rectal bleeding. (Pl.'s Ex. P-6.) Dr. Seaman acknowledges rectal bleeding is unrelated to his

7

specialty, and his recommendation for a gastrointestinal consult was not meant to aid in the diagnosis of lupus. (Seaman Dep. 69-70.)

On April 8, 2008, Dr. Jin conducted a rectal exam of Baez, but Baez testified he did not disrobe during the exam. (Hr'g Tr. 53, 70, May 6, 2008). Baez has received no diagnosis or treatment of his rectal bleeding. (Hr'g Tr. 37, May 6, 2008.) Appropriate responses to rectal bleeding might include a colonoscopy and a gastrointestinal consult. (Hr'g Tr. 180-81, May 6, 2008.)

## II.  PROCEDURAL HISTORY

Baez filed a pro se complaint against prison officials and doctors at SCI-Greene and SCI-Graterford. The court granted Baez's motion for appointment of counsel, and placed the action in administrative suspense pending appointment of counsel. Prison officials from SCI-Greene filed a motion to transfer claims against them to the Western District of Pennsylvania. The court removed the action from administrative suspense and ordered a hearing on a rule to show cause why Baez's claims against all defendants associated with SCI-Greene should not be severed and transferred. Counsel was appointed for Baez and the court deferred decision on transfer of claims against SCI-Greene defendants to provide Baez an opportunity to file a counseled response. Medical doctor defendants from SCI-Greene, including Dr. Falor and Dr. Jin, joined in the motion to transfer claims to the Western District of Pennsylvania.

Defendants Felipe Arias, Koseriowski, Eakin, Cusick, Stefanic, Harmon Crup, and Frank Masino filed a motion to dismiss. Baez filed a motion for transfer to SCI-Graterford. The court denied the motion to transfer without prejudice and gave Baez leave to file a counseled amended complaint.

Baez filed a motion for new counsel, and counsel filed a petition to withdraw. The court granted counsel's petition to withdraw. Baez then filed a motion for a preliminary injunction. New counsel, Angus R. Love, Esq., was appointed to represent Baez. The court held a two day evidentiary hearing on Baez's motion for preliminary injunction. Baez, Dr. Jin, and Dr. Falor testified. After the evidentiary hearing, the parties took a deposition of Dr. Seaman and provided a transcript to the court. The parties submitted proposed findings of fact and conclusions of law on Baez's motion for preliminary injunction. The court heard oral argument on the motion for preliminary injunction.

After the August, 2008 teledermatology consult with Dr. Schleicher, Baez requested that the court reopen the record for the injunction to admit both Dr. Schleicher's report and Baez' letter complaining about the consult. The court, granting Baez' petition on January 7, 2009, ordered the record opened for supplementary evidentiary submissions through March 6, 2009, to be followed by supplementary briefing by all parties on Baez' motion for injunctive relief.

## III. DISCUSSION

### A. Motion to dismiss

Defendants Felipe Arias, Koseriowski, Eakin, Cusick, Stefanic, Harmon Crup, and Frank Masino filed a motion to dismiss Baez's claims against them. After these defendants filed the motion to dismiss, Baez filed a counseled amended complaint. The motion to dismiss will be denied as moot.

### B. Motion for preliminary injunction

Baez filed a motion for a preliminary injunction to require defendants to provide him with a dermatology consult to evaluate his symptoms of lupus, and a gastroenterology consult to determine the reason for his rectal bleeding. A preliminary injunction is an extraordinary

9

remedy to be granted only if the moving party demonstrates: (1) reasonable probability of success; and (2) irreparable harm if relief is not granted. Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989). The court should also take into account: (3) the possibility of harm to other interested persons; and (4) the public interest. Id. Preliminary injunctions are only appropriate to remedy irreparable harm which is immediate or imminent, not speculative. Campbell Soup Co., v. ConAgra, Inc., 977 F.2d 86, 91 (3rd Cir. 1992).

In the complaint underlying his motion for injunctive relief, Baez claims defendants were deliberately indifferent to his symptoms of lupus and rectal bleeding. Deliberate indifference to the serious medical needs of a prisoner constitutes "unnecessary and wanton infliction of pain" prohibited by the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Denial of reasonable requests for medical treatment by prison officials is deliberate indifference when it exposes the inmate to "undue suffering or the threat of tangible residual injury" Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987).

