IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ORLANDO BAEZ, ) | |
| ) | Civil Action No. 09 - 1149 |
| Plaintiff, ) | |
| ) | District Judge Terrence F. McVerry |
| v. ) | Magistrate Judge Lisa Pupo Lenihan |
| ) | |
| STANLEY FALOR, et al, ) | |
| ) | |
| Defendants. ) | |

# REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that the Motion for Judgment on the Pleadings filed by Defendants Folino and Burks (ECF No. 122) be granted.

## II. REPORT

Plaintiff, Orlando Baez, a capital inmate presently incarcerated at the State Correctional Institution at Greene, located in Waynesburg, Pennsylvania, commenced this civil action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983. The original complaint was filed on November 7, 2006 in the United States District Court for the Eastern District of Pennsylvania and alleges violations of the Eighth Amendment regarding the medical treatment that Plaintiff was provided while he was incarcerated at the State Correctional Institution at Graterford (SCI-Graterford) and the State Correctional Institution at Greene (SCI-Greene). On July 23, 2009, Plaintiff's claims arising from his incarceration at SCI-Greene were transferred to this Court (ECF No. 108). On November 24, 2009, Defendants Folino and Burks filed a Motion for

Judgment on the Pleadings (ECF No. 122). For the reasons set forth below, the Motion should be granted.

## A. Standard of Review

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings within such time as to not delay the trial. Fed. R. Civ. P. 12(c). The standard of review for a motion for judgment on the pleadings is identical to that of the motion to dismiss under Federal Rule 12(b)(6). Turbe v. Gov't of Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991) (citations omitted).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. In deciding this motion, the court must read the complaint in the light most favorable to the plaintiff and all well-pleaded, material allegations in the complaint must be taken as true. Estelle v. Gamble, 429 U.S. 97 (1976). The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn, 373 U.S. 746, 753 n. 6 (1963). A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v.Twombly, 550 U.S. 554, 556 (2007) (rejecting the traditional 12 (b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The court must accept as true all allegations of the complaint and all reasonable factual inferences must be viewed in the light most favorable to the plaintiff. Angelastro v. Prudential-Bache Securities, Inc., 764 F.2d 939, 944 (3d Cir. 1985). "Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic

Corp., 550 U.S. at 555. *See also* Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1951 (U.S. 2009) (holding that, while the Complaint need not contain detailed factual allegations, it must contain more than a "formulaic recitation of the elements" of a constitutional claim and must state a claim that is plausible on its face) (quoting Twombly and providing further guidance on the standard set forth therein).

Courts generally consider the allegations of the complaint, attached exhibits, and matters of public record in deciding motions to dismiss. Pension Benefit Guar. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). Factual allegations within documents described or identified in the complaint also may be considered if the plaintiff's claims are based upon those documents. *Id*. (citations omitted). Moreover, a district court may consider indisputably authentic documents without converting a motion to dismiss into a motion for summary judgment. Spruill v. Gillis, 372 F.3d 218, 223 (3d Cir. 2004); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

## B. Relevant Facts

On January 25, 2007, Prison officials from SCI-Greene filed a motion to transfer claims against them to the Western District of Pennsylvania. The Eastern District of Pennsylvania Court ordered a hearing on a rule to show cause why Plaintiff's claims against all defendants associated with SCI-Greene should not be severed and transferred. Counsel was appointed for Plaintiff and the court deferred decision on transfer of claims against SCI-Greene defendants to provide Plaintiff an opportunity to file a counseled response.

3

On October 17, 2007, Plaintiff filed a motion requesting that he be transferred to SCI-Graterford. The court denied the motion to transfer without prejudice and gave Plaintiff leave to file a counseled amended complaint. On March 24, 2008, Plaintiff filed a motion for an immediate preliminary injunction regarding his medical treatment at SCI-Greene. On May 6 and 7, 2008, the court held evidentiary hearings on Plaintiff's motion for preliminary injunction where Plaintiff, Dr. Jin, and Dr. Falor testified. After the evidentiary hearings, the parties took the deposition of Dr. Seaman and provided a transcript to the court. In June of 2008, the parties submitted proposed findings of fact and conclusions of law.