Deliberate indifference may be found if a prison official: has knowledge of the need for medical care yet intentionally refuses to provide it; delays necessary medical treatment for non-medical reasons; prevents an inmate from receiving recommended treatment for serious medical needs; or denies access to a physician capable of evaluating the need for such treatment. See e.g., Monmouth County, 834 F.2d at 346-47; Durmer v. O'Carroll, 991 F.2d 64, 67-68 (3d Cir. 1993) (summary judgment denied where pre-incarceration doctor and neurologist recommended physical therapy for inmate, and reasonable trier of fact could find prison doctor deliberately avoided providing physical therapy). Continuing courses of treatment that the doctor knew were painful, ineffective, or entailed substantial risk of serious harm, may also amount to deliberate indifference. White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

10

A prisoner claiming deliberate indifference to his medical needs must demonstrate that those needs are serious. See Monmouth County, 834 F.2d at 346. A medical need is "serious" if it has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the need for a doctor's attention. Id. at 347. In considering the seriousness of an inmate's medical need, the court may consider the effect of denying the particular treatment. Id. "[W]here denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." Id.

However, even if a prisoner's medical needs are serious, "prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67. A court will not attempt to second-guess the propriety or adequacy of a particular course of treatment if it remains a question of sound professional judgment. Campbell v. Sacred Heart Hospital, 496 F. Supp. 692, 694 (E.D. Pa. 1980) (summary judgment in favor of defendants where, after four days of observation and examination in prison infirmary, plaintiff was released into general prison population without medication, treatment, or any agreement on whether he suffered from narcolepsy). Neither mere medical malpractice nor disagreement as to the proper medical treatment supports an Eighth Amendment claim. Monmouth County, 834 F.2d at 346. "Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim." Norris v. Frame, 585 F.2d 1183, 1186 (3d Cir. 1978); Roach v. Kligman, 412 F. Supp. 521, 525 (E.D. Pa. 1976). Whether additional diagnostic techniques or forms of treatment are required is a matter of medical judgment. Estelle, 429 U.S. at 107.

Systemic lupus is chronic, progressively debilitating, and potentially fatal; known treatments cannot cure the condition, but they may be able to delay its progression. A lupus

11

specialist has diagnosed Baez as having systemic lupus. Defendants would likely cause Baez lasting injury and undue suffering, violating his Eighth Amendment rights, were they to delay treatment needlessly, treat his lupus indifferently, or not treat him at all.

However, defendants are providing Baez with more than minimal treatment for his lupus. Both Dr. Falor and Dr. Jin have made their own primary care investigation of Baez' skin and circulatory complaints. Baez was sent twice to Dr. Seaman for a rheumatology consult, and Dr. Jin has ordered most of the lab work Dr. Seaman prescribed. On Dr. Seaman's recommendation, Dr. Jin arranged for Baez to be seen first by a dermatologist, Dr. Schleicher, and subsequently by a lupus specialist, Dr. Koumpouras of the University of Pittsburgh's Center for Lupus Excellence, who diagnosed Baez as having systemic lupus and possibly Sjogren's syndrome as well. Dr. Jin has stated that he will continue to treat Baez as Dr. Koumpouras recommends, and he will return Baez for a six-month follow-up appointment as Dr. Koumpouras requests.

Internal bleeding, which can be diagnosed through blood in stool, can signal a condition which could be life-threatening if untreated. Both Drs. Falor and Jin investigated Baez' complaints about rectal bleeding. In Dr. Jin's professional opinion, while Baez' present minor level of rectal bleeding merits further investigation, the medical tests he and Dr. Falor ordered did not that establish that a specialty consult with a gastroenterologist or a colonoscopy was required. Only Dr. Seaman, of all of the physicians who have treated Baez, have recommended that he be seen by a gastroenterologist.

Defendants' response to Baez' requests for medical treatment may have been deliberately indifferent because they were needlessly tardy or obstructive; that remains to be determined at trial. There may have been malpractice under state law. However, Baez is presently receiving treatment in excess of the minimum required by the Eighth Amendment.

Baez argues that injunctive relief is warranted because defendants have only raised the quality of the care they are providing in response to this litigation. According to Baez, if the court were to deny injunctive relief, defendants would be at liberty not to treat his conditions adequately. However, until defendants cease treating him adequately, Baez' concerns are speculative. The court may not enjoin defendants from violating Baez' Eighth Amendment rights when they are not violating them currently or threatening to do so.

Baez' request for a preliminary injunction is denied.