On July 22, 2008, Plaintiff, though counsel, filed an Amended Complaint (ECF No. 77). After an August, 2008 teledermatology consult with Dr. Schleicher, Plaintiff requested that the court reopen the record for the injunction to admit both Dr. Schleicher's report and Plaintiff's letter complaining about the consult. The court granted Plaintiff's petition and ordered the record opened for supplementary evidentiary submissions through March 6, 2009, to be followed by supplementary briefing by all parties on Plaintiff's motion for injunctive relief. On May 4, 2009, the Court denied Plaintiff's request for preliminary injunctive relief finding that Plaintiff was receiving treatment in excess of the minimum required by the Eighth Amendment (ECF No. 98). On July 23, 2009, Plaintiff's claims arising from his incarceration at SCI-Greene were transferred to this Court (ECF No. 108).

In his counseled Amended Complaint, Plaintiff asserts that Defendant Burks, the DOC Chief Grievance Officer, and Defendant Folino, the Superintendent of SCI-Greene, were responsible for his transfer from SCI-Graterford to SCI-Greene. Plaintiff also claims that Burks delayed her response to his grievances and that this delay caused him to be denied medical care.

He further claims that defendant Folino was aware of his medical condition but failed to refer him to an outside specialist for treatment and accuses Folino of making medical decisions regarding inmate care for non-medical reasons.

Relevant to this Court's review of the pending Motion are the following Findings of Fact made by Judge Shapiro following hearings and submission of evidence in regards to Plaintiff's Motion for Injunctive Relief.

> Baez is a prisoner previously incarcerated at SCI-Graterford and currently incarcerated at SCI-Greene. Defendant Dr. Byunghak Jin, a general surgeon at SCI-Greene, is employed by Prison Health Services. Defendant Dr. Stanley Falor, a general practitioner employed by Prison Health Services, has worked at SCI-Greene since January, 1994. Baez testified Dr. Falor took his complaints seriously and treated him better than the other physicians. Dr. Falor has not been involved in Baez's care since August, 2006.
>
> Baez alleges that since 2004, he has had constant pain in his stomach, chest, and heart. Baez testified he submitted sick call slips to SCI-Greene staff, but they ignored him, laughed, or walked away. The pain medication provided to Baez was ineffective. Dr. Jin acknowledged Baez had complained about stomach and abdominal pain, and ineffectiveness of pain medication, since arriving at SCI-Greene.
>
>     A.    Lupus
>
> After evaluating Baez's symptoms, Dr. Falor referred Baez to Dr. David E. Seaman, a rheumatologist who specializes in lupus. Lupus is a chronic, inflammatory systemic disease that can affect different organs in the body. There are two types of lupus: skin lupus, causing skin rashes, and systemic lupus, affecting the nervous, circulatory, lung and cardiovascular, and gastrointestinal systems. Skin lupus can become systemic lupus. Systemic lupus can be fatal.
>
> There is no single diagnostic test for lupus; diagnosis depends on evaluating a number of symptoms and test results. Symptoms of lupus include: malar rash, discoid rash, photosensitivity, oral ulcers, arthritis, serositis, renal disorder, neurologic disorder, hematologic disorder, immunologic disorder, high anti-double strain DNA level, and high antinuclear antibody level. Lupus has both latent and active stages, and symptoms can appear and recede.

Lupus has no cure, but treatment can slow progression of the disease. Skin lupus is treated with topical creams and oral medication.

Dr. Seaman saw Baez on June 29, 2006, and April 16, 2008. Dr. Seaman was not provided with Baez's medical records prior to the June, 2006 examination, and did not speak with Dr. Falor or Dr. Jin prior to or after examining Baez. Dr. Seaman observed excoriated, or "scabby," lesions on Baez's arms, back, trunk, and legs. In his June 29, 2006, report, Dr. Seaman stated he doubted Baez had systematic lupus but wanted to rule it out; he planned the following:

(1) Will obtain CBC, CR, LFT, TSH, ANA, DNA, ENA, C3, C4-SSA/B, CR, U/A.

(2) X-ray C spine and LS spine.

(3) CT of the abdomen.

(4) Suggest referral to GI, cardiology and dermatology. This will be deferred to Dr. Falor.

(5) Follow-up in one month in the Waynesburg office.

The cervical lumbar x-rays and CT scan of the abdomen were performed. In a July 11, 2006, progress note, Dr. Jin deferred any dermatology, cardiology, or gastrointestinal consult.

Baez was not returned to see Dr. Seaman one month after the first visit. According to the file Dr. Seaman maintained for Baez, "Vicki" from SCI-Greene called Dr. Seaman to schedule a one month follow up visit on July 26, 2006. The visit was rescheduled for September 6, 2006, because Dr. Seaman had ordered a "DES test" for Baez in August. A note in Baez's file stated Vicki from SCI-Greene called to cancel the September 6, 2006, office visit because Baez refused a CT scan. The note stated that if Baez decided to have the CT scan done, the visit would be rescheduled. Baez signed a consent form for a CT scan on September 11, 2006; the CT scan was performed on November 8, 2006. Baez was not returned for a second visit with Dr. Seaman until one and a half years after the CT scan was performed.

Baez's second visit with Dr. Seaman was on April 16, 2008. Dr. Seaman did not have an opportunity to review complete medical records before Baez's second visit. Dr. Seaman did not receive Baez's laboratory results until the second visit. Baez complained of arthralgia, abdominal pain, and heart pains.

6

After examination, Dr. Seaman suspected Baez had subacute cutaneous lupus, or skin lupus. Dr. Seaman wanted Baez to see a dermatologist for further evaluation, because there are multiple forms of skin lupus. At deposition, Dr. Seaman testified he could not state with any certainty that a delay in seeing a dermatologist would cause Baez injury in the future.

Baez's symptoms of a photosensitive skin rash, arthralgia, abnormal double strain DNA test results, high anti-nuclear antibody ("ANA") test results, and positive SS-A / SS-B test results are consistent with lupus. Dr. Seaman testified that as of the medical examination on April, 2008, Baez did not have a malar (butterfly-shaped cheek) rash, which is another symptom of lupus. Dr. Seaman has not received test results for the SS-A and SS-B antibodies, which might support a diagnosis of subacute cutaneous lupus or Sjogren's syndrome. Baez has had a recurring non-malar rash for approximately a year while at SCI-Greene, but has not been seen by a dermatologist at SCIGreene. Dr. Seaman recommended that Baez see a dermatologist for his skin condition.

Dr. Seaman testified at his deposition that he had not determined whether Baez had lupus. After the April, 2008, medical examination, Dr. Seaman received x-rays of Baez; Dr. Seaman did not make any further diagnosis as a result. Dr. Seaman had not yet received SS-A or SS-B antibody tests, to help him determine whether Baez has skin lupus or Sjogren's syndrome. Dr. Seaman suggested a second rheumatology opinion.

Dr. Jin, who does not specialize in lupus, became medical director at SCI-Greene on October 1, 2006. Dr. Jin did not know for certain whether Baez has lupus. Lupus Erythematosis is listed on Baez's "problem list" dated March 22, 2006, and on Baez's progress notes of July 20, 2006. "Systemic lupus" is noted on May 8, 2006. Duplicate testing for lupus on May 8, 2006, returned positive results; anti-double strain DNA and antinuclear antibody tests returned positive; lab reports from March 21, 2006, and May 8, 2006, were positive for double strain DNA; and a lab report from July 8, 2006, showed high antinuclear antibody, elevated ESR, and high anti-double strain DNA results. Dr. Jin noted elevated anti-nuclear antibody and elevated ESR levels in 2008, but stated in an April 23, 2008, letter that "no clinical traits of lupus" were shown.

Dr. Jin first decided not to follow Dr. Seaman's recommendations to refer Baez to gastroenterology and dermatology specialists because he did not agree it was necessary. Dr. Jin concluded Baez did not have lupus because he did not see any symptoms during an April 8, 2008, examination. Baez testified he did not disrobe during examinations by Dr. Jin, and Dr. Jin has never seen Baez's skin, other than his face and head. Dr. Falor agreed with Dr. Jin's initial decision not to send Baez for a dermatology consult after reviewing Baez' medical chart and

because of his familiarity with Dr. Jin. As prison doctors, Dr. Falor and Dr. Jin have been instructed to take cost into consideration when evaluating whether to follow a consultant's recommendation.

Dr. Jin later changed his mind and arranged a dermatology consult for Baez. Baez was seen by Dr. Stephen Schleicher, via teledermatology on August 18, 2008. Dr. Schleicher was not able to detect any rashes but noted that Baez was "belligerent and uncommunicative" during the exam; Baez reportedly said, "I will not communicate unless my lawyer is present." Dr. Schleicher recommended an ANA test every quarter, as well as a lupus band test, but did not state definitively that Baez had systemic lupus or Sjogren's syndrome.

Dr. Jin sent Baez to a second dermatological consult off-site on December 8, 2008. The December 15, 2008 lab report analyzing tests taken during that consult stated that the results were non-specific for lupus or other ANA-related autoimmune disorders. After Dr. Jin forwarded these results to him, Dr. Seaman would not state conclusively that Baez had lupus or any other systemic autoimmune disorder. However, on Dr. Seaman's recommendation, Dr. Jin arranged for Baez to be seen by a rheumatology specialist at the University of Pittsburgh's Lupus Center of Excellence.

On February 20, 2009, Baez was seen by Dr. Fotios Koumpouras at the University of Pittsburgh, who diagnosed him as having systemic lupus, and possibly secondary Sjogren's syndrome. Dr. Koumpouras recommended courses of medication and tests to treat Baez' lupus, as well as his secondary joint pain and dry mouth. Dr. Koumpouras also requested repeat follow-up visits with Baez every six months.

B. Rectal bleeding

Baez complained of rectal pain while at SCI-Greene, but medical staff did not respond to his first sick call slip regarding rectal bleeding. Baez's complaints of rectal bleeding have been documented in progress notes. On June 18, 2007, Baez tested positive for blood in the stool that cannot be detected by the naked eye. Blood in the stool can result from internal bleeding. Dr. Falor testified the hemoccult test showed the extent of Baez's bleeding was not serious because the blood counts did not change appreciably. Dr. Jin conceded further investigation must be done to determine why Baez is experiencing rectal bleeding.

Baez also complained of rectal bleeding during his second visit with Dr. Seaman. Dr. Seaman recommended that Baez see a gastroenterology specialist for the rectal bleeding. Dr. Seaman acknowledges rectal bleeding is unrelated to

> his specialty, and his recommendation for a gastrointestinal consult was not meant to aid in the diagnosis of lupus.
>
> On April 8, 2008, Dr. Jin conducted a rectal exam of Baez, but Baez testified he did not disrobe during the exam. Baez has received no diagnosis or treatment of his rectal bleeding. Appropriate responses to rectal bleeding might include a colonoscopy and a gastrointestinal consult.

Memorandum dated May 4, 2009 (ECF No. 98) (internal citations omitted).

### C. Liability under 42 U.S.C. § 1983

The Plaintiff's Complaint seeks to assert liability against Defendants pursuant to 42 U.S.C. § 1983. To state a claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements. He must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. West v. Atkins, 487 U.S. 42 (1988); Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, Daniels v. Williams, 474 U.S. 327, 330-331 (1986).

To establish personal liability against a defendant in a section 1983 action, that defendant must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior. Rizzo v. Goode, 423 U.S. 362 (1976). Accordingly, individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986). Personal involvement by a defendant can be shown by alleging either personal direction or actual knowledge and acquiescence in a subordinate's actions. Rode, 845 F.2d at 1207. *See also* Keenan v.

Philadelphia, 983 F.2d 459, 466 (3d Cir. 1992); Andrews v. Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990).

Moreover, a supervising public official has no affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates. Notwithstanding, when a supervising official knowingly permits a continuing custom or policy that results in harm to the plaintiff, 1983 liability may attach. Colburn v. Upper Darby Township, 838 F.2d 663, 673 (3d Cir. 1988), *cert. denied*, 489 U.S. 1065 (1989) (Colburn I). However, at a minimum such liability may be imposed "only where there are both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." *Id*. (quoting Chinchello, 805 F.2d at 133). *See also* Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997).

### D. Medical Treatment

The Complaint purports to state a claim for deliberate indifference to serious medical needs in violation of the Eighth and Fourteenth Amendments. In this regard, as a convicted, sentenced prisoner, Plaintiff's claim concerning his medical treatment invokes the protections of the Eighth Amendment. In order to make out a prima facie case that a prison official's actions violate the Eighth Amendment's prohibition against cruel and unusual punishment, an inmate must show two elements. First, a prisoner must show that the condition, either alone or in combination with other conditions, deprived him of "the minimal civilized measure of life's necessities," or at least a "single, identifiable human need." Wilson v. Seiter, 501 U.S. 294 (1991) (citing Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). Second, an inmate must

demonstrate deliberate indifference to prison conditions on the part of prison officials. Farmer v. Brennan, 511 U.S. 825 (1994); Wilson, 501 U.S. at 297; Rhodes, 452 U.S. at 347. "[O]nly the unnecessary and wanton infliction of pain implicates the Eighth Amendment. . . . To violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind.'" Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 297).

The Supreme Court has explained that the first showing requires the court objectively to determine whether the deprivation of the basic human need was "sufficiently serious."

> [E]xtreme deprivations are required to make out a conditions of-confinement claim . . . . Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation.

Hudson v. McMillan, 503 U.S. 8 (1992).

The second prong requires a court subjectively to determine whether the officials acted with a sufficiently culpable state of mind. The Supreme Court has clarified the proper test for determining when correctional officials act with "deliberate indifference."

> . . . [A] prison official cannot be found liable under the Eighth Amendment for denying an in-mate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference . . . . The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments."

Farmer, 511 U. S. at 837.

Thus, the "deliberate indifference" standard for purposes of liability under section 1983 is a stringent standard of fault requiring proof that a defendant disregarded a known or obvious consequence of his action. Board of County Commissioners of Bryan County v. Brown, 520

11

U.S. 397, 410 (1997). The defendant must be both aware of facts from which the inference could be drawn that a substantial harm exists and he must also draw the inference. Farmer, 511 U.S. at 837. An official is not deliberately indifferent if "he fails to alleviate a significant risk that he should have identified." *Id*. Furthermore, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id*. Thus, a prison official may be held liable under the Eighth Amendment only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.

What is required to prove an Eighth Amendment violation "varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992). To state an Eighth Amendment violation in the context of medical treatment, an inmate must prove two elements: 1) plaintiff was suffering from a "serious medical need," and 2) prison officials were deliberately indifferent to the serious medical need. Gamble v. Estelle, 429 U.S. 97 (1978).

The first showing requires the court to objectively determine whether the medical need was "sufficiently serious." A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).

The second prong requires a court subjectively to determine whether the officials acted with a sufficiently culpable state of mind. Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial

of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury. Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993).

Plaintiff's allegations, taken with the record facts, are insufficient to support liability against Defendant Folino as the Superintendent of SCI-Greene. Although Plaintiff alleges that Defendant Folino was aware of his medical concerns, Plaintiff's allegations, construed liberally, do not support a finding that Defendant Folino had any personal involvement in the claims alleged in the Complaint. Moreover, any attempt to allow Plaintiff to amend his complaint against his Defendant Folino would be futile because Defendant Folino does not have any authority to make treatment decisions concerning Plaintiff's medical care. *See* Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993) (warden and commissioner cannot be considered deliberately indifferent by failing to directly respond to a medical complaint by a prisoner who was receiving treatment by the prison doctors). *See also* Ayala v. Terhune, 195 Fed. App'x 87, 91 (3d Cir. 2006) (upholding grant of summary judgment in favor of prison administrators who refused to approve prisoner-plaintiff's colostomy reversal surgery despite outside doctor's recommendation).

In Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004), the Third Circuit reiterated its holding in Durmer.

> . . . If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate

13

treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.

> Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official [] will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference. Thus dismissal of [a prisoner's] claims after the point at which [he] was first under medical care is appropriate because [the prisoner] bears the burden of proving (and hence pleading) facts supporting the defendants' mental states, *see* Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n. 2 (3d Cir. 2001), and he has failed to so plead . . . .

Spruill, 372 F.3d at 236.

Here, the record is clear that Plaintiff has been treated by numerous medical professionals since he was transferred to SCI-Greene. Thus, although Plaintiff alleges some facts that indicate that Defendant Folino may have been aware of his medical concerns, they do not show that he was aware, or should have been aware, of any alleged risk to Plaintiff's health. Thus, Defendant Folino is entitled to judgment on the pleadings as to this claim.

Plaintiff also seeks to assert liability against Defendant Burks due to her involvement in reviewing and/or affirming grievance decisions. First, the filing of a grievance is not sufficient to show the actual knowledge necessary for personal involvement. Rode, 845 F.2d at 1208. Moreover, mere concurrence in a prison administrative appeal process does not implicate a constitutional concern. *See, e.g.*, Boggs v. Olivarez, 2000 WL 1838211 (9th Cir. Dec. 13, 2000) (holding that prison officials did not violate inmate's due process rights by allegedly improperly handling inmate grievances because inmates had no protected liberty interest in the prison grievance procedure); Antonelli v. Sheahan, 81 F.3d 1422, 1431 (7th Cir. 1996) (holding that a state's inmate grievance procedures do not give rise to a liberty interest protected by the Due

Process Clause); Leavitt v. Allen, 46 F.3d 1114 (1st Cir. 1995) (holding that prison regulations which establish a grievance procedure cannot give rise to a liberty interest because they confer only procedural protections, not substantive rights, upon the inmates who may use the grievance procedures; Mann v. Adams, 855 F.2d 639, 640 (9th Cir.) (finding no legitimate claim of entitlement to a prison grievance procedure), *cert. denied*, 488 U.S. 898 (1988); Garfield v. Davis, 566 F. Supp. 1069, 1074 (E.D. Pa. 1983) (holding that administrative review of prison disciplinary hearings is not constitutionally guaranteed and, therefore, plaintiff's claims with respect to the Program Review Committee's decision did not rise to constitutional significance); Harmon v. Divirgilis, 2005 WL 387591 (E.D. Pa. Feb. 16, 2005) (there is no constitutional right to administrative review of prison disciplinary proceedings).

While prisoners have a constitutional right to seek redress of their grievances from the government, that right is the right of access to the courts, which is not compromised by the failure of the prison to address his grievances. Wilson v. Horn, 971 F.Supp. 943, 947 (E.D. Pa. 1997), *aff'd*, 142 F.3d 430 (3d Cir. 1988) (Table).

Here, Plaintiff attempts to assert liability against Defendant Burks by claiming that her delayed response to his grievance appeals interfered with his ability to obtain adequate medical treatment. The factual record in this case clearly shows that Burks' response time in answering Plaintiff's grievance had no impact at all on his medical care. Plaintiff received constant care and attention to the extent that he allowed the prescribed treatment and tests to be performed. (In fact, it is quite doubtful he could have received better treatment had he not been incarcerated.) There is no "delay" in his treatment that corresponds to the time it took Plaintiff to receive responses to his grievances. Moreover, the record shows that, on several occasions, resolution of

his grievances was remanded for further investigation by personnel other than Burks, thus delaying any response from her on final appeal. There simply is nothing to suggest that Burks had any involvement at all, nor any authority over Plaintiff's medical care. Thus, she is entitled to judgment on the pleadings as to this claim.

### E. Transfer

Plaintiff also seeks to allege liability against Defendant Burks and Folino for allegedly causing him to be transferred to SCI-Greene in retaliation for his right to petition the government for redress of grievances. It is well settled that retaliation for the exercise of a constitutionally protected right may violate the protections of the First Amendment, which is actionable under section 1983. Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001); White v. Napoleon, 897 F.2d 103, 112 (3d Cir. 1990). However, merely alleging the fact of retaliation is insufficient; in order to prevail on a retaliation claim, a plaintiff must show three things: (1) the conduct which led to the alleged retaliation was constitutionally protected; (2) that he was subjected to adverse actions by a state actor (here, the prison officials); and (3) the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. *See* Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997).

With respect to the first factor, it is well settled that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right. Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000). Accordingly, a prisoner litigating a retaliation claim need not prove that he had an independent liberty interest in the privileges he

was denied. Rauser, 241 F.3d at 333. Rather, the first requirement a Plaintiff must show is that the conduct which led to the alleged retaliation was constitutionally protected. *Id*.

A prisoner's ability to file grievances and lawsuits against prison officials is a protected activity for purposes of a retaliation claim. *See* Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d Cir. 1981) (retaliation for exercising right to petition for redress of grievances states a cause of action for damages arising under the constitution); Woods, 60 F.3d at 1165 (prison officials may not retaliate against an inmate for complaining about a guard's misconduct). Plaintiff claims that the retaliation was the result of his filing grievances and complaints. Thus, he has alleged the first element of a retaliation claim.

The second element requires a prisoner to show that he suffered some "adverse action" at the hands of the prison officials. A plaintiff can satisfy the second requirement by demonstrating that the "adverse" action "was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." *See* Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000). Adverse actions that are sufficient to support a retaliation claim include filing false misconduct reports, Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), transferring a prisoner to another prison, Rauser, 241 F.3d at 333, and placing a prisoner in administrative custody, Allah, 229 F.3d at 225.

The third factor requires that there be a causal link between the exercise of the constitutional right and the adverse action taken against the prisoner. Rauser, 241 F.3d at 333-34. This may be established by evidence of a temporal proximity between the prisoner's protected activity and the defendant's adverse action; however, the timing of the alleged retaliatory action must be suggestive of retaliatory motive.

If the plaintiff proves these three elements, the burden shifts to the state actor to prove that it would have taken the same action without the unconstitutional factors. Mt. Healthy, 429 U.S. at 287. "This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334.

In establishing the elements of a retaliation claim, a plaintiff must come forward with more than "general attacks" upon the defendant's motivations and must produce "affirmative evidence" of retaliation from which a jury could find that the plaintiff had carried his burden of proving the requisite motive. Crawford-El v. Britton, 523 U.S. 574, 600 (1998) (internal citations omitted). Because retaliation claims can be easily fabricated, district courts must view prisoners' retaliation claims with sufficient skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner. *See* Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied*, 516 U.S. 1084 (1996); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). Finally, allegations of *de minimis* acts of retaliation do not state a claim under § 1983. Thaddeus-X v. Blatter, 175 F.3d 378, 397 (6th Cir. 1999); Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001).

Here, there is no allegation or evidence to suggest that either Defendant Folino or Burks had any involvement whatsoever in the decision to transfer him from Graterford to Greene. Male capital inmates such as Plaintiff are housed only Graterford or Greene. The record shows that Plaintiff has a separation on record from SCI-Graterford (ECF No. 137-16, p. 4). Thus, the

only place he can be housed is at SCI-Greene. Nothing suggests that either Folino or Burks was involved in any way with the separation. Consequently, Defendants Folino and Burks are entitled to judgment as a matter of law with respect to Plaintiff's claims against them.

## III. CONCLUSION

It is respectfully recommended that the Motion for Judgment on the Pleadings filed by Defendants Folino and Burks (ECF No. 122) be granted.

In accordance with the applicable provisions of the Magistrate Judges Act [28 U.S.C. § 636(b)(1)(B) & (C)] and the Local Rules of Court, the parties shall have fourteen days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen days from the date on which the objections are served to file its response. A party's failure to file timely objections will constitute a waiver of that party's appellate rights. Brightwell v. Lehman, 637 F.3d 187, 193, n.7 (3d Cir. 2011).

Dated: September 21, 2011

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Cc: Orlando Baez
 CB - 3721
 175 Progress Drive
 SCI GREENE
 Waynesburg, PA 15370