# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ORLANDO BAEZ, | ) | |
| | ) | Civil Action No. 09 – 1149 |
| Plaintiff, | ) | |
| | ) | District Judge Terrence F. McVerry |
| v. | ) | Chief Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| STANLEY FALOR, *et al.*, | ) | ECF Nos. 193, 233, 234 |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This case is before the Court on Defendants' Motion for Summary Judgment (ECF No. 193), Plaintiff's Motion for Emergency Medical Care (ECF No. 233), and Plaintiff's Motion to Compel (ECF No. 234). For the reasons that follow, Defendants' Motion will be granted and Plaintiff's Motions will be denied.

## I.    PROCEDURAL HISTORY

Plaintiff, Orlando Baez, a capital inmate presently incarcerated at the State Correctional Institution at Greene ("SCI-Greene") located in Waynesburg, Pennsylvania, commenced this civil action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983. The original complaint was filed on November 7, 2006 in the United States District Court for the Eastern District of Pennsylvania and alleged violations of the Fourteenth and Eighth Amendments regarding the medical treatment that Plaintiff was provided while he was incarcerated at the State Correctional Institution at Graterford ("SCI-Graterford") and SCI-Greene. (ECF No. 6.) On January 25, 2007, prison officials from SCI-Greene filed a motion to transfer claims against them to the

Western District of Pennsylvania.  (ECF No. 14.)  The Eastern District of Pennsylvania ordered a hearing on a rule to show cause as to why Plaintiff's claims against all Defendants associated with SCI-Greene should not be severed and transferred.  (ECF No. 31.)  Counsel was appointed for Plaintiff and the court deferred decision on transfer of claims against SCI-Greene Defendants to provide Plaintiff an opportunity to file a counseled response.  (ECF Nos. 37, 38.)

On October 17, 2007, Plaintiff filed a motion requesting that he be transferred to SCI-Graterford.  (ECF No. 40).  The court denied the motion to transfer without prejudice and gave Plaintiff leave to file a counseled amended complaint.  (ECF No. 53.)  On March 24, 2008, Plaintiff filed a motion for an immediate preliminary injunction relating to the medical care he was receiving at SCI-Greene.  (ECF No. 61.)  On May 6 and 7, 2008, the court held evidentiary hearings on Plaintiff's motion for preliminary injunction where Plaintiff, Dr. Byunghak Jin, and Dr. Stanley Falor testified.  (ECF Nos. 69, 70, 72, 73.)  After the evidentiary hearings, the parties took the deposition of Dr. Seaman and provided a transcript to the court.  In June 2008, the parties submitted proposed findings of fact and conclusions of law.  (ECF Nos. 74, 75.)

On July 22, 2008, Plaintiff, through counsel, filed an Amended Complaint.  (ECF No. 77.)  After an August 2008 teledermatology consult with Dr. Stephen Schleicher, Plaintiff requested that the court reopen the record for injunction to admit both Dr. Schleicher's report and Plaintiff's letter complaining about the consult.  The court granted Plaintiff's request and ordered the record opened for supplementary evidentiary submissions to be followed by supplementary briefing by all parties.  (ECF No. 89.)  On May 4, 2009, the Honorable Norma Shapiro denied Plaintiff's request for preliminary injunctive relief finding that Plaintiff was receiving treatment in excess of the minimum required by the Eighth Amendment.  (ECF No. 98.)  On July 23, 2009, Plaintiff's claims arising from his incarceration at SCI-Greene were transferred to this Court.

(ECF No. 108.)   Specifically, Plaintiff's claims against the following Defendants were transferred: Louis Folino, Superintendent of SCI-Greene ("Folino"); Dr. Stanley Falor ("Dr. Falor");[1] Diane Manson, CHCA ("Manson");[2] Shirley Hickman, PA-C ("Hickman"); Dr. Abimbola Talabi ("Dr. Talabi"); Sharon Burks, Chief Grievance Appeals Officer ("Burks"); Dr. Byunghak Jin ("Dr. Jin"); Debra Gress, CRNP ("Gress"); Michelle Howard-Diggs, PA-C ("Diggs"); and Prison Health Services ("PHS").[3]  (ECF Nos. 108, 111.)

Defendants Folino and Burks filed a Motion for Judgment on the Pleadings (ECF No. 122), which this Court granted on November 8, 2011 (ECF No. 219).   The remaining Defendants, excluding Defendant Mason, filed a Motion for Summary Judgment on September 6, 2011.  (ECF No. 193.)  A Brief in support of the Motion for Summary Judgment (ECF No. 206) and Concise Statement of Material Facts (ECF No. 204) with Appendix (ECF No. 205) were filed on September 28, 2011.  A Supplemental Appendix (ECF No. 209) was filed on October 12, 2011 and a Supplement to the Motion for Summary Judgment (ECF No. 216) was filed on October 29, 2011.  Plaintiff filed an Appendix in Opposition to Defendants' Motion for Summary Judgment on January 20, 2012.  (ECF No. 220.)  Defendants elected to file a Reply Brief (ECF No. 227) and Plaintiff filed a Sur-Reply Brief on June 6, 2012 (ECF No. 232).  The Motion for Summary Judgment is now ripe for review.

---

[1]      Dr. Falor is deceased and was dismissed as a Defendant in this matter on February 9, 2011.

[2]      Diane Manson has never been properly served.  As such, the pending Motion for Summary Judgment does not pertain to her.

[3]      An examination of Judge Shapiro's order of transfer shows that it did not include PHS; however, the Court believes this was inadvertent as they are clearly a proper Defendant in this case.

## II.   BACKGROUND

**A.   Findings of Fact made by Judge Shapiro with regard to Plaintiff's Motion for Preliminary Injunction, Eastern District of Pennsylvania Case No. 06-4923**

Relevant to this Court's review of the pending Motion for Summary Judgment are the following Findings of Fact made by Judge Shapiro on May 4, 2009, following hearings and submission of evidence in regards to Plaintiff's motion for injunctive relief filed in the United States District Court for the Eastern District of Pennsylvania.

Baez is a prisoner previously incarcerated at SCI-Graterford and currently incarcerated at SCI-Greene. Defendant Dr. Byunghak Jin, a general surgeon at SCI-Greene, is employed by Prison Health Services. Defendant Dr. Stanley Falor, a general practitioner employed by Prison Health Services, has worked at SCI-Greene since January, 1994. Baez testified Dr. Falor took his complaints seriously and treated him better than the other physicians. Dr. Falor has not been involved in Baez's care since August, 2006.

Baez alleges that since 2004, he has had constant pain in his stomach, chest, and heart. Baez testified he submitted sick call slips to SCI-Greene staff, but they ignored him, laughed, or walked away. The pain medication provided to Baez was ineffective. Dr. Jin acknowledged Baez had complained about stomach and abdominal pain, and ineffectiveness of pain medication, since arriving at SCI-Greene.

A. Lupus

After evaluating Baez's symptoms, Dr. Falor referred Baez to Dr. David E. Seaman, a rheumatologist who specializes in lupus. Lupus is a chronic, inflammatory systemic disease that can affect different organs in the body. There are two types of lupus: skin lupus, causing skin rashes, and systemic lupus, affecting the nervous, circulatory, lung and cardiovascular, and gastrointestinal systems. Skin lupus can become systemic lupus. Systemic lupus can be fatal.

There is no single diagnostic test for lupus; diagnosis depends on evaluating a number of symptoms and rest results. Symptoms of lupus include: malar rash, discoid rash, photosensitivity, oral ulcers, arthritis, serositis, renal disorder, neurologic disorder, hematologic disorder, immunologic disorder, high anti-double strain DNA level, and high antinuclear antibody level. Lupus has both latent and active stages, and symptoms can appear and recede.

Lupus has no cure, but treatment can slow progression of the disease. Skin lupus is treated with topical creams and oral medication.

Dr. Seaman saw Baez on June 29, 2006, and April 16, 2008. Dr. Seaman was not provided with Baez's medical records prior to the June, 2006 examination, and did not speak with Dr. Falor or Dr. Jin prior to or after examining Baez. Dr. Seaman observed excoriated, or "scabby," lesions on Baez's arms, back, trunk, and legs. In his June 29, 2006, report, Dr. Seaman stated he doubted Baez had systemic lupus but wanted to rule it out; he planned the following:

(1) Will obtain CBC, CR, LFT, TSH, ANA, DNA, ENA, C3, C4-SSA/B, CR, U/A.

(2) X-ray C spine and LS spine.

(3) CT of the abdomen.

(4) Suggest referral to GI, cardiology and dermatology. This will be deferred to Dr. Falor.

(5) Follow-up in one month in the Waynesburg office.

The cervical lumbar x-rays and CT scan of the abdomen were performed. In a July 11, 2006, progress note, Dr. Jin deferred any dermatology, cardiology, or gastrointestinal consult.

Baez was not returned to see Dr. Seaman one month after the first visit. According to the file Dr. Seaman maintained for Baez, "Vicki" from SCI-Greene called Dr. Seaman to schedule a one month follow up visit on July 26, 2006. The visit was rescheduled for September 6, 2006, because Dr. Seaman had ordered a "DES test" for Baez in August. A note in Baez's file stated Vicki from SCI-Greene called to cancel the September 6, 2006, office visit because Baez refused a CT scan. The note stated that if Baez decided to have the CT scan done, the visit would be rescheduled. Baez signed a consent form for a CT scan on September 11, 2006; the CT scan was performed on November 8, 2006. Baez was not returned for a second visit with Dr. Seaman until one and a half years after the CT scan was performed.

Baez's second visit with Dr. Seaman was on April 16, 2008. Dr. Seaman did not have an opportunity to review complete medical records before Baez's second visit. Dr. Seaman did not receive Baez's laboratory results until the second visit. Baez complained of arthralgia, abdominal pain, and heart pains.

5

After examination, Dr. Seaman suspected Baez had subacute cutaneous lupus, or skin lupus.  Dr. Seaman wanted Baez to see a dermatologist for further evaluation, because there are multiple forms of skin lupus.  At deposition, Dr. Seaman testified he could not state with any certainty that a delay in seeing a dermatologist would cause Baez injury in the future.

Baez's symptoms of a photosensitive skin rash, arthralgia, abnormal double strain DNA test results, high anti-nuclear antibody ("ANA") test results, and positive SS-A / SS-B test results are consistent with lupus.  Dr. Seaman testified that as of the medical examination on April, 2008, Baez did not have a malar (butterfly-shaped cheek) rash, which is another symptom of lupus.  Dr. Seaman has not received test results for the SS-A and SS-B antibodies, which might support a diagnosis of subacute cutaneous lupus or Sjogren's syndrome. Baez has had a recurring non-malar rash for approximately a year while at SCI-Greene, but has not been seen by a dermatologist at SCI-Greene.  Dr. Seaman recommended that Baez see a dermatologist for his skin condition.

Dr. Seaman testified at his deposition that he had not determined whether Baez had lupus.  After the April, 2008, medical examination, Dr. Seaman received x-rays of Baez; Dr. Seaman did not make any further diagnosis as a result.  Dr. Seaman had not yet received SS-A or SS-B antibody tests, to help him determine whether Baez has skin lupus or Sjogren's syndrome.  Dr. Seaman suggested a second rheumatology opinion.

Dr. Jin, who does not specialize in lupus, became medical director at SCI-Greene on October 1, 2006.  Dr. Jin did not know for certain whether Baez has lupus.  Lupus Erytheumatosis is listed on Baez's "problem list" dated March 22, 2006, and on Baez's progress notes of July 20, 2006.  "Systemic lupus" is noted on May 8, 2006.  Duplicate testing for lupus on May 8, 2006, returned positive results; anti-double strain DNA and antinuclear antibody tests returned positive; lab reports from March 21, 2006, and May 8, 2006, were positive for double strain DNA; and a lab report from July 8, 2006, showed high antinuclear antibody, elevated ESR, and high anti-double strain DNA results.  Dr. Jin noted elevated anti-nuclear anti-body and elevated ESR levels in 2008, but stated in an April 23, 2008, letter that "no clinical traits of lupus" were shown.

Dr. Jin first decided not to follow Dr. Seaman's recommendations to refer Baez to gastroenterology and dermatology specialists because he did not agree it was necessary.  Dr. Jin concluded Baez did not have lupus because he did not see any symptoms during an April 8, 2008, examination.  Baez testified he did not disrobe during examinations by Dr. Jin, and Dr. Jin has never seen Baez's skin, other than his face and head.  Dr. Falor agreed with Dr. Jin's initial decision not to send Baez for a dermatology consult after reviewing Baez's medical chart and because of his familiarity with Dr. Jin.  As prison doctors, Dr. Falor and Dr. Jin

have been instructed to take cost into consideration when evaluating whether to follow a consultant's recommendation.

Dr. Jin later changed his mind and arranged a dermatology consult for Baez. Baez was seen by Dr. Stephen Schleicher, via teledermatology on August 18, 2008. Dr. Schleicher was not able to detect any rashes but noted that Baez was "belligerent and uncommunicative" during the exam; Baez reportedly said, "I will not communicate unless my lawyer is present." Dr. Schleicher recommended an ANA test every quarter, as well as a lupus band test, but did not state definitively that Baez had systemic lupus or Sjogren's syndrome.

Dr. Jin sent Baez to a second dermatological consult off-site on December 8, 2008. The December 15, 2008 lab report analyzing tests taken during that consult stated that the results were non-specific for lupus or other ANA-related autoimmune disorders. After Dr. Jin forwarded these results to him, Dr. Seaman would not state conclusively that Baez had lupus or any other systemic autoimmune disorder. However, on Dr. Seaman's recommendation, Dr. Jin arranged for Baez to be seen by a rheumatology specialist at the University of Pittsburgh's Lupus Center of Excellence.

On February 20, 2009, Baez was seen by Dr. Fotios Koumpouras at the University of Pittsburgh, who diagnosed him as having systemic lupus, and possibly secondary Sjogren's syndrome. Dr. Koumpouras recommended courses of medication and tests to treat Baez's lupus, as well as his secondary joint pain and dry mouth. Dr. Koumpouras also requested repeat follow-up visits with Baez every six months.

B. Rectal bleeding

Baez complained of rectal pain while at SCI-Greene, but medical staff did not respond to his first sick call slip regarding rectal bleeding. Baez's complaints of rectal bleeding have been documented in progress notes. On June 18, 2007, Baez tested positive for blood in the stool that cannot be detected by the naked eye. Blood in the stool can result from internal bleeding. Dr. Falor testified the hemoccult test showed the extent of Baez's bleeding was not serious because the blood counts did not change appreciably. Dr. Jin conceded further investigation must be done to determine why Baez is experiencing rectal bleeding.

Baez also complained of rectal bleeding during his second visit with Dr. Seaman. Dr. Seaman recommended that Baez see a gastroenterology specialist for the rectal bleeding. Dr. Seaman acknowledges rectal bleeding is unrelated to his specialty, and his recommendation for gastrointestinal consult was not meant to aid the diagnosis of lupus.

On April 8, 2008, Dr. Jin conducted a rectal exam of Baez, but Baez testified he did not disrobe during the exam. Baez has received no diagnosis or treatment of his rectal bleeding. Appropriate responses to rectal bleeding might include a colonoscopy and a gastrointestinal consult.

Memorandum dated May 4, 2009 (ECF No. 98) (internal citations omitted).

## B.   Summary of Plaintiff's Medical Records

In addition to the above recitation of facts, the following is a summary of Plaintiff's medical records by year since arriving at SCI-Greene.

### 1.   2005

On the day Plaintiff arrived at SCI-Greene, April 28, 2005, he was examined and placed on the sick call list to be seen by a physician's assistant. Plaintiff stated that he had chronic abdominal pain since December 2004 and that he had a biopsy performed a month earlier but did not know the results. (ECF No. 209-1 at 4.) Throughout the months of April and May, Plaintiff complained of chest and abdominal pain. He was seen by numerous nurses and physician's assistants, including Defendants Hickman and Diggs, and prescribed medication for his pain such as Motrin and Feldene. (ECF No. 209-1 at 1-4; No. 205-6 at 33-34, 47-50.) They also ordered an EKG, chest x-ray, and blood studies, which all returned normal. (ECF No. 205-5 at 15-16, 33.) Plaintiff was examined by Dr. Talabi on May 31, 2005. (ECF No. 205-6 at 47-48.) Plaintiff reported continuous chest and abdominal pain but Dr. Talabi found no significant abnormalities. (ECF No. 205-6 at 47-48.) He did, however, order DP II, Erythrocyte Sedimentation Rate ("ESR"), and reactive protein tests as well as an EKG and a repeat EKG. (ECF No. 205-5 at 32.) Dr. Talabi also saw Plaintiff for non-specific abdominal pain on June 9, 2005. (ECF No. 205-6 at 46.) He reviewed Plaintiff's lab results, which showed no significant

findings except for an elevated ESR, and a repeat test was ordered.  (ECF No. 205-5 at 46; 205-6 at 32.)

Throughout June and July, Plaintiff continued to complain of pain and was seen by Hickman on numerous occasions who observed Plaintiff to be in no acute distress.  (ECF No. 205-6 at 42-46.)  His chart was reviewed by Dr. Falor on June 26, 2005, and it was noted that Plaintiff's EKG was within normal limits and that his pain was non-specific.  (ECF No. 205-6 at 45.)  Lab tests were ordered to be repeated in September.  (ECF No. 205-5 at 31.)  Plaintiff was seen by Dr. Falor again on July 27, 2005, and Dr. Falor's assessment was puzzling pain along the milk line.  (ECF No. 205-6 at 41-42.)  He ordered lab work to measure Plaintiff's serum prolactin levels, which returned within normal limits.  (ECF No. 205-5 at 31.)

Plaintiff was seen by Hickman, Diggs, and physician's assistant Nancy Zeigler numerous times in the month of August.  (ECF No. 205-6 at 39-40.)  Again, he was observed to be in no acute distress but complained of the same chest and abdominal pain.  (ECF No. 205-6 at 39-40.)  Plaintiff's chart was forwarded to Dr. Falor, who saw Plaintiff on August 25, 2005.  (ECF No. 205-6 at 39.)  Dr. Falor conducted an examination and found pain and tenderness along Plaintiff's vestigial milk line.  (ECF No. 205-6 at 39.)  He was going to research this finding and he ordered Plaintiff Ultram for his pain.  (ECF No. 205-5 at 30; 205-6 at 39.)  Several days later, Plaintiff complained that he was still in pain despite taking Ultram but he was advised by Diggs to continue with his medication.  (ECF No. 205-6 at 39.)

On September 6, 2005, Plaintiff was examined by Dr. Talabi.  (ECF No. 205-6 at 38.)  His assessment was non-specific pain and he noted that he was going to discuss the case with Dr. Falor.  (ECF No. 205-6 at 38.)  Dr. Talabi also saw Plaintiff on September 15, 2005.  (ECF No. 205-6 at 37.)  Plaintiff complained of pain along the nipple line, and Dr. Talabi's assessment was

9

chronic chest and abdominal pain.  (ECF No. 205-6 at 37.)  Dr. Talabi discontinued the Ultram and ordered Phenylgesic pain medication.  (ECF No. 205-5 at 30.)  Plaintiff later complained to Hickman that neither the Phenylgesic nor Ultram relieved his pain and that they both caused digestive complications.  (ECF No. 205-6 at 37.)  She ordered serum protein electrophoresis and urine microalbumin tests.  (ECF No. 205-5 at 29.)

In October, Plaintiff complained of skin lesions.  (ECF No. 205-6 at 36.)  He saw Diggs on October 4, 2005, who observed multiple hyperpigmented areas on Plaintiff's torso.  (ECF No. 205-6 at 36.)  Her assessment was dermatitis and she ordered Diprosone cream.  (ECF No. 205-5 at 29; No. 205-6 at 36.)  On October 11, 2005, Plaintiff was informed that additional testing would be required because his lab results reported elevated protein levels.  (ECF No. 205-6 at 35.)  On October 18, 2005, Plaintiff reported to Gress that his chest, heart, and stomach still hurt and that the Phenylgesic pain medication failed to help and caused him more pain.  (ECF No. 205-6 at 34-35.)  Gress noted his elevated protein and globulin levels as well as elevated ESR of unknown etiology.  (ECF No. 205-6 at 34.)  She discontinued the Phenylgesic and waited for the results of Plaintiff's protein electrophoresis results.  (ECF No. 205-5 at 29; No. 205-6 at 34.)  Plaintiff's lab results returned on October 24, 2005, and he was placed on the sick call list to discuss the results.  (ECF No. 205-5 at 28; No. 205-6 at 34.)  Hickman ordered x-rays of the skull, spine, and pelvis, all of which returned as normal except for the lumbosacral spine which showed some straightening but otherwise appeared normal.  (ECF No. 205-5 at 13-14, 28.)

Plaintiff was seen by Dr. Falor on November 17, 2005.  (ECF No. 205-6 at 32-33.)  Plaintiff reported that the Phenylgesic upset his stomach and that nothing had relieved his pain.  (ECF No. 205-6 at 32.)  He also reported that the worse pain was located where a biopsy had been performed in March at SCI-Graterford.  (ECF No. 205-6 at 32.)  Plaintiff stated that he had

10

skin bumps all over his chest, back, arms, and thighs but that they had gradually disappeared. (ECF No. 205-6 at 33.)  Dr. Falor found a firm raised scar on the left milk line with darker pigmentation and multiple red follicules over Plaintiff's body.  (ECF No. 205-6 at 33.)  He noted Plaintiff's elevated protein and globulin levels and their unknown etiology.  (ECF No. 205-6 at 33.)  He felt that Plaintiff had folliculitis and a painful scar from the biopsy surgery.  (ECF No. 205-6 at 33.)  He ordered Vicodin, Doxycycline, and Erythromy cream.  (ECF No. 205-5 at 28.) Dr. Falor referred Plaintiff to Dr. Jin for continuity of care and follow-up and noted that he was going to speak to Dr. Jin regarding a possible biopsy of Plaintiff's scar.  (ECF No. 205-5 at 28; No. 205-6 at 31, 33.)

Plaintiff continued to complain of chest and abdominal pain when he was seen by Hickman later that month.  (ECF No. 205-6 at 31.)  He was examined by Dr. Jin on November 28, 2005.  (ECF No. 205-6 at 30-31.)  Dr. Jin explained that Plaintiff most likely had a hyper-sensitive scar from the March biopsy that showed benign fibrofatty tissue and he questioned whether Plaintiff's pain was real or phantom.  (ECF No. 205-6 at 30-31.)  He offered to perform a Re-excision of the affected area with subsequent steroid injections to relieve Plaintiff's discomfort but Plaintiff refused stating that he did not trust Dr. Jin to do anything for him.  (ECF No. 205-6 at 30.)  Dr. Jin then planned to follow-up with Plaintiff in two months concerning his complaints of chest and stomach pain and noted that Plaintiff's medical visits would be limited to monitoring his complaints unless something changed.  (ECF No. 205-6 at 30.)

Throughout December, Plaintiff submitted sick call slips for the same chest and abdominal pain.  (ECF No. 205-6 at 27-29.)  His chart was reviewed by Hickman and Diggs on several occasions who noted that Plaintiff's symptoms had not changed and he was seen by Gress who attempted to explain Plaintiff's condition, findings, and treatment plan.  (ECF No.

205-6 at 27-29.)  Plaintiff was informed that he would be seen by Dr. Jin in the new-year.  (ECF No. 205-5 at 27; No. 205-6 at 27.)

### 2.  2006

Plaintiff continued to complain of the same pain in January and he was seen by Diggs on several occasions before being seen by Dr. Jin on January 25, 2006.  (ECF No. 205-6 at 25-26.)  Dr. Jin examined Plaintiff and again discussed steroid injections to relieve Plaintiff's pain.  (ECF No. 205-6 at 25.)   Plaintiff initially agreed but refused the injections when Dr. Jin went to perform them on February 1, 2006.  (ECF No. 205-5 at 3, 27; No. 205-6 at 24-25.)  On February 9, 2006, Dr. Falor was able to palpate a cord of tissue around Plaintiff's milk line but he could find no cases with this type of issue in his research.  (ECF No. 205-6 at 24.)  Plaintiff reported no relief from any prescribed pain medications.  (ECF No. 205-6 at 24.)  Dr. Falor was going to perform more research and consider Indocin for the pain, which was ordered by Diggs on February 17, 2006.  (ECF No. No. 205-5 at 26; 205-6 at 24.)

Plaintiff was seen by Dr. Talabi on February 28, 2006.  (ECF No. 205-6 at 23.)  Dr. Talabi noted Plaintiff's most recent lab results and ordered additional testing, including an anti-nuclear antibody ("ANA") test.  (ECF No. 205-5 at 26; No. 205-6 at 23.)   He also ordered Naprosyn.  (ECF No. 205-5 at 26.)  Dr. Talabi saw Plaintiff again on March 14, 2006.  (ECF No. 205-6 at 20-21.)  He noted Plaintiff's prolactin, protein, and globulin levels; sedimentation rate; and the results of his ANA test and decided to order a H. Pylori antibody test.  (ECF No. 205-5 at 25; No. 205-6 at 20-21.)   After speaking with Dr. Talabi, Dr. Falor ordered an anti-double stranded DNA ("anti-dsDNA") test in place of the H. Pylori antibody test.  (ECF No. 205-5 at 25; No. 205-6 at 20.)

On March 20, 2006, Plaintiff requested different or more pain medication because the Naprosyn was not working.  (ECF No. 205-6 at 19.)  Dr. Talabi reviewed Plaintiff's chart and noted that there were no objective findings to support Plaintiff's chest and abdominal complaints. (ECF No. 205-6 at 18-19.)  He noted Plaintiff's lab results and ordered a chest x-ray and numerous medications, including Pepto-Bismol, Tetracycline, Metronidazole, and Prilosec. (ECF No. 205-5 at 25; No. 205-6 at 18-19.)  A chest x-ray was performed, which returned normal, but one view could not be obtained.  (ECF No. 205-5 at 12.)  Plaintiff later refused the Prilosec and Metronidazole, and he requested an increase in his pain medication because the Naprosyn was ineffective.  (ECF No. 205-6 at 17-18.)

Plaintiff was seen by Dr. Falor on April 6, 2006.  (ECF No. 205-6 at 16-17.)  Dr. Falor noted that the anti-dsDNA and ANA tests reported positive for a possible diagnosis of Lupus and Plaintiff reported that his niece had Lupus.  (ECF No. 205-6 at 16-17.)  Dr. Falor saw Plaintiff for a follow-up on April 19, 2006.  (ECF No. 205-6 at 15.)  Plaintiff reported that he did not get relief from the Naprosyn.  (ECF No. 205-6 at 15.)  Dr. Falor ordered a rheumatology consult. (ECF No. 205-5 at 24; No. 205-6 at 15.)  Several days later, Diggs ordered a repeat anti-dsDNA test and Gress ordered Ultram for Plaintiff's pain.  (ECF No. 205-5 at 24.)  Shortly thereafter, Plaintiff refused the Ultram, claiming that it made his condition worse and, as such, it was discontinued.  (ECF No. 205-5 at 24; No. 205-6 at 14.)

Plaintiff's repeated anti-dsDNA test also returned positive for a possible diagnosis of Lupus.  (ECF No. 205-6 at 14.)  Plaintiff was seen by Dr. Falor on May 16, 2006, and he ordered a trial of Methadone pain medication.  (ECF No. 205-6 at 13.)  Dr. Falor informed Plaintiff that the rheumatology consult had been approved and he was going to follow-up with Plaintiff after the consultation.  (ECF No. 205-6 at 13.)  Prior to the consultation, however, Plaintiff continued

13

to complain of pain and he was seen by Gress, Dr. Falor, and Dr. Jin on numerous occasions. (ECF No. 205-6 at 11-12.)  They advised that they would try to follow the rheumatologist's recommendations after Plaintiff's consultation.  (ECF No. 205-6 at 12.)  Plaintiff had an EKG and lateral x-ray performed on May 26, 2006.  (ECF No. 205-5 at 23.)  The EKG returned as non-specific and the chest x-ray returned normal.  (ECF No. 205-5 at 11; No. 205-6 at 11.)

On June 8, 2006, Plaintiff complained to Dr. Falor that his cell was dusty and that he had pain that radiated down his back.  (ECF No. 205-6 at 11.)  Dr. Falor noted that Plaintiff had been on numerous medications and that his pain was unresponsive to non-narcotics.  (ECF No. 205-6 at 10-11.)  He also noted that Plaintiff had refused steroid injections.  (ECF No. 205-6 at 11.)  He ordered Salsalate, Ranitidine, and Lioresal.  (ECF No. 205-5 at 23.)  On June 14, 2006, Plaintiff told Diggs that the medication Dr. Falor gave him for his neck and spine pain helped but did not do anything for his "Lupus."  (ECF No. 205-6 at 10.)  He was encouraged to speak frankly about his symptoms and concerns to the rheumatologist.  (ECF No. 205-6 at 10.)  Plaintiff requested different pain medication when he was seen by Gress on June 19 and 21, 2006.  (ECF No. 205-6 at 9-10.)  She noted that Plaintiff was soon to be seen by the rheumatologist, with whom he was encouraged to address the lack of success he had been having with pain medication.  (ECF No. 205-6 at 9-10.)

Plaintiff was seen by rheumatologist, Dr. David Seaman on June 29, 2006.  (ECF No. 205-5 at 9; No. 205-6 at 9.)  In his report, Dr. Seaman noted that no outside records were available for his review and that Plaintiff was "a somewhat poor historian." (ECF No. 205-5 at 9.)  Plaintiff told Dr. Seaman of his constant pain since December 2004, and he also stated that he had a recurrent rash on his arms, legs, buttocks, and groin area that worsened with sun exposure.  (ECF No. 205-5 at 9.)  Plaintiff also complained of dry mouth and chronic back and

14

neck pain that worsened with activity and improved with rest.  (ECF No. 205-5 at 9.)  Dr. Seaman noted Plaintiff's abnormal ANA and anti-dsDNA tests.  (ECF No. 205-5 at 9.)  He performed a physical examination, which resulted in no objective findings except for excoriated lesions on Plaintiff's arms, back, trunk, and legs.  (ECF No. 205-5 at 9.)  He also noted Plaintiff's biopsy scar, which was "exquisitely tender" and sensitive.  (ECF No. 205-5 at 9.)  Based on his examination, he doubted Plaintiff had Systemic Lupus Erythematosus ("SLE") but recommended that numerous tests be performed in order to rule out that finding.  (ECF No. 205-5 at 9.)  He also suggested an x-ray of the spine, a CT scan of the abdomen, and referrals to a gastroenterologist, cardiologist, and dermatologist.  (ECF No. 205-5 at 9.)  However, he deferred such referrals to Dr. Falor.  (ECF No. 205-5 at 9.)  He recommended that Plaintiff be seen again in one month.  (ECF No. 205-5 at 9.)

Upon return to SCI-Greene, Dr. Falor ordered x-rays of Plaintiff's cervical spine and lumbar spine as per Dr. Seaman's recommendation.  (ECF No. 205-6 at 9.)  Dr. Falor also ordered numerous lab studies and a CT scan of Plaintiff's abdomen.  (ECF No. 205-6 at 9.)  A follow-up appointment with Dr. Seaman was made but later cancelled due to Plaintiff's refusal to consent to the CT scan.  (ECF No. 205-5 at 8; No. 205-6 at 8.)

Plaintiff saw Dr. Jin on July 11, 2006, at which time Plaintiff stated that he had Lupus.  (ECF No. 205-6 at 7.)  Dr. Jin explained that Plaintiff had an increased antibody level that suggested Lupus.  (ECF No. 205-6 at 7.)  He informed Plaintiff that he had no signs or physical evidence of Lupus and that Dr. Seaman concurred with this assessment.  (ECF No. 205-6 at 7.)  Dr. Jin indicated that he discussed the case with the Regional Medical Director who agreed to have the abdominal CT scan and x-rays performed despite the remote possibility of finding any pathology.  (ECF No. 205-6 at 7.)  He deferred any dermatology, gastroenterology, or cardiology

15

consults at that time.  (ECF No. 205-6 at 6.)  Also on July 11, 2006, Plaintiff had x-rays of his cervical spine which showed no fractures.  (ECF No. 211-2 at 3.)  All bony appendages were normal, but there were some possible mild degenerative changes.  (ECF No. 211-2 at 3.)  The x-rays of his lumbosacral spine were normal.  (ECF No. 93-2 at 4.)

Plaintiff continued to complain of pain and request pain medication throughout July.  (ECF No. 205-6 at 4-6.)  He was seen by Gress who noted that a treatment plan was in progress per Dr. Falor.  (ECF No. 205-6 at 5-6.)  Plaintiff was seen by Dr. Falor on July 20, 2006.  (ECF No. 205-6 at 4-5.)  Plaintiff had no new complaints of pain but informed Dr. Falor that he did not want to be seen anymore by Dr. Jin.  (ECF No. 205-6 at 5.)  Dr. Falor planned to follow-up with Dr. Seaman after Plaintiff's abdominal CT scan was performed.  (ECF No. 205-6 at 4.)  On August 9, 2006, Dr. Falor reviewed Plaintiff's chart and test results and felt that Plaintiff may have Sjogren's syndrome.  (ECF No. 205-6 at 3.)  He again noted that he would follow-up with Dr. Seaman after the CT scan.  (ECF No. 205-6 at 3.)

In July, Gress approached Plaintiff to obtain his consent for the CT scan but Plaintiff refused to sign the consent form.  (ECF No. 205-6 at 4.)  Plaintiff wanted to speak to his attorney and have him read the form before consenting.  (ECF No. 205-6 at 4.)  The appointment with Dr. Seaman was going to be rescheduled pending the consent.  (ECF No. 205-6 at 3.)  In August, Plaintiff again refused to sign the consent form but later signed after altering it.  (ECF No. 205-5 at 6; No. 205-6 at 2.)  He was informed that the form was not valid because he had altered it and then he stated that he no longer wanted to sign the form.  (ECF No. 205-6 at 1-2.)

Plaintiff later agreed to sign the consent form, which he in fact signed on September 11, 2006.  (ECF No. 205-5 at 50; No. 205-5 at 5.)  Plaintiff had a CT scan of his abdomen performed

at SCI-Smithfield on November 8, 2006, which returned normal.  (ECF No. 205-5 at 10.)  He was transferred back to SCI-Greene on November 11, 2006.  (ECF No. 205-5 at 48-49.)[4]

### 3. 2007

Plaintiff had a physical examination performed by Dr. Minhi Park on April 12, 2007.  (ECF No. 205-5 at 48.)  Dr. Park reviewed the results of Plaintiff's lab tests performed in March 2007 and noted that Plaintiff's vital signs were stable.  (ECF No. 205-5 at 48.)

On May 11, 2007, Plaintiff was transferred to Lancaster County concerning his criminal matters.  (ECF No. 205-5 at 2.)  Upon his return on June 7, 2007, he was examined by a nurse who noted that he was in no acute distress and had no injuries from the transport.  (ECF No. 205-5 at 48.)

On June 11, 2007, Plaintiff was seen by Diggs for complaints of rectal bleeding.  (ECF No. 205-5 at 47.)  He reported bleeding on and off for about a year.  (ECF No. 205-5 at 47.)  He stated that it had gotten worse while he was in Lancaster.  (ECF No. 205-5 at 47.)  He also wanted to discuss his chest pain and Lupus.  (ECF No. 205-5 at 47.)  Diggs performed a rectal examination and found no external lesions.  (ECF No. 205-5 at 47.)  He was given instructions on obtaining three consecutive stool samples for testing.  (ECF No. 205-5 at 47.)  Diggs also discussed testing for HIV, to which Plaintiff was agreeable.  (ECF No. 205-5 at 47.)  Plaintiff's chart was given to Dr. Jin for review.  (ECF No. 205-5 at 46.)  On June 15, 2007, Plaintiff was given three hemoccult test kit slides and instructed on how to use them.  (ECF No. 205-5 at 21, 46.)  Dr. Jin reviewed Plaintiff's chart and Diggs' rectal examination.  (ECF No. 205-5 at 46.)  He noted that he was going to wait for the test results.  (ECF No. 205-5 at 46.)  Plaintiff returned

---

[4]     Plaintiff initiated the instant suit in the Eastern District of Pennsylvania on November 7, 2006.  However, because Plaintiff has called into question the adequacy of the medical care he has received since the filing of this suit and claims that he is being denied medical care to this day, the Court will further summarize Plaintiff's medical records for the years following the initiation of this suit.

two hemoccult test slides, one of which showed the presence of occult blood and one of which did not. (ECF No. 205-5 at 45.)  On June 18, 2007, Dr. Jin noted the hemoccult test results and that he would follow-up as needed. (ECF No. 205-5 at 45.)

Later in June, Plaintiff refused to consent to the HIV testing and refused all blood work that had been ordered by Dr. Jin on June 18, 2006. (ECF No. 205-5 at 21, 45.)  On June 27, 2007, a nurse noted that Plaintiff had an itchy rash on his right axilla, right arm, chest, and groin area. (ECF No. 205-5 at 45.)  Dr. Jin was notified and he ordered Benadryl for the affected areas. (ECF No. 205-5 at 20, 45.)  Plaintiff was seen by Diggs the following day and reported having a rash for 24 hours. (ECF No. 205-5 at 44.)  Plaintiff reported little response from the Benadryl. (ECF No. 205-5 at 44.)  He denied allergies or taking over the counter medications. (ECF No. 205-5 at 44.)  Her assessment was dermatitis of an unknown etiology. (ECF No. 205-5 at 44.)  She ordered Amlactin cream and a Medrol dose pack. (ECF No. 205-5 at 20.)  The issue was discussed with Dr. Jin, who ordered Plaintiff Vistaril. (ECF No. 205-5 at 20.)  He was housed in the infirmary for treatment. (ECF No. 205-5 at 20.)

On July 29, 2007, Plaintiff reported improved symptoms and the rash resolving. (ECF No. 205-5 at 43.)  He stated that the itching was gone, and he was allowed to return to his cell after being examined by Dr. Jin. (ECF No. 205-5 at 42-43.)  Dr. Jin examined Plaintiff the next day. (ECF No. 205-5 at 42.)  He felt that Plaintiff may have had an allergic reaction, which responded to steroids and antihistamines. (ECF No. 205-5 at 42.)  Plaintiff was discharged back to his cell and the Benadryl was discontinued. (ECF No. 205-5 at 19, 42.)

On August 1, 2007, Plaintiff complained that the rash had returned and he also complained of pain from his Lupus. (ECF No. 205-5 at 41.)  He was seen by Dr. Jin on August 3, 2007. (ECF No. 205-5 at 41.)  Dr. Jin examined Plaintiff and found no rash on his trunk or

upper extremities.  (ECF No. 205-5 at 41.)  The lower extremities were improving and had a

fading rash.  (ECF No. 205-5 at 41.)  Plaintiff stated that he still had some itching and Dr. Jin

ordered Benadryl.  (ECF No. 205-5 at 19, 41.)

Plaintiff again complained of a rash on November 16, 2007.  (ECF No. 205-5 at 40.)  He

was seen by nurse practitioner Michelle Lukas whose assessment was dermatitis of an unknown

etiology.  (ECF No. 205-5 at 40.)  She ordered Benadryl, and Plaintiff was kept in the infirmary

for 23-hour observation.  (ECF No. 205-5 at 18, 39-40.)  He was later seen by Diggs who

ordered a Medrol dose pack and calamine lotion.  (ECF No. 205-5 at 18.)  He was discharged

from the infirmary and sent back to his cell.  (ECF No. 205-5 at 18.)

### 4.  2008

On April 5, 2008, Plaintiff was seen by Dr. James Caramanna for abrasions to his right

wrist secondary to handcuffs.  (ECF No. 205-5 at 39.)  He claimed that he was assaulted by

corrections officers while being transported to a video conference for a civil suit and that the

officers placed his handcuffs on too tightly.  (ECF No. 205-5 at 38.)  Plaintiff was examined and

there were no neurological deficits noted, only superficial abrasions.  (ECF No. 205-5 at 39.)  He

was offered medication, which he declined, and Dr. Caramanna ordered an x-ray of both wrists,

which returned normal.  (ECF No. 205-5 at 18, 39; No. 209-1 at 23.)  There was no evidence of

any new fracture.  (ECF No. 209-1 at 23.)  On April 7, 2008, he saw Lukas who examined his

writs and found that he had full range of motion and minimal swelling.  (ECF No. 205-5 at 38.)

He was able to make a fist.  (ECF No. 205-5 at 38.)  Her assessment was that he had a minor

abrasion and she ordered Motrin.  (ECF No. 205-5 at 17, 37.)

Dr. Jin conducted an examination on April 8, 2008.  (ECF No. 205-5 at 37.)  He noted

that Plaintiff had not been seen in several months.  (ECF No. 205-5 at 37.)  There was no

evidence of any dermatological problem.  (ECF No. 205-5 at 37.)  He ordered several lab tests, which included DP II, ANA, and anti-dsDNA tests.  (ECF No. 205-5 at 17.)  He also ordered a second rheumatology consult with Dr. Seaman.  (ECF No. 205-5 at 17.)

The following day, Plaintiff complained of chest, stomach, back, neck, spinal, kidney, and joint pain.  (ECF No. 205-5 at 36.)  He stated that his pain was caused by Lupus and his abdominal pain increased if he ate too much, too quickly.  (ECF No. 205-5 at 36.)  He also had a fear of moving his bowels because of rectal bleeding.  (ECF No. 205-5 at 36.)  He was examined and the nurse practitioner noted that he had good bowel sounds and no enlarged organs.  (ECF No. 205-5 at 35-36.)  She noted that a rheumatology consult was pending, she ordered Diprosone cream, and she was going to schedule him for a rectal exam.  (ECF No. 205-5 at 35-36; No. 209-2 at 7.)

On April 14, 2008, he complained to Diggs of continuing pain in his right wrist.  (ECF No. 209-3 at 35.)  He reported increased irritation with writing or typing.  (ECF No. 209-3 at 35.)  His exam showed that he had full range of motion in the wrist.  (ECF No. 209-3 at 35.)  His grip strength was 4/5.  (ECF No. 209-3 at 35.)  He had no bony deformity.  (ECF No. 209-3 at 35.)  The Motrin was discontinued and Naprosyn was ordered.  (ECF No. 209-2 at 7.)

Plaintiff was seen by Dr. Seaman on April 16, 2008.  (ECF No. 209-1 at 21.)  Dr. Seaman noted in his report that Plaintiff's CT scan of the abdomen was unremarkable but that his labs from 2006 showed a higher titer DNA and positive double-stranded DNA.  (ECF No. 209-1 at 21.)  Plaintiff stated that he continued to have an intermittent rash but that his last "outbreak" was in November 2007.  (ECF No. 209-1 at 21.)  He also stated that he continued to have vague abdominal pains and "heart pains" and vague pain in his hands, wrists, neck, and back.  (ECF No. 209-1 at 21.)  Following an examination, Dr. Seaman noted that he suspected Plaintiff had

20

Subacute Cutaneous Lupus Erythematosus but he doubted Plaintiff had idiopathic Systemic Lupus Erythematosus.  (ECF No. 209-1 at 21.)  He also felt that Plaintiff could have secondary Sjogren's syndrome.  (ECF No. 209-1 at 21.)  He noted that repeat ANA, DNA, and SS-A/B tests were pending.  (ECF No. 209-1 at 21.)  Because Plaintiff also complained of rectal bleeding, he encouraged Plaintiff to follow-up with Dr. Jin for consideration of a gastroenterology referral.  (ECF No. 209-1 at 21.)

On April 17, 2008, Diggs went to see Plaintiff but he was not in his cell.  (ECF No. 209-3 at 34.)  He had been placed on restricted movement by security following his return from Dr. Seaman's consultation.  (ECF No. 209-3 at 34.)  Also on that day, Dr. Jin saw Plaintiff and noted that Plaintiff was in no distress and showed no physical evidence of discomfort.  (ECF No. 209-3 at 34.)  Plaintiff claimed that the guards had retaliated against him earlier in the month by placing his handcuffs on too tightly.  (ECF No. 209-3 at 34.)  Dr. Jin explained that the x-rays of his wrists were negative.  (ECF No. 209-3 at 33.)  He also discussed Plaintiff's visit with Dr. Seaman and noted that Dr. Seaman's report was still pending.  (ECF No. 209-3 at 33.)

Dr. Jin examined Plaintiff on April 28, 2008, after he complained of chest, heart, back, neck, spinal, kidney, wrist, and joint pain.  (ECF No. 209-3 at 31-32.)  He noted that Plaintiff was able to walk into the triage room with a normal gait and in no distress.  (ECF No. 209-3 at 31.)  Dr. Jin examined Plaintiff and documented his findings.  (ECF No. 209-3 at 31-32.)  There were no rashes found on Plaintiff's face, upper extremities, or lower extremities.  (ECF No. 209-3 at 31-32.)  He had full range of motion in his knees.  (ECF No. 209-3 at 31-32.)  His chest was clear.  (ECF No. 209-3 at 31.)  His heart had regular rate and rhythm with no murmurs.  (ECF No. 209-3 at 31-32.)  He also reported no rectal bleeding at that time.  (ECF No. 209-3 at 32.)  Plaintiff left the exam room while Dr. Jin was explaining his findings.  (ECF No. 209-3 at 32.)

On May 23, 2008, he saw a nurse practitioner for the same complaints.  (ECF No. 209-3 at 30.)  She scheduled him to see Dr. Jin, whom he later saw on May 28, 2008.  (ECF No. 209-3 at 30.)  Plaintiff complained that he was in the same pain he had been in for the last four years and that he never received any pain medication.  (ECF No. 209-3 at 30.)  Dr. Jin observed that Plaintiff walked into the triage room without any difficulty, with a normal gain, and in no distress.  (ECF No. 209-3 at 30.)  He found no significant findings upon examination and noted that Plaintiff had been given numerous pain medications on many occasions.  (ECF No. 209-3 at 29.)  He ordered Motrin, a DP II test, and an ESR test.  (ECF No. 209-2 at 6.)  Plaintiff's lab results were reviewed on June 6, 2009.  (ECF No. 209-3 at 29.)  It was noted that Plaintiff had elevated protein and globulin levels and an ESR of 23.  (ECF No. 209-3 at 29.)  Medical was going to follow-up as needed.  (ECF No. 209-3 at 29.)

Plaintiff refused a rectal examination on July 14, 2008.  (ECF No. 209-3 at 28.)  On August 6, 2008, Dr. Jin took pictures of Plaintiff's scalp and neck for his upcoming dermatological consult with dermatologist Dr. Stephen M. Schleicher.  (ECF No. 209-2 at 5; No. 209-3 at 28.)  Plaintiff had a teledermatology consultation with Dr. Schleicher on August 8, 2008, but was upset, angry, and refused to speak because he wanted to see the doctor in person.  (ECF No. 209-3 at 27-28.)  The consultation was terminated because of Plaintiff's refusal to cooperate.  (ECF No. 209-3 at 27-28.)  However, Dr. Jin ordered several lab tests following the consult.  (ECF No. 209-2 at 5.)

On August 18, 2008, Dr. Schleicher issued a report based on the materials sent to him by Dr. Jin and from his observation of Plaintiff during the consultation.  (ECF No. 209-1 at 19.)  He noted that Plaintiff was belligerent and uncommunicative during the teledermatology session.  (ECF No. 209-1 at 19.)  He reported that Plaintiff stated he was "tricked" by the medical staff,

having been told that Dr. Schleicher would examine him in person, and the session was terminated because Plaintiff would not communicate unless his lawyer was present.  (ECF No. 209-1 at 19.)  Dr. Schleicher recommended repeat ANA tests and noted that Plaintiff had no signs of Lupus except for his lab results.  (ECF No. 209-1 at 19.)  As such, he did not feel that therapy for the disease was necessary.  (ECF No. 209-1 at 19.)  He did, however, report that a lupus band test could be performed, which involved a punch biopsy of the skin to check for immunoglobulin deposition, a sign of systemic lupus.  (ECF No. 209-1 at 19.)

Dr. Jin reviewed Plaintiff's lab results on August 20, 2008, and he reviewed Plaintiff's chart on November 3, 2008.  (ECF No. 209-3 at 27.)  He noted that Plaintiff had not submitted a sick call request since August 8, 2008.  (ECF No. 209-3 at 27.)  He ordered repeat lab work. (ECF No. 209-2 at 5.)  Dr. Park reviewed Plaintiff's lab work on November 11, 2008, and she noted no significant changes from prior lab testing.  (ECF No. 209-3 at 26.)  She noted Plaintiff's condition and that no special care was needed at that time.  (ECF No. 209-3 at 26.)

On November 18, 2008, Diggs examined Plaintiff for a rash on his scalp.  (ECF No. 209-3 at 26.)  Plaintiff also reported swollen ankles and sores on his legs.  (ECF No. 209-3 at 26.) Diggs noted multiple pustules and hyperpigmentation at the base of his hair follicles and mild excoriation on his legs.  (ECF No. 209-3 at 26.)  Her assessment was scalp folliculitis and joint pain with swelling although the exam revealed no edema.  (ECF No. 209-3 at 26.)  She discussed the case with Dr. Jin and ordered T-gel shampoo for Plaintiff's scalp.  (ECF No. 209-2 at 4; No. 209-3 at 26.)

Dr. Jin examined Plaintiff on November 20, 2008.  (ECF No. 209-3 at 25.)  He noted that Plaintiff had no skin irritations on his face or scalp except for evidence of old folliculitis seen on his upper neck.  (ECF No. 209-3 at 25.)   He noted some ankle pain and offered Plaintiff

23

Ibuprofen, which Plaintiff declined stating that it was ineffective and hurt his stomach.  (ECF No. 209-3 at 25.)

On November 24, 2008, Dr. Jin noted that a physician at West Dermatology Associates was willing to see Plaintiff regarding a biopsy of his skin for Lupus.  (ECF No. 209-2 at 4; No. 209-3 at 24.)  Plaintiff was sent to West Dermatology Associates on December 8, 2008, at which time the punch biopsy was performed on his right hip area.  (ECF No. 209-1 at 17; No. 209-3 at 24.)  The lab report from the biopsy dated December 15, 2008, stated that the results were non-specific for Lupus or other ANA-related autoimmune disorders.  (ECF No. 94-1 at 9.)  Dr. Jin removed the sutures from the biopsy on December 18, 2008, and he saw Plaintiff for a follow-up evaluation on December 30, 2008.  (ECF No. 209-3 at 20-21.)  He noted that the biopsy site was well-healed and that all of Plaintiff's extremities had full range of motion.  (ECF No. 209-3 at 20-21.)  Dr. Jin offered Plaintiff pain medication but Plaintiff was non-responsive.  (ECF No. 209-3 at 20.)  He ordered numerous lab studies.  (ECF No. 209-2 at 3.)

### 5.  2009

After being asked by Dr. Jin whether he had any further recommendations, Dr. Seaman responded by letter on January 12, 2009.  (ECF No. 209-1 at 18.)  Dr. Seaman stated that he had reviewed Plaintiff's lab results from August and November 2008, which showed elevated sedimentation rates and a higher titer ANA and positive double-stranded DNA, but had yet to make a specific diagnosis.  (ECF No. 209-1 at 18.)  He suggested referring Plaintiff to the University of Pittsburgh Medical Center, Lupus Center of Excellence for a second rheumatologic opinion.  (ECF No. 209-1 at 18.)

On January 20, 2009, Diggs examined Plaintiff's most recent lab results.  (ECF No. 209-3 at 19.)  She noted elevated protein, globulin, ESR and ANA titers.  (ECF No. 209-3 at 19.)

Plaintiff was examined by Dr. Jin the following day.  (ECF No. 209-3 at 17-19.)  Plaintiff was uncommunicative, but when Dr. Jin asked how he could help Plaintiff stated that no one had helped him in four years.  (ECF No. 209-3 at 19.)  Although Plaintiff stated that he had pain all over, he refused pain medication.  (ECF No. 209-3 at 19.)  His examination revealed good range of motion all over his body with no swelling.  (ECF No. 209-3 at 18.)  Dr. Jin felt that Plaintiff may have an autoimmune disorder.  (ECF No. 209-3 at 17.)  He ordered an EKG and planned to continue monitoring as necessary.  (ECF No. 209-2 at 2; No. 209-3 at 17.)

On February 11, 2009, Dr. Jin noted that he was going to request a consult with Dr. Fotios Koumpouras from the Lupus Center at the University of Pittsburgh.  (ECF No. 209-2 at 2; No. 209-3 at 16.)  Dr. Jin spoke to Dr. Koumpouras, who reviewed Plaintiff's medical records and said he was glad to evaluate him.  (ECF No. 209-3 at 16.)  Plaintiff was later informed that was going to be seen by a rheumatologist at the Lupus Center.  (ECF No. 209-3 at 15.)

Plaintiff was seen by Dr. Koumpouras on February 20, 2009.  (ECF No. 209-1 at 10-15; No. 209-3 at 15.)  Dr. Koumpouras reported that Plaintiff's double-stranded DNA test was specific for SLE and that part of Plaintiff's joint pain may be from SLE.  (ECF No. 209-1 at 14.)  He recommended repeat testing and initiating hydroxychloroquine.  (ECF No. 209-1 at 14.)  He also reported that Plaintiff had evidence of secondary Sjogren's syndrome, with SSA, SSB, ANA and severe dry eyes and dry mouth.  (ECF No. 209-1 at 14.)  The plan was to begin Plaquenil and Restasis, try Evoxac or Salagen for Plaintiff's dry mouth, consider Prednisone, and repeat lab testing.  (ECF No. 209-1 at 14.)  He also recommended that Plaintiff see an ophthalmologist for a baseline retinal examination.  (ECF No. 209-1 at 14.)  On February 23, 2009, Dr. Jin ordered the Plaquenil, Restasis, Prednisone, and ophthalmology consult as per Dr. Koumpouras'

recommendations.  (ECF No. 209-2 at 2.)  He also ordered numerous lab studies.  (ECF No. 209-2 at 1.)

On March 2, 2009, Plaintiff reported to Dr. Jin that the new medication was not helping. (ECF No. 209-3 at 14.)  Dr. Jin informed him that it could take 2-3 more weeks before any difference was noted.  (ECF No. 209-3 at 14.)  He ordered artificial tears for Plaintiff's eyes. (ECF No. 209-2 at 1.)  On March 8, 2009, Plaintiff stated that the Plaquenil did not reduce any of his pain but the Restasis helped his eyes.  (ECF No. 209-3 at 13.)  Dr. Jin ordered Tylenol.  (ECF No. 209-2 at 1.)

Dr. Jin contacted Dr. Koumpouras on March 10, 2009, and notified him that Plaintiff did not get any relief from the Plaquenil.  (ECF No. 209-1 at 9.)  Dr. Koumpouras informed Dr. Jin that it can take 2-3 months for Plaquenil to be effective.  (ECF No. 209-1 at 9.)  Dr. Jin told Plaintiff to continue with his Plaquenil.  (ECF No. 209-3 at 13.)  He ordered a higher dosage of Prednisone and a 24-hour urine test.  (ECF No. 209-1 at 40.)

Plaintiff saw Dr. Jin for complaints of back, lung, and kidney pain on March 17, 2009. (ECF No. 209-3 at 11.)  Dr. Jin stressed that it would take several more weeks for the Plaquenil to be effective and that medications may not take the pain completely away.  (ECF No. 209-3 at 11.)  Plaintiff refused Tylenol and Dr. Jin ordered Vicodin.  (ECF No. 209-1 at 39; No. 209-3 at 11.)  Plaintiff's urine results were reviewed by Dr. Park on March 19, 2009, and Dr. Park noted no significant findings.  (ECF No. 209-3 at 10.)

On April 1, 2009, Diggs discontinued the Vicodin because Plaintiff reported that it made him nauseous and gave him a headache.  (ECF No. 209-3 at 9.)  She ordered Motrin and Flexeril. (ECF No. 209-1 at 39.)  Dr. Jin discontinued the Motrin when he saw Plaintiff on April 3, 2009. (ECF No. 209-1 at 38.)  Plaintiff stated that the Plaquenil and the increased Prednisone did not

help and that the Vicodin made him sick and dizzy.  (ECF No. 209-3 at 8.)  Dr. Jin ordered

Methadone.  (ECF No. 209-1 at 38.)

On April 13, 2009, Plaintiff stated that the Plaquenli, Prednisone, and Methadone did not

help.  (ECF No. 209-3 at 7.)  He stated that the Methadone made him nauseous and gave him dry

mouth.  (ECF No. 209-3 at 7.)  Dr. Jin observed Plaintiff typing in the library in no distress.

(ECF No. 209-3 at 7.)  He decreased the Methadone and ordered blood work.  (ECF No. 209-1 at

37-38.)

From April 16, 2009 to April 21, 2009, Plaintiff was monitored in the infirmary for

complaints of pain, sweating, and vomiting.  (ECF No. 209-2 at 39-40; No. 209-3 at 1-6.)  Dr.

Jin discontinued the Methadone and ordered blood work and a chest x-ray that returned normal.

(ECF No. 209-1 at 22, 37.)  On April 21, 2009, the retina specialist informed Dr. Jin that there

were no retinal concerns with being on Plaquenil.  (ECF No. 209-1 at 8.)  He recommended that

Plaintiff continue with the Restasis and add artificial tears as needed.  (ECF No. 209-1 at 8.)  Dr.

Jin ordered artificial tears and another retinal eye consult for October 2009.  (ECF No. 209-1 at

36.)

Plaintiff saw Dr. Jin on April 27, 2009, and complained that he had back pain especially

when he bent forward.  (ECF No. 209-2 at 38.)  He still reported that the Plaquenil and the

Prednisone did not help.  (ECF No. 209-2 at 38.)  Dr. Jin increased the Methadone dosage and

decreased the Prednisone.  (ECF No. 209-1 at 35; No. 209-2 at 38.)  He also ordered Metamucil

and milk of magnesium.  (ECF No. 209-1 at 35.)

On May 1, 2009, Plaintiff stated that the increased Methadone did not help, made him

nervous, and upset his stomach.  (ECF No. 209-2 at 37.)  Dr. Jin agreed to discontinue the

Methadone.  (ECF No. 209-1 at 35; No. 209-2 at 37.)  Plaintiff also complained of itchiness all

over, which he felt was due to the decrease in Prednisone.  (ECF No. 209-2 at 37.)  Dr. Jin increased the Prednisone dosage.  (ECF No. 209-1 at 35.)  On May 6, 2009, Plaintiff stated that the Plaquenil did not help his symptoms and no pain medication provided him any relief.  (ECF No. 209-2 at 37.)  Dr. Jin ordered Tylenol #3.  (ECF No. 209-1 at 34.)  On May 21, 2009, Plaintiff complained to Diggs that he was still in pain and that the medications were ineffective. (ECF No. 209-2 at 36.)  She scheduled him to see Dr. Jin regarding his complaints.  (ECF No. 209-1 at 34; No. 209-2 at 36.)

Dr. Jin examined Plaintiff on May 28, 2009.  (ECF No. 209-2 at 35.)  Plaintiff reported that nothing helped his pain but Dr. Jin observed that Plaintiff was in no acute distress.  (ECF No. 209-2 at 35.)  Dr. Jin asked Plaintiff whether he wanted the pain medications discontinued and Plaintiff did not answer.  (ECF No. 209-2 at 35.)  Dr. Jin ordered a sleep mask to help Plaintiff sleep because he was complaining about the lights in the area.  (ECF No. 209-2 at 35.)

Plaintiff continued to complain of pain throughout June.  (ECF No. 209-2 at 33-34.) Plaintiff's request for a double mattress was denied because Dr. Jin thought it was not medically necessary.  (ECF No. 209-2 at 33.)  Dr. Jin saw Plaintiff for the same complaints of pain on July 1, 2009.  (ECF No. 209-2 at 31-32.)  Plaintiff accused Dr. Jin of ignoring him.  (ECF No. 209-2 at 32.)  Plaintiff was examined and Dr. Jin noted that he had good range of motion with no tenderness.  (ECF No. 209-2 at 31.)  He was able to turn and lift without difficulty.  (ECF No. 209-2 at 31.)  Plaintiff complained that the Plaquenil did not help.  (ECF No. 209-2 at 31.)  Dr. Jin was going to consult the Lupus Center.  (ECF No. 209-2 at 31.)  On July 13, 2009, Dr. Jin ordered numerous lab tests.  (ECF No. 209-1 at 33.)  The tests were reviewed and sent to the Lupus Center on July 22, 2009.  (ECF No. 209-2 at 30.)

On July 30, 2009, Diggs examined Plaintiff for complaints of a burning sensation in his throat.  (ECF No. 209-2 at 29.)  He stated that his chest hurt when he breathed and he had pain when he swallowed.  (ECF No. 209-2 at 29.)  Diggs examined Plaintiff and noted no significant findings.  (ECF No. 209-2 at 29.)  She scheduled Plaintiff to see Dr. Jin and ordered a chest x-ray.  (ECF No. 209-1 at 32.)

Plaintiff was examined by Lukas on August 3, 2009.  (ECF No. 209-2 at 29.)  Plaintiff reported throat pain and coughing for a week.  (ECF No. 209-2 at 29.)  His throat was mildly red but otherwise unremarkable.  (ECF No. 209-2 at 29.)  She ordered Robitussin and a chest x-ray.  (ECF No. 209-1 at 32.)  She also saw him that day for wax in his ear, which she removed.  (ECF No. 209-2 at 28.)  Dr. Jin examined Plaintiff on August 5, 2009.  (ECF No. 209-2 at 27-28.)  Plaintiff's chest was clear and his throat was negative for any sores or tenderness.  (ECF No. 209-2 at 28.)  He ordered Robitussin and he also ordered Pepcid and Motrin, which Plaintiff refused to take.  (ECF No. 209-1 at 32No. 209-2 at 27.)  The Motrin and the Pepcid were discontinued on August 18, 2009.  (ECF No. 209-1 at 31.)

Plaintiff saw Diggs on August 25, 2009.  (ECF No. 209-2 at 26.)  He complained of a sore throat, earache, difficulty sleeping, and joint pain.  (ECF No. 209-2 at 26.)  His throat appeared normal.  (ECF No. 209-2 at 26.)  Plaintiff had ear wax and she scheduled to have his ear irrigated.  (ECF No. 209-1 at 31; No. 209-2 at 26.)  The wax was removed from his left ear on August 28, 2009.  (ECF No. 209-2 at 25.)

On September 8, 2009, Plaintiff complained of joint pain and wanted a second mattress.  (ECF No. 209-2 at 25.)  Diggs noted that Plaintiff's consult with the Lupus Center was pending and she scheduled him to see Dr. Jin.  (ECF No. 209-1 at 31; No. 209-2 at 25.)  Dr. Jin reviewed

Plaintiff's chart and noted that he would review the Lupus Center's recommendations after Plaintiff's consultation.  (ECF No. 209-2 at 25.)

Plaintiff saw Dr. Koumpouras at the Lupus Center on September 17, 2009.  (ECF No. 209-1 at 7.)  His impression was SLE, probably active and with no response to Prednisone or Plaquenil.  (ECF No. 209-1 at 7.)  He felt that a second mattress may help with Plaintiff's back pain.  (ECF No. 209-1 at 7.)  His plan was to continue with the Plaquenil, increase the Restasis, try Evoxac or Pilocarpine for dry mouth, maintain Prednisone but add calcium and vitamin D, consider Tramadol for pain, have an annual ophthalmology retinal exam, and order additional blood tests.  (ECF No. 209-1 at 7.)  Dr. Jin reviewed Plaintiff's lab results and entered orders for Prednisone, Plaquenil, Restasis, Evoxac, Ultram, Os-Cal, and a retinal consult.  (ECF No. 209-1 at 30.)

Plaintiff was seen by Dr. Jin on September 28, 2009.  (ECF No. 209-2 at 22.)  Plaintiff stated that the Ultram helped somewhat but he would not give any definitive answers to Dr. Jin's questions.  (ECF No. 209-2 at 22.)  Dr. Jin advised him to continue the Ultram for another 2-3 weeks.  (ECF No. 209-2 at 22.)  Dr. Jin discussed Plaintiff's care with Dr. Koumpouras on September 30, 2009.  (ECF No. 209-2 at 22.)  Dr. Koumpouras recommended additional blood work, Methotrexate, Evoxac and a 24-hour urine protein test.  (ECF No. 209-2 at 22.)  Dr. Jin ordered everything except the Evoxac, which had already been ordered.  (ECF No. 209-1 at 29.)  Dr. Jin examined Plaintiff on October 1, 2009.  (ECF No. 209-2 at 21.)  Plaintiff reported that the Ultram provided some relief.  (ECF No. 209-2 at 21.)

Plaintiff was examined by Diggs on October 8, 2009.  (ECF No. 209-2 at 20-21.)  Plaintiff complained of joint pain, fever, chills, vomiting, and difficulty swallowing.  (ECF No. 209-2 at 21.)  Her examination was benign.  (ECF No. 209-2 at 20.)  Plaintiff was advised to

consider a liquid diet, which he refused.  (ECF No. 209-2 at 20.)  She scheduled him to see Dr. Jin.  (ECF No. 209-1 at 28; No. 209-2 at 20.)  Dr. Jin approved Plaintiff's request for a second mattress.  (ECF No. 209-1 at 28.)

Plaintiff was seen for multiple complaints on October 15, 2009.  (ECF No. 209-2 at 20.) The nurse practitioner noted that Plaintiff had a benign examination on October 8, 2009, but that he was scheduled to see Dr. Jin.  (ECF No. 209-2 at 20.)  He was seen by the nurse practitioner again on October 19, 2009.  (ECF No. 209-2 at 19.)  He stated that he could not take the second mattress because it came out of the garbage.  (ECF No. 209-2 at 19.)  He also complained that the medication was making him sick.  (ECF No. 209-2 at 19.)  She noted that he was scheduled to see Dr. Jin.  (ECF No. 209-2 at 19.)

Plaintiff saw the retina specialist on October 20, 2009.  (ECF No. 209-1 at 6.)  The retinal exam was not completed because Plaintiff was unable to keep his eyes open.  (ECF No. 209-1 at 6; No. 209-2 at 19.)

On October 26, 2009, Plaintiff complained of joint, chest, back, and abdominal pain. (ECF No. 209-2 at 19.)  He also complained that the medications were not effective and caused him increased abdominal pain.  (ECF No. 209-2 at 19.)  He also stated that he did not want his second mattress because it had come out of the trash.  (ECF No. 209-2 at 19.)  Diggs was going to have Dr. Jin review Plaintiff's chart.  (ECF No. 209-2 at 18.)  She questioned whether the medications should be adjusted but suggested that Plaintiff continue to take it as directed.  (ECF No. 209-2 at 18.)

On November 16, 2009, Plaintiff again requested a second mattress, which was reordered.  (ECF No. 209-2 at 17.)  Plaintiff had another retinal exam on November 18, 2009. (ECF No. 209-1 at 27.)  Plaintiff was seen by a nurse practitioner on December 2, 2009, who

noted that there was no change in his complaints.  (ECF No. 209-2 at 16.)  She noted that Dr. Jin was aware of his complaints and that a follow-up with the rheumatologist at the Lupus Center was pending.  (ECF No. 209-2 at 16.)  He was instructed to tell the rheumatologist about his problems.  (ECF No. 209-2 at 16.)  Diggs saw Plaintiff on December 10, 2009.  (ECF No. 209-2 at 16.)  Plaintiff complained of joint and abdominal pain, headaches, vision disturbances, and nausea and he stated that no one was addressing his problems.  (ECF No. 209-2 at 16.)  He requested to see a specialist.  (ECF No. 209-2 at 16.)  Diggs was going to have his chart reviewed by Dr. Balk.  (ECF No. 209-2 at 16.)  Dr. Balk recommended that vitamin D be given because Plaintiff had little activity in the yard and limited sun exposure.  (ECF No. 209-1 at 27; No. 209-2 at 16.)

Dr. Jin conducted a full examination on December 11, 2009.  (ECF No. 209-2 at 14-15.)  Plaintiff stated that the Ultram was not helping and that the medication he was taking upset his stomach.  (ECF No. 209-2 at 14-15.)  Dr. Jin ordered Vicodin and discontinued the vitamin D, Os-cal, and Evoxac.  (ECF No. 209-1 at 27.)

Plaintiff was placed in the infirmary for a 24-hour urine test on December 13, 2009.  (ECF No. 209-2 at 13.)  He was returned to his cell on December 15, 2009, and he saw a nurse practitioner for a sore throat and neck on December 22, 2009.  (ECF No. 209-2 at 12-13.)  Vosol HC and a neck x-ray were ordered.  (ECF No. 209-1 at 26.)

Plaintiff was seen by Dr. Jin for earwax removal on December 24, 2009.  (ECF No. 209-2 at 11-12.)  Plaintiff reported that the Vicodin seemed to relieve his pain a little and his back pain had improved due to the new mattress.  (ECF No. 209-2 at 11.)  Dr. Jin discontinued the Vosol HC and the x-ray and he scheduled Plaintiff for another retinal consult and a follow-up visit to the Lupus Center for January 2010.  (ECF No. 209-1 at 26.)

32

Plaintiff saw the retina specialist on December 29, 2009.  (ECF No. 209-1 at 5; No. 209-2 at 11.)  The specialist recommended that artificial tears be added to the Restasis treatment to help with Plaintiff's dry eyes.  (ECF No. 209-1 at 5.)  Dr. Jin discontinued the Restasis and ordered artificial tears.  (ECF No. 209-1 at 25; No. 209-2 at 11.)

### 6.  2010

Dr. Jin saw Plaintiff on January 4, 2010, at which time Plaintiff reported that the Vicodin did not help.  (ECF No. 209-2 at 10.)  Plaintiff also complained that the artificial tears bothered him due to the preservatives.  (ECF No. 209-2 at 10.)  Dr. Jin reordered the Restasis and was going to schedule a consult with the Lupus Center.  (ECF No. 209-1 at 25; No. 239-6 at 7.)  Plaintiff was seen by Diggs on January 8, 2010, for complaints of joint pain and dry eyes.  (ECF No. 239-8 at 43.)  Plaintiff was advised that Dr. Jin had ordered him eye drops and that a consult with the Lupus Center was pending.  (ECF No. 239-8 at 43.)  On January 12, 2012, Dr. Jin discontinued the artificial tears and ordered artificial eye drops with non-preservatives.  (ECF No. 239-6 at 6, No. 239-8 at 43.)  Two days later, Plaintiff complained of burning eyes, and the nurse discussed this complaint with Dr. Jin, who saw Plaintiff on January 25, 2010.  (ECF No. 239-8 at 41-42.)  Plaintiff reported that his vision was double and blurry at times but that his eyes were better with the new drops.  (ECF No. 239-8 at 41-43.)     Plaintiff also complained of abdominal, back and spinal pain.  (ECF No. 239-8 at 42.)  Dr. Jin ordered several lab tests and Vicodin for two weeks.  (ECF No. 239-6 at 5.)  Plaintiff was scheduled to go to the Lupus Center on February 25, 2010.  (ECF No. 239-8 at 41.)  Plaintiff's lab work was forwarded to the Lupus Center on February 1, 2010.  (ECF No. 239-8 at 41.)

Dr. Jin saw Plaintiff on February 2, 4 and 11, 2010, at which time Plaintiff reported that he was still in pain but that he was not taking his pain medication because it caused him a sore

33

throat, his neck to swell, and stomach complications. (ECF No. 239-8 at 39-41.) Plaintiff was informed that he was soon to be seen by a specialist at the Lupus Center. (ECF No. 239-8 at 39-41.) On February 19, 2010, Plaintiff was seen by Diggs and complained that he was still in pain, that he could not take the Vicodin, and that he was afraid to take Motrin. (ECF No. 239-8 at 39.) Plaintiff was advised that he was scheduled to go to the Lupus Center and that lab work would be ordered monthly until May 10, 2010. (ECF No. 239-6 at 4; No. 239-8 at 38-39.)

Plaintiff was seen by Dr. Koumpouras at the Lupus Center on February 25, 2010. (ECF No. 239-4 at 35.) Pursuant to Dr. Koumpouras' recommendations, Dr. Jin ordered several medications and lab tests. (ECF No. 239-6 at 4; No. 239-8 at 38.)

Plaintiff had a full exam performed by Dr. Jin on March 5, 2010. (ECF No. 239-8 at 36-37.) Plaintiff complained that he was still in pain and that he was not taking his pain medication because it caused burning in his throat and stomach. (ECF No. 239-8 at 36.) Dr. Jin's assessment was pain secondary to Lupus. (ECF No. 239-8 at 36.) Plaintiff was subsequently seen by Dr. Jin, who noted that he was not on any pain medication. (ECF No. 239-8 at 35.) Plaintiff was offered Tylenol, which he claimed did not help him. (ECF No. 239-8 at 35.) Dr. Jin ordered Ultram, which Plaintiff subsequently refused because it was given to him crushed per DOC policy. (ECF No. 239-6 at 3; No. 239-8 at 34.) Following a conversation with Dr. Koumpouras on April 7, 2010, Dr. Jin increased Plaintiff's dosage of Lyrica. (ECF No. 239-6 at 2; No. 239-8 at 34.) He also ordered another retinal consult. (ECF No. 239-6 at 2.)

On April 13, 2010, Plaintiff complained of a lump in his rectum that he noticed when straining to move his bowels. (ECF No. 239-8 at 33.) A rectal exam was performed and no external masses were noted. (ECF No. 239-8 at 33.) Plaintiff was given three hemoccult test

slides to test for blood in his stool.  (ECF No. 239-6 at 2.)  The test slides returned negative. (ECF No. 239-8 at 33.)

On April 15, 2010, Dr. Jin ordered Plaquenil.  (ECF No. 239-6 at 2; No. 239-8 at 33.) The following day, Dr. Jin saw Plaintiff for a follow-up regarding his rectal complaints from a few days earlier.  (ECF No. 239- at 32.)  Upon examination, Dr. Jin noted a mass on the left side of Plaintiff's anal canal.  (ECF No. 239-8 at 32.)  Dr. Jin ordered Prednisone and a repeat rectal exam in two weeks.  (ECF No. 239-6 at 1.)

On April 22, 2010, Plaintiff complained of pressure to his eyes but denied any pain. (ECF No. 239-8 at 31.)  The nurse performed an exam and noticed that his right eye seemed somewhat swollen compared to his left.  (ECF No. 239-8 at 31.)  Plaintiff was already receiving eye drops and he was scheduled for a retinal exam on May 18, 2010.  (ECF No. 239-8 at 31.) The nurse informed him that he should notify medical if pain occurred or if the pressure increased.  (ECF No. 239-8 at 31.)  Later that day, Plaintiff refused both the Lyrica and Ultram complaining that it made his "throat close."  (ECF No. 239-8 at 31.)  Dr. Jin saw Plaintiff the following day and noted no evidence of irritation in Plaintiff's eyes.  (ECF No. 239-8 at 31.)  He explained that Plaintiff was to be seen by the retina specialist soon.  (ECF No. 239-8 at 31.)  He also ordered that the Lyrica not be crushed.  (ECF No. 239-5 at 40.)

On April 30, 2010, Plaintiff had a follow-up to his rectal examination.  (ECF No. 239-8 at 30.)  Plaintiff declined to be examined stating that his rectal problems were resolved.  (ECF No. 239-8 at 30.)  Plaintiff also stated that the medicine he was taking relieved his pain for about six hours a day.  (ECF No. 239-8 at 30.)  Dr. Jin noted that Plaintiff was to be seen by a retina specialist concerning his eye problems and he was also to be seen at the Lupus Center in the near future.  (ECF No. 239-8 at 30.)

Plaintiff was seen by Dr. Park for complaints of chest pain on May 2, 2010.  (ECF No. 239-8 at 29.)  His vital signs were stable and his mental state was clear.  (ECF No. 239-8 at 29.)  Dr. Park's assessment was anxiety and non-specific chest pain.  (ECF No. 239-8 at 29.)  An EKG was ordered, which returned normal.  (ECF No. 239-5 at 40.)

Due to Plaintiff's complaints that the crushed Ultram caused him pain in his throat and stomach, Dr. Jin ordered that the Ultram not be crushed.  (ECF No. 239-5 at 39; No. 239-8 at 28.)  On May 11, 2010, Plaintiff stated that the Ultram was only effective for a three-hour window and that the rest of the time he experienced pain.  (ECF No. 239-8 at 28.)  Plaintiff also complained of rectal bleeding and dark stool.  (ECF No. 2398 at 28.)  Blood work was ordered, Plaintiff was given three hemoccult test slides to test for blood in his stool, and his chart was pulled for Dr. Jin's review.  (ECF No. 239-5 at 39; No. 239-8 at 28.)

On May 17, 2010, Plaintiff was seen by a nurse for complaints of a rash and vision problems.  (ECF No. 239-8 at 27.)  He was given selenium sulfide lotion and informed that he was to see the retina specialist the following day.  (ECF No. 239-5 at 38; No. 239-8 at 27.)  Plaintiff had a retinal examination on May 18, 2010.  (ECF No. 239-4 at 34.)  It was recommended that the Restasis be discontinued, that artificial tears be used frequently, and that Plaintiff be seen by a cornea/dry eye specialist.  (ECF No. 239-4 at 34.)  That same day, Dr. Jin discontinued the Restasis and ordered several lab tests.  (ECF No. 239-5 at 38.)  On May 25, 2010, Dr. Jin noted a pending consult with a cornea/dry eye specialist.  (ECF No. 239-5 at 37; No. 239-8 at 26.)

Plaintiff was seen by Dr. Jin on May 27, 2010.  (ECF No. 239-8 at 25.)  Plaintiff stated that he thought the Ultram caused him migraine headaches and an upset stomach even when it was uncrushed.  (ECF No. 239-8 at 25.)  He also stated that the Lyrica only helped him for three

hours at a time.  (ECF No. 239-8 at 25.)  Dr. Jin noted that he would discontinue the Ultram but informed Plaintiff that there were no other available alternatives.  (ECF No. 239-5 at 37; No. 239-8 at 25.)  Plaintiff was seen by Diggs on June 2, 2010.  (ECF No. 239-8 at 24.)  He complained of excruciating pain, visual problems, and migraine headaches.  (ECF No. 239-8 at 24.)  Plaintiff was informed that he was to see a dry eye specialist and he was given Excedrin Migraine for his headaches.  (ECF No. 239-5 at 37; No. 239-8 at 24.)

Plaintiff was seen by the cornea/dry eye specialist on June 3, 2010.  (ECF No. 239-4 at 33.)  The specialist recommended that Plaintiff start using Fluorometholone eye drops three times a day for four days and to restart Restasis after two days.  (ECF No. 239-4 at 33.)  He further recommended Lacri-lube in both eyes and preservative free artificial tears as needed. (ECF No. 239-4 at 33.)  Dr. Jin ordered the recommended treatment.  (ECF No. 239-5 at 36.)

On June 11, 2010, Plaintiff was seen by Diggs for complaints that the ointment made his eyes even drier.  (ECF No. 239-8 at 23.)  He also continued to complain of migraine headaches. (ECF No. 239-8 at 23.)  Diggs was to consult Dr. Jin for potential medication adjustments for Plaintiff's headaches and eye concerns.  (ECF No. 239-8 at 23.)  Later that day, she discontinued the Excedrin Migraine and ordered Midrin.  (ECF No. 239-5 at 36.)

Plaintiff was seen by Dr. Jin on June 16, 2010.  (ECF No. 239-8 at 22.)  Plaintiff stated that his dry eyes did not improve in spite of the eye drops and that the Midrin only worked at night but not during the day.  (ECF No. 239-8 at 22.)  Dr. Jin ordered a follow-up consult with the Lupus Center.  (ECF No. 239-5 at 35; No. 239-8 at 22.)

Plaintiff was seen by Diggs for complaints of join pain on June 23, 2010.  (ECF No. 239-8 at 21.)  Her assessment was joint discomfort secondary to Lupus and she noted that Plaintiff was scheduled to be seen at the Lupus Center.  (ECF No. 239-8 at 21.)  Diggs saw Plaintiff again

later that same day, and she noted some moderate edema and mild erythema.  (ECF No. 239-8 at 21.)  She ordered Benadryl.  (ECF No. 239-5 at 35.)

Plaintiff was seen by Dr. Jin on July 1, 2010.  (ECF No. 239-8 at 20.)  Dr. Jin ordered an EKG, chest x-ray, and several lab tests.  (ECF No. 239-5 at 34.)  He also ordered that Plaintiff be observed for 23 hours.  (ECF No. 239-5 at 34.)  Plaintiff's EKG returned normal.  (ECF No. 239-8 at 19.)  During observation, Plaintiff complained of pain in his chest, which he stated was coming from his stomach and radiating to his epigastria area.  (ECF No. 239-8 at 19.)  He also complained of a headache and was given Midrin.  (ECF No. 239-8 at 19.)

Plaintiff was examined by Dr. Jin on July 2, 2010.  (ECF No. 239-8 at 18.)  Plaintiff complained that his chest pain was a six out of ten.  (ECF No. 239-8 at 18.)  Dr. Jin ordered that Plaintiff be housed in medical for a few days so that his vital signs could be monitored.  (ECF No. 239-5 at 34; No. 239-8 at 18.)  Dr. Jin saw Plaintiff on July 4, 2010, and Plaintiff walked away when Dr. Jin asked him whether he still had chest or abdominal pain.  (ECF No. 239-8 at 16.)  Plaintiff was given an eye patch upon complaining that the lights bothered his eyes.  (ECF No. 239-5 at 34.)  Later that day, Plaintiff refused his medication, eye drops, and dinner.  (ECF No. 239-8 at 15.)  He refused to speak to the nurses and was observed sitting on his bed with a towel over his head.  (ECF No. 239-8 at 15.)  He was seen by Dr. Jin the following day, at which time Plaintiff stated that he felt better and that he slept better with the eye patch.  (ECF No. 239-8 at 15.)  Plaintiff had an EKG, which returned normal, and Dr. Jin discharged him back to his cell on July 6, 2010.  (ECF No. 239-5 at 33; No. 239-8 at 13.)  Dr. Jin reordered Plaintiff a double mattress on July 8, 2010, but the double mattress was removed because Plaintiff refused to sign the acknowledgment of receipt form.  (ECF No. 239-5 at 33; No. 239-8 at 13.)

Plaintiff complained of a headache on July 20, 2010, and Dr. Jin approved his request for Midrin.  (ECF No. 239-5 at 32; No. 239-8 at 12.)  On July 22, 2010, Plaintiff was seen by a nurse for complaints of pain from his neck to his lower back and swelling in his throat.  (ECF No. 239-8 at 12.)  The nurse noted some swelling, and she encouraged Plaintiff to go to medical for evaluation but Plaintiff declined.  (ECF No. 239-8 at 12.)  The nurse noted that a call was placed to the Lupus Center regarding follow-up for next week.  (ECF No. 239-8 at 12.)

Upon complaining of pain from "head to toe," Plaintiff was evaluated by Dr. Jin on July 28, 2010.  (ECF No. 239-8 at 11.)  Plaintiff appeared normal and Dr. Jin noted that he was going to be seen at the Lupus Center the following day.  (ECF No. 239-8 at 11.)

Plaintiff was seen by Dr. Koumpouras at the Lupus Center on July 29, 2010.  (ECF No. 239-4 at 32.)  Dr. Koumpouras noted that Plaintiff was improving, and per Dr. Koumpouras's recommendations, Dr. Jin adjusted Plaintiff's medication, prescribed Prilosec, and ordered several lab tests.  (ECF No. 239-4 at 31; No. 239-5 at 32.)

When seen on August 18, 2010, Plaintiff told Dr. Jin that he had pain and not Gastroesophageal Reflux Disease ("GERD").  (ECF No. 239-8 at 10.)  Upon examination, Dr. Jin found vertical string like tissue on Plaintiff's left chest wall that he had not previously noticed.  (ECF No. 239-8 at 9-10.)  Dr. Jin discussed a possible biopsy but Plaintiff was reluctant.  (ECF No. 239-8 at 9.)

On August 27, 2010, Plaintiff was seen by Diggs for complaints of pain and dry eyes.  (ECF No. 239-8 at 9.)  He also complained that he had not gotten his double mattress and the Prilosec that was ordered for his stomach.  (ECF No. 239-8 at 9.)  Diggs ordered the Prilosec and pulled Plaintiff's chart for Dr. Jin's review.  (ECF No. 239-5 at 31.)

Plaintiff was seen by Dr. Jin on September 7, 2010. (ECF No. 239-8 at 8.) Plaintiff complained that none of the pain medication helped his pain and that the Midrin did not relieve his headaches. (ECF No. 239-8 at 8.) When Dr. Jin discussed an option for pain control, Plaintiff did not answer. (ECF No. 239-8 at 8.) Dr. Jin saw Plaintiff for the same complaints of pain on September 15, 2010. (ECF No. 239-8 at 7.) Plaintiff appeared in no acute distress and Dr. Jin noted that Plaintiff's Lupus was under treatment. (ECF No. 239-8 at 7.)

Plaintiff was seen by Diggs on September 24, 2010. (ECF No. 239-8 at 6.) He complained that the Lyrica and Plaquenil were not helping and no one was doing anything to help him. (ECF No. 239-8 at 6.) He demanded that someone call the Lupus Center to tell them that the medications were not working. (ECF No. 239-8 at 6.) Diggs ordered x-rays of Plaintiff's spine and pulled his chart for Dr. Jin's review. (ECF No. 239-5 at 31; No. 239-8 at 6.)

Plaintiff was seen by a nurse on October 1, 2010. (ECF No. 239-8 at 5.) He complained of a rash and pain to his spine and neck. (ECF No. 239-8 at 5.) Plaintiff stated that no medication had been helpful. (ECF No. 239-8 at 5.) The nurse encouraged him to follow-up with the doctor at the Lupus Center about his pain. (ECF No. 239-8 at 5.) The Prednisone was increased and Plaintiff was scheduled to see Dr. Jin the following week. (ECF No. 239-5 at 30.)

Plaintiff was seen by Dr. Jin on October 7, 2010. (ECF No. 239-8 at 5.) Plaintiff stated that he had spinal pain from his neck to his lumbar area and also pain in his left chest wall. (ECF No. 239-8 at 5.) Dr. Jin discussed the results of Plaintiff's x-rays, which showed minimal degenerative disc disease with moderate muscle spasm. (ECF No. 239-4 at 21.) He ordered the muscle relaxer Robaxin to see if that would help with the pain. (ECF No. 239-5 at 30.) On October 15, 2010, Dr. Jin reordered Plaintiff's medications, which included the following: Methotrexate, Pilocarpine, Prilosec, Lyrica, Os-Cal, Plaquenil, artificial tears, Restasis, and

40

Pednisone.  (ECF No. 239-5 at 29; No. 239-8 at 4.)  The Robaxin was increased on October 20, 2010, and reordered for an additional ninety days on November 3, 2010.  (ECF No. 239-5 at 28.)

On November 12, 2010, Plaintiff complained that the eye specialist had written him a prescription for glasses, which he had not yet received.  (ECF No. 239-8 at 3.)  Plaintiff's chart was reviewed and no prescription was noted.  (ECF No. 239-8 at 3.)  Plaintiff's chart was referred to Dr. Jin regarding Plaintiff's request for glasses.  (ECF No. 239-5 at 28.)  On November 19, 2010, Diggs noted that all of Plaintiff's charts had been reviewed and the prescription for the glasses was found misfiled.  (ECF No. 239-8 at 3.)  The Health Care Administrator was notified and corrective lenses were ordered per the eye specialist's recommendation on June 3, 2010.  (ECF No. 239-5 at 28No. 239-8 at 3.)

On November 24, 2010, Dr. Jin ordered a follow-up consult with the eye specialist and the Lupus Center.  (ECF No. 239-5 at 27.)  Plaintiff was seen by a nurse on November 30, 2010.  (ECF No. 239-8 at 1.)  He had sores on his neck and chin and the nurse ordered medication for relief.  (ECF No. 239-5 at 27.)  Plaintiff requested to see Dr. Jin, whom he saw on December 3, 2010.  (ECF No. 239-8 at 1.)  Dr. Jin noted that Plaintiff's blood work showed improvement and that his skin was clear.  (ECF No. 239-8 at 1.)  He also noted that because Plaintiff always presented with the same complaints, he was going to suggest to PHS and the Health Care Administrator that Plaintiff's follow-up visits be limited barring any unforeseen acute events. (ECF No. 239-5 at 26; No. 239-8 at 1.)

Plaintiff was seen by the eye specialist on December 21, 2010.  (ECF No. 239-4 at 30.) The eye specialist noted that there was no toxicity from Plaquenil and recommended continuation of all treatment.  (ECF No. 239-4 at 30.)  He also noted that Plaintiff complained of lacrimal gland tenderness and recommended a trial of Restasis, which Plaintiff was already

taking.  (ECF No. 239-4 at 30; No. 239-7 at 40.)  Pursuant to the management care meeting on December 21, 2010, it was approved that Plaintiff be seen by a medical provider every two weeks for his frequent chronic complaints.  (ECF No. 239-5 at 26; No. 239-7 at 40.)

### 7.  2011

Plaintiff was examined by Dr. Jin on January 3, 2011.  (ECF No. 239-7 at 38-39.) Plaintiff complained about pain, dry mouth, and dry eyes.  (ECF No. 239-7 at 39.)  Plaintiff stated that sometimes he did not use his eye drops for a few days and sometimes he used them multiple times a day.  (ECF No. 239-7 at 39.)  He told Dr. Jin that he had his attorney call the Lupus Center and they apparently informed his attorney that Dr. Jin had cancelled Plaintiff's appointment.  (ECF No. 239-7 at 39.)  When Dr. Jin explained that Plaintiff did not yet have an appointment with the Lupus Center, Plaintiff did not respond.  (ECF No. 239-7 at 38-39.)  Dr. Jin informed Plaintiff that he would make a follow-up appointment with the Lupus Center and that he would follow-up with Plaintiff in two weeks unless urgent medical issues arose.  (ECF No. 239-7 at 38.)

Plaintiff was examined by Diggs on January 6, 2011.  (ECF No. 239-7 at 37-38.)  He complained that he was having burning pain in his left side.  (ECF No. 239-7 at 38.)  Diggs noted a tender cord palpation on his left side.  (ECF No. 239-7 at 37.)  She forwarded Plaintiff's chart for Dr. Jin's review and recommended follow-up regarding a possible biopsy.  (ECF No. 239-7 at 37.)

Plaintiff was seen by Dr. Larry Moreland at the Lupus Center on January 11, 2011.  (ECF No. 239-4 at 29.)  Dr. Moreland recommended that Plaintiff continue with his medications and be referred to a gastroenterologist for his abdominal pain.  (ECF No. 239-4 at 29.)  He further recommended a Dexa scan and repeat lab work in two months.  (ECF No. 239-4 at 29.)  Dr. Jin

42

met with Plaintiff on January 13, 2011, to discuss the visit.  (ECF No. 239-7 at 36.)  Dr. Jin noted

that Dr. Moreland recommended a referral to a gastroenterologist but Plaintiff denied any

gastroenterological complications such as heartburn.  (ECF No. 239-7 at 36.)  He further noted

that most of Plaintiff's pain was in his left upper abdominal wall where the biopsy had been

performed at SCI-Graterford five to six years earlier.  (ECF No. 239-7 at 36.)  Dr. Jin informed

Plaintiff that he would review Dr. Moreland's recommendations and continue care as needed.

(ECF No. 239-7 at 36.)  Dr. Jin also ordered that the Robaxin not be crushed because Plaintiff

complained that it was causing him a sore throat.  (ECF No. 239-5 at 25; No. 239-7 at 36.)

Plaintiff was examined by Dr. Park on January 20, 2011.  (ECF No. 239-7 at 35.)  He

complained of stomach and chest pain.  (ECF No. 239-7 at 35.)  Dr. Park's examination revealed

no findings and she explained to Plaintiff Lupus prognosis and treatment.  (ECF No. 239-7 at

35.)  She planned for Plaintiff to continue his medications as directed.  (ECF No. 239-7 at 35.)

Plaintiff was seen for his biweekly exam on February 1, 2011, and no acute issues were

noted.  (ECF No. 239-7 at 34.)  He was transferred to SCI-Graterford for court related matters on

February 10, 2011, and he was subsequently transferred back to SCI-Greene on March 31, 2011.

(ECF No. 239-7 at 27-33.)   Upon his return, Dr. Jin reordered the following medications:

Relafen, Zantac, artificial tears, Plaquenil, Prilosec, Prednisone, Lyrica, Os-Cal, Pilocarpine,

Restasis, Robaxin, and Methotrexate.  (ECF No. 239-5 at 21.)  Plaintiff was examined by Dr. Jin

on April 5, 2011.  (ECF No. 239-7 at 25-26.)  Dr. Jin's examination revealed no new findings

and he noted that Plaintiff would continue to be monitored and treated for his Lupus.  (ECF No.

239-7 at 25-26.)

On April 14, 2011, Plaintiff was seen by Joshua Trbovich, a new physician's assistant.

(ECF No. 239-7 at 24.)  Plaintiff argued that Trbovich did not know anything because he was

new.  (ECF No. 239-7 at 24.)  Trbovich encouraged Plaintiff to have a more positive outlook on his condition and perhaps it would help with the pain.  (ECF No. 239-7 at 24.)  Plaintiff became argumentative and started discussing the instant litigation.  (ECF No. 239-7 at 24.)  Trbovich scheduled Plaintiff to see Dr. Jin the following week.  (ECF No. 239-5 at 20; No. 239-7 at 24.)  Plaintiff was seen by Trbovich the following day at which time Trbovich ordered x-rays of Plaintiff's thoracic and lumbar spine.  (ECF No. 239-5 at 20; No. 239-7 at 23.)

Plaintiff was seen by Dr. Jin on April 18, 2011.  (ECF No. 239-7 at 22-23.)  Dr. Jin explained that he was to have x-rays done of his spine.  (ECF No. 239-7 at 23.)  Plaintiff stated that he received a shot of Toradol that temporarily helped his pain while he was at SCI-Graterford.  (ECF No. 239-7 at 23.)  Dr. Jin explained that Toradol was a NSAID and that Plaintiff had always maintained NSAIDs did not help his pain.  (ECF No. 239-7 at 23.)  Dr. Jin ordered that Plaintiff receive Toradol every Monday and Thursday for two weeks to see if it helped.  (ECF No. 239-5 at 19.)  He also was going to consult with PHS regarding a Dexa scan. (ECF No. 239-5 at 19.)

Plaintiff was seen by Trbovich on April 29, 2011.  (ECF No. 239-7 at 21.)  Plaintiff complained of the same chronic pains and requested a double mattress.  (ECF No. 239-7 at 21.)  Trbovich informed Plaintiff that Dr. Jin would evaluate him for a double mattress.  (ECF No. 239-7 at 21.)  Plaintiff was seen by Dr. Jin on May 2, 2011, but did not mention anything about the double mattress.  (ECF No. 239-7 at 21.)  Plaintiff stated that the Toradol helped but he did not think he was receiving the same dosage he received at SCI-Graterford.  (ECF No. 239-7 at 21.)  Dr. Jin increased the Toradol dosage.  (ECF No. 239-5 at 19.)

Dr. Jin saw Plaintiff on May 6, 2011.  (ECF No. 239-7 at 19.)  Plaintiff complained of an ear ache and Dr. Jin ordered ear drops.  (ECF No. 239-5 at 18.)  Plaintiff requested a double

mattress and was seen by Trbovich on May 13, 2011.  (ECF No. 239-5 at 18.)  Plaintiff stated

that he did not want to be seen by Trbovich so he was scheduled to see Dr. Jin the following

week.  (ECF No. 239-5 at 18; No. 239-7 at 18.)

Plaintiff was seen by Dr. Jin on May 16, 2011, and Dr. Jin increased the dosage of

Toradol.  (ECF No. 239-5 at 18; No. 239-7 at 18.)  He also ordered a follow-up visit with the

Lupus Center.  (ECF No. 239-5 at 18.)  Plaintiff later stated that the increase in the Toradol

helped his pain.  (ECF No. 239-7 at 17.)  He had the Dexa scan performed on May 20, 2011, and

the results revealed normal bone density.  (ECF No. 239-7 at 17.)

Dr. Jin went to see Plaintiff on June 2, 2011, at which time he observed Plaintiff sleeping

on his bed and noted that Plaintiff's mattress was thick enough and that he did not need a second

one.  (ECF No. 239-7 at 16.)  Dr. Jin discussed pain control with the Toradol injections.  (ECF

No. 239-7 at 16.)  Plaintiff stated that it helped and he requested to have it every third day which

Dr. Jin approved.  (ECF No. 239-5 at 17; No. 239-7 at 16.)

Plaintiff was seen by Dr. Park on June 10, 2011.  (ECF No. 239-7 at 15.)  He complained

of chronic joint pain and continuous discomfort, including difficulty sleeping, migraine

headaches, and blurred vision.  (ECF No. 239-7 at 15.)  He stated that he needed a new firm

double mattress.  (ECF No. 239-7 at 15.)  Dr. Park explained that mattress requests were now

matters dealt with by inmate housing and not medical.  (ECF No. 239-7 at 15.)  Plaintiff became

upset and walked away.  (ECF No. 239-7 at 15.)

Plaintiff was seen by Dr. Jin on June 16, 2011.  (ECF No. 239-7 at 14-15.)  Plaintiff

asked to increase the Toradol shot to every two days, and Dr. Jin agreed.  (ECF No. 239-5 at 16;

No. 239-7 at 14.)  Dr. Jin also ordered x-rays of Plaintiff's hands.  (ECF No. 239-5 at 16; No.

239-7 at 15.)  On June 23, 2011, Plaintiff was seen by Trbovich and requested a double mattress.

(ECF No. 239-7 at 14.)  Trbovich referred the matter to Dr. Jin.  (ECF No. 239-5 at 16; No. 239-7 at 14.)

Plaintiff was seen by Dr. Jin on July 1, 2011.  (ECF No. 239-7 at 13.)  Plaintiff stated that his order for Toradol was expiring.  (ECF No. 239-7 at 13.)  Dr. Jin asked whether the Toradol was helping and Plaintiff said "not really."  (ECF No. 239-7 at 13.)  Dr. Jin advised Plaintiff that due to side effects he would not renew the Toradol if it was not helping.  (ECF No. 239-5 at 15; No. 239-7 at 13.)

Plaintiff was seen by Dr. Moreland at the Lupus Center on July 5, 2011.  (ECF No. 239-4 at 28.)  Dr. Moreland recommended that Plaintiff receive Neurontin and folic acid, that the Lyrica and Robaxin be discontinued, that repeat lab testing be done in two months, and that Plaintiff continue with the artificial tears.  (ECF No. 239-4 at 28.)  Dr. Jin followed all recommendations and faxed Plaintiff's Dexa scan results to Dr. Moreland as requested.  (ECF No. 239-5 at 15; No. 239-7 at 12.)

Plaintiff was seen by Dr. Jin on July 14, 2011.  (ECF No. 239-7 at 12.)  Dr. Jin discussed the change in Plaintiff's medication and informed him that he was to be seen by the eye specialist.  (ECF No. 239-7 at 12.)  Plaintiff was seen by the eye specialist on July 19, 2011.  (ECF No. 239-4 at 27.)  The eye specialist noted that Plaintiff's Sjorgren's syndrome seemed well controlled and he recommended that Plaintiff continue with Restasis and the artificial tears.  (ECF No. 239-4 at 27.)

Plaintiff was seen by Trbovich on July 20, 2011.  (ECF No. 239-7 at 11.)  Plaintiff complained of pain and a rash.  (ECF no. 239-7 at 11.)  He stated that the Toradol helped him a little.  (ECF No. 239-7 at 11.)  Trbovich reordered the Toradol injections every two days for a week and a cream for Plaintiff's rash.  (ECF No. 239-5 at 14.)

Dr. Jin saw Plaintiff on July 27, 2011, and decided to continue the Toradol injections on an as needed basis. (ECF No. 239-7 at 10.) Dr. Jin ordered Mobic, which Plaintiff refused after a few days claiming that it did not help. (ECF No. 239-5 at 13; No. 239-7 at 7-8.) The Mobic was discontinued on August 22, 2011. (ECF No. 239-5 at 12; No. 239-7 at 7.) Plaintiff's chart was reviewed by Dr. Park on August 23, 2011, and she suggested that Plaintiff's medication may need to be reduced. (ECF No. 239-7 at 7.) When Dr. Park met with Plaintiff on September 1, 2011, she reviewed each medication and discussed the possibility of reducing dosages and medication. (ECF No. 239-7 at 6.) Plaintiff became angry and wanted to leave so his medication was not changed. (ECF No. 239-7 at 6.)

Plaintiff was seen by Trbovich on September 7, 2011. (ECF No. 239-7 at 5.) Trbovich discussed the multiple treatment plans that had been attempted to control Plaintiff's pain. (ECF No. 239-7 at 5.) Trbovich stated that the Toradol injections could lead to serious side effects with prolonged use and Plaintiff complained that the oral tablets did not work. (ECF No. 239-7 at 5.) Plaintiff wanted to restart the injections but Trbovich advised that it was not in his best interest due to the side effects. (ECF No. 239-7 at 5.) Plaintiff became frustrated and left. (ECF No. 239-7 at 5.) Trbovich ordered Plaintiff a double mattress for three months pending approval by security. (ECF No. 239-5 at 12.)

Plaintiff was seen by Dr. Jin on September 22, 2011. (ECF No. 239-7 at 4.) Plaintiff complained that the new double mattress was not firm enough to help his back pain. (ECF No. 239-7 at 4.) Dr. Jin advised him to place it on the floor or just use a single mattress and Plaintiff became argumentative. (ECF No. 239-7 at 4.)

Plaintiff was seen by Trbovic on October 5, 2011. (ECF No. 239-7 at 2.) Plaintiff complained that his new double mattress was not a new mattress and that it was sagging in the

middle.  (ECF No. 239-7 at 2.)  He also complained of the same chronic pain.  (ECF No. 239-7 at 2.)  Trbovic informed Plaintiff that medical had no say so over what mattress he received.  (ECF No. 239-7 at 2.)  He scheduled Plaintiff to see Dr. Jin the following week.  (ECF No. 239-5 at 11; No. 239-7 at 2.)  Dr. Jin saw Plaintiff on October 11, 2011.  (ECF No. 239-7 at 1.)  He noted that Plaintiff was mainly complaining of pain around his scar.  (ECF No. 239-7 at 1.)  He offered Plaintiff a local injection of steroids, which Plaintiff declined.  (ECF No. 239-7 at 1.)

On November 1, 2011, Plaintiff was seen for complaints of ear pain and a rash.  (ECF No. 239-6 at 39.)  He was given ear drops and a Lidex cream.  (ECF No. 239-5 at 10.)  Also on November 1, 2011, Plaintiff's current medications were reordered until June 1, 2012.  (ECF No. 239-5 at 10.)  This medication included: folic acid, Plaquenil, Prilosec, Prednisone, Relafen, Oyst-Cal, Salagen, Zantac, Neurontin, Restasis, artificial tears, and Trexall (Methotrexate).  (ECF No. 239-5 at 10.)

On November 15, 2011, Dr. Jin ordered several lab tests in preparation for Plaintiff's follow-up appointment at the Lupus Center.  (ECF No. 239-5 at 9; No. 239-6 at 38.)  Dr. Jin saw Plaintiff on November 18, 2011, at which time Plaintiff stated that his pain had increased.  (ECF No. 239-6 at 37.)  When Dr. Jin asked whether any pain medication he had been on before had helped, Plaintiff answered that the Relafen he was currently taking helped for a short time.  (ECF No. 239-6 at 37.)  Dr. Jin informed Plaintiff that he would have a follow-up appointment at the Lupus Center soon.  (ECF No. 239-6 at 37.)

Dr. Jin reviewed Plaintiff's blood work on November 30, 2011, and noted an increased ANA titer but otherwise appeared normal.  (ECF No. 239-6 at 36.)  Plaintiff was seen by Trbovich on December 5, 2011, and stated that he was upset he got artificial tears and not the preservative free eye drops recommended by the specialist.  (ECF No. 239-6 at 36.)  Trbovich

48

discontinued the artificial tears and ordered Refresh eye drops without preservatives.  (ECF No. 239-5- at 8.)  Plaintiff was examined by Dr. Park on December 8, 2011, at which time he complained of stomach, spinal cord, and chest pain.  (ECF No. 239-6 at 35.)  Dr. Park's examination revealed no findings and she recommended that Plaintiff continue with his medications.  (ECF No. 239-6 at 35.)  Dr. Jin saw Plaintiff on December 16, 2011, and informed him that he was to be seen at the Lupus Center on January 17, 2012.  (ECF No. 239-6 at 35.)

Plaintiff was seen by Dr. Jin on December 28, 2011.  (ECF No. 239-6 at 33.)  Plaintiff stated that he wanted pain medication, and told Dr. Jin that he wanted Oxycodone when asked what kind of pain medication he wanted.  (ECF No. 239-6 at 33.)  Dr. Jin told Plaintiff that Oxycodone was not available and offered him Vicodin instead, which Plaintiff stated did not work.  (ECF No. 239-6 at 33.)  Plaintiff was advised to try the Vicodin and Dr. Jin ordered it for two weeks.  (ECF No. 239-5 at 8; No. 239-6 at 33.)  Plaintiff later refused to take the Vicodin claiming that it made his pain worse and he continued to request Oxycodone.  (ECF No. 239-6 at 32.)

### 8.  2012

Plaintiff was seen on January 10, 2012, regarding his refusal to take the Vicodin.  (ECF No. 239-6 at 31.)  He became agitated with Dr. Jin after Dr. Jin explained that Plaintiff was going to be seen at the Lupus Center in the near future.  (ECF No. 239-6 at 31.)

Plaintiff was seen by Dr. Marc Levesque at the Lupus Center on January 17, 2012.  (ECF No. 239-2; No. 239-6 at 30.)  Dr. Levesque recommended an increase in the Neurontin and Methotrexate and to add a Vitamin D supplement.  (ECF No. 239-2 at 3.)  The following day, Dr. Jin entered orders increasing the Neurontin and Methotrexate and adding the Vitamin D

supplement.  (ECF No. 239-5 at 7.)  He also ordered Refresh and a follow-up consult with the retina specialist.  (ECF No. 239-5 at 7.)

Plaintiff was seen by Dr. Jin on January 25, 2012, at which point he went over Dr. Levesque's recommendations and informed Plaintiff that he would be seen at the Lupus Center in four to five months. (ECF No. 239-6 at 30.)  Plaintiff was also seen by Dr. Jin on January 31, 2012.  (ECF No. 239-6 at 29.)  He had been complaining about his double mattress.  (ECF No. 239-6 at 29.)  The mattress was inspected and found to be in acceptable condition.  (ECF No. 239-6 at 29.)

On February 3, 2012, Plaintiff refused his Refresh eye drops claiming that it made his eyes burn.  (ECF No. 239-6 at 28.)  He was seen on February 8, 2012, complaining that the changes to his medication had not helped.  (ECF No. 239-6 at 28.)  He stated that he only got two hours of relief after taking his medication.  (ECF No. 239-6 at 28.)  Plaintiff was told to continue his medication as recommended by the Lupus Center and he would have follow-up as needed. (ECF No. 239-6 at 28.)

On February 16, 2012, Plaintiff complained that he was not receiving his Refresh eye drops and Dr. Jin noted that Plaintiff had refused the eye drops.  (ECF No. 239-6 at 27.)  He reordered them that day.  (ECF No. 239-5 at 5.)

Plaintiff was examined by Dr. Park on February 23, 2012, who recommended no changes to Plaintiff's medications.  (ECF No. 239-6 at 27.)  The following day, Dr. Jin ordered that Plaintiff be allowed to continue use of his double mattress for another six months.  (ECF No. 239-5 at 5; No. 239-6 at 26.)

Plaintiff was examined by Dr. Jin on March 1, 2012, and his examination revealed no significant findings.  (ECF No. 239-6 at 25-26.)  He was seen on March 14, 2012, for the same

complaints of pain.  (ECF No. 239-6 at 24-25.)  It was recommended that Plaintiff continue with his current medications.  (ECF No. 239-6 at 24.)  At this time, Plaintiff also requested a new double mattress and did so again on March 21, 2012.  (ECF No. 239-6 at 23-25.)  Plaintiff was informed that medical did not issue the mattresses and that he would have to discuss the issue with his block officers if he felt his current mattresses were worn thin.  (ECF No. 239-6 at 23.)

Plaintiff was examined by Dr. Jin on April 5, 2012.  (ECF No. 239-6 at 20-21.)  Dr. Jin noted that Plaintiff's Lupus was under control but Plaintiff stated that his blood pressure was elevated because he was under a lot of stress.  (ECF No. 239-6 at 20.)  Dr. Jin ordered that Plaintiff's blood pressure be checked once a week for four weeks.  (ECF No. 239-4 at 39.)  Dr. Jin also saw Plaintiff on April 12, 2012.  (ECF No. 239-6 at 20.)  Plaintiff appeared to have good range of motion.  (ECF No. 239-6 at 20.)  Dr. Jin observed Plaintiff's double mattress and noted that it appeared to be in good shape.  (ECF No. 239-6 at 20.)

On April 30, 2012, Dr. Jin ordered lab work in preparation for Plaintiff's follow-up appointment at the Lupus Center.  (ECF No. 239-4 at 39; No. 239-6 at 18.)  On May 9, 2012, Plaintiff requested that his eye drops be reordered, and Refresh and Restasis were reordered until December 10, 2012.  (ECF No. 239-4 at 38; No. 239-6 at 18.)  On May 15, 2012, Dr. Jin reordered Plaintiff's medications which included: folic acid, Plaquenil, Methotrexate, Omeprazole (Prilosec), Prednisone, Relafen, Pilocarpine, Zantac, Neurontin, Os-Cal, and Vitamin D.  (ECF No. 239-4 at 17; No. 239-6 at 17.)

On May 17, 2012, Plaintiff complained of the same pain.  (ECF No. 239-6 at 16-17.)  The nurse noted that Plaintiff's most recent lab work was within normal limits but she ordered an EKG.  (ECF No. 239-4 at 37; No. 239-6 at 16-17.)

Plaintiff was seen by Dr. Levesque at the Lupus Center on May 22, 2012.  (ECF No. 239-1; No. 239-6 at 16.)  Dr. Levesque noted that Plaintiff's lab results from his last visit were all normal and his double-stranded DNA test was negative.  (ECF No. 239-1 at 2.)  He also noted that Plaintiff's lab tests from March were all normal but that he had a positive rheumatoid factor and a positive SSA and SSB.  (ECF No. 239-1 at 2.)  Plaintiff stated that his main problem was that he "ached all over," mainly in his joints but also in his muscles and spine.  (ECF No. 239-1 at 2.)  He stated that the increased Neurontin helped a little but that the increased Methotrexate did not help his joint pain.  (ECF No. 239-1 at 2.)  He did not report any new symptoms.  (ECF No. 239-1 at 2.)  Dr. Levesque recommended additional lab tests, a Dexa scan, hand films, and to continue with the Neurontin.  (ECF No. 239-1 at 3.)  He also encouraged exercise therapy for improvement of fibromyalgia symptoms.  (ECF No. 239-1 at 3.)  Dr. Jin adjusted Plaintiff's medication and ordered that the additional lab tests be performed in July.  (ECF No. 239-4 at 37.)

Plaintiff was seen by Dr. Jin on May 30, 2012.  (ECF No. 239-6 at 15.)  Plaintiff stated that he was still in pain and he complained of itchy skin.  (ECF No. 239-6 at 15.)  Dr. Jin adjusted Plaintiff's Prednisone dosage.  (ECF No. 239-4 at 36; No. 239-6 at 15.)  On June 18, 2012, Dr. Jin ordered a Dexa scan and x-rays of Plaintiff's hands per Dr. Levesque's recommendation.  (ECF No. 239-4 at 36; No. 239-6 at 14.)

Plaintiff was seen on July 5, 2012.  (ECF No. 239-6 at 12-13.)  He verbalized the same complaints and stated that his issues were getting progressively worse.  (ECF No. 239-6 at 13.)  The nurse practitioner advised Plaintiff that she would review his chart to see if there were any further tests that could be done, at which point Plaintiff became disrespectful and the visit was terminated.  (ECF No. 239-6 at 12-13.)  He was seen again for the same complaints on July 19,

2012.  (ECF No. 239-6 at 12.)  Plaintiff became angry after the nurse practitioner started to ask questions and the visit was terminated.  (ECF No. 239-6 at 12.)

Plaintiff was examined by Dr. Jin on July 27, 2012.  (ECF No. 239-6 at 9-10.)  Plaintiff became angry and argumentative when Dr. Jin asked what he could do for him.  (ECF No. 239-6 at 10.)  Plaintiff complained that he was not getting proper care or treatment and he was upset that Dr. Jin did not refer him to a gastroenterologist.  (ECF No. 239-6 at 10.)  Dr. Jin explained that, as a general surgeon, he had enough knowledge about the gastrointestinal tract and there was no indication that Plaintiff needed a referral to a gastroenterologist.  (ECF No. 239-6 at 10.)  Dr. Jin's examination revealed no significant findings.  (ECF No. 239-6 at 9-10.)  He noted that he doubted Plaintiff was experiencing severe pain as he claimed but did not doubt that he was in some discomfort.  (ECF No. 239-6 at 9.)  He planned to continue with Plaintiff's current treatment.  (ECF No. 239-6 at 9.)

### III.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact.  National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as

presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52).  If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50.  Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form.  See Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

## IV.    DISCUSSION

### A.    Eighth Amendment – Deliberate Indifference to Medical Needs

Plaintiff claims that Defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment.  Defendants move for summary judgment on the basis that Plaintiff has failed to put forth sufficient evidence to support a jury verdict in his favor on the issue of deliberate indifference.

Prison officials are required under the Eighth Amendment to provide basic medical treatment to prisoners.  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)).  In order to establish a violation based on the Eighth Amendment, "evidence must show (i) a serious medical need, and (ii) acts or omissions by

54

prison officials that indicate deliberate indifference to that need." Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Natale v. Camden County Corr. Facillity, 318 F.3d 575, 582 (3d Cir. 2003).

To satisfy the first prong, the plaintiff must demonstrate that his medical needs are serious. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citing Estelle, 429 U.S. at 103-04). Serious medical needs include those that have been diagnosed by a physician as requiring treatment or that are so obvious that a lay person would recognize the necessity for doctor's attention, and those conditions which, if untreated, would result in the unnecessary and wanton infliction of pain or a lifelong handicap or permanent loss. See Atkinson v. Taylor, 316 F.3d 257, 272-73 (3d Cir. 2003); see also Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988). Defendants do not argue that Plaintiff's medical needs are not serious. As such, the Court will assume for the purpose of this Opinion that Plaintiff's medical needs are sufficiently serious for Eighth Amendment purposes.

The second element of the test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical needs. The "deliberate indifference" standard is a stringent standard of fault requiring proof that a defendant disregarded a known or obvious consequence of his action. Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 410 (1997). The defendant must be both aware of facts from which the inference could be drawn that a substantial harm exists, and he must also draw the inference. Farmer v. Brennan, 511 U.S. 825, 837 (1994). The test for whether a prison official was deliberately indifferent is whether that defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 841. Only egregious acts or omissions can violate this standard.

See White v. Napoleon, 897 F.2d 103, 108-09 (3d Cir. 1990).  Nevertheless, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if harm ultimately was not averted." Farmer, 511 U.S. at 844.

The Third Circuit has found deliberate indifference where a prison official: (1) "knows of a prisoner's need for medical treatment but intentionally refuses to provide it;" (2) "delays necessary medical treatment for non-medical reasons;" (3) "prevents a prisoner from receiving needed or recommended treatment"; or (4) "persists in a particular course of treatment in the face of reluctant pain and risk of permanent injury."  Rouse, 182 F.3d at 197 (internal citations and quotations omitted).  The Third Circuit has also held that "[n]eedless suffering resulting from a denial of simple medical care, which does not serve any penological purpose," violates the Eighth Amendment.  Atkinson, 316 F.3d at 266; see also Monmouth County Corr. Inst. Inmates, 834 F.2d at 346; Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993).

However, the deliberate indifference standard affords considerable deference to prison doctors in the diagnosis and treatment of medical problems on inmates.  Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979).  Courts will not second-guess the propriety or adequacy of a particular course of treatment if it is a question of sound professional judgment.  Id.  Thus, "mere disagreements over medical judgment do not state Eighth Amendment claims."  White, 897 F.2d at 110 (internal quotations and citations omitted).  Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, that would amount to medical malpractice and not an Eighth Amendment violation.  See White, 897 F.2d at 110; see also Estelle, 429 U.S. at 105-06.  Accordingly, a "misdiagnosis or preference for a certain type of treatment will not alone rise to the level of

deliberate indifference." <u>Christy v. Robinson</u>, 216 F. Supp. 2d 398, 413 (D. N.J. 2002) (citations omitted). Moreover, "no [Eighth Amendment] claim is stated when a doctor disagrees with the professional judgment of another doctor" because "[t]here may, for example, be several acceptable ways to treat an illness." <u>White</u>, 897 F.2d at 110. Against this backdrop, the Court considers each claim of deliberate indifference in turn.

**1. Deprivation of medical treatment**

Plaintiff contends that Defendants and the rest of the medical staff at SCI-Greene have denied him medical treatment since he arrived on April 28, 2005. Although he does not dispute that he was provided with some medical attention, he maintains that Defendants provided him with medical attention without providing him medical treatment. Plaintiff maintains that Defendants were aware that he had been experiencing chest, heart, and stomach pains since December 2004, and upon his arrival at SCI-Greene, they did nothing to uncover the cause of his pain. Instead, they provided him with the same ineffective medications that he received at SCI-Graterford, which he contends they already knew would not help. He further maintains that they ignored the symptoms with which he presented and abnormal test results from prior years, all of which he claims were indicative that something was seriously wrong. He claims that no further testing was done because Defendants wanted to avoid diagnosing him with a serious medical condition, and when the tests were eventually performed, they still avoided diagnosing his condition despite the fact that he presented with objective evidence of Lupus and other serious medical conditions. He contends they did this in order to relieve themselves from the responsibility of providing him with costly treatment, including visits with specialists and effective medications, and they instead opted for less costly and efficacious treatment of which they knew would be unsuccessful.

First, the Court finds Plaintiff's contention that Defendants denied him medical care and treatment and avoided diagnosing his condition to be rebutted by the record.  Plaintiff was seen by numerous medical providers upon his arrival at SCI-Greene and he was prescribed medication for his pain.  Numerous EKGs, x-rays, and lab tests were ordered, all which returned normal until he presented with an elevated ESR in June 2005.  Throughout June and July 2005, Plaintiff was seen by Dr. Falor who tried to uncover the source of Plaintiff's pain.  On July 27, 2005, Dr. Falor assessed Plaintiff with puzzling pain along the milk line and he ordered lab work to measure Plaintiff's serum prolactin levels, which returned within normal limits.  He examined Plaintiff again on August 25, 2005, and assessed Plaintiff with the same pain but needed to research this finding.  In the meantime, Plaintiff was prescribed more pain medication.  In September 2005, Plaintiff was examined by Dr. Talabi who assessed him with non-specific pain.  Because Plaintiff complained that the pain medication was not working and making him sick, Dr. Talabi ordered a different pain medication.  After complaining to Hickman that none of the pain medications relieved his pain, more lab tests were ordered, which later revealed that Plaintiff had elevated protein and globulin levels of an unknown etiology.  Because of this, more x-rays were ordered and he was seen by Dr. Falor on November 17, 2005.  Dr. Falor believed that Plaintiff had a hypersensitive painful scar from the biopsy surgery that had been performed prior to his transfer and he ordered Plaintiff a different pain medication.  At this point, Dr. Falor referred Plaintiff to Dr. Jin for continuity of care and follow-up.  Dr. Jin also felt as if Plaintiff had a hypersensitive scar from the biopsy.  He offered to perform a re-excision of the affected area with subsequent steroid injections to relieve his discomfort but Plaintiff refused.

In January 2006, Plaintiff was again offered steroid injections to relieve his pain and he again refused.  Because Plaintiff reported no relief from any of the previously prescribed pain

58

medications, he was prescribed a different pain medication.  In February 2006, Plaintiff was seen by Dr. Talabi who ordered additional lab testing and a different pain medication.  In March 2006, he was again seen by Dr. Talabi who noted Plaintiff's lab results, prescribed medications, and ordered additional testing.  In April 2006, Dr. Falor noted that Plaintiff's tests reported positive for a possible diagnosis of Lupus and he ordered a rheumatology consult with Dr. Seaman.

Plaintiff's factual allegations demonstrate a clear disagreement of the methods of treatment that he received, but do not show that care was withheld or delayed, either intentionally or otherwise.  His medical records clearly show that his complaints were not ignored.  Defendants frequently ordered testing so as to diagnose the cause of Plaintiff's pain and provided him with various types of medications in an effort to alleviate his discomfort.  He was consistently seen and examined by medical providers, and although they never found any objective evidence to support Plaintiff's complaints of pain, they continued to order diagnostic testing and offer medication.  As soon as Plaintiff presented with evidence to support a possible diagnosis of Lupus, Dr. Falor ordered a consultation with a rheumatologist.  While Plaintiff may have experienced some delay in being returned for his follow-up visit with the rheumatologist, which will be discussed *infra*, he has since received repeated examinations at regular intervals from specialists at the University of Pittsburgh Medical Center, Lupus Center of Excellence and their recommendations have been followed by Dr. Jin.  Unfortunately, despite all the medical intervention, Plaintiff claims he is still in pain.  While Plaintiff may disagree with this conclusion, there is no indication that he was denied medical treatment or that Defendants avoided diagnosing his condition.

Although Plaintiff styles his claim as a "denial" of medical treatment, it is clear from his submissions that he is actually challenging the adequacy, appropriateness, and effectiveness of

the treatment he received.  Despite his pleas to the contrary, this is a classic case whereby Plaintiff disagrees with the medical treatment rendered.  Plaintiff has been given medical treatment and he is dissatisfied with the results; he disagrees with Defendants' assessment and treatment of his medical conditions.  However, as previously stated, a disagreement over medical diagnosis and course of treatment is insufficient to establish deliberate indifference as long as it is a matter of sound professional judgment.  *See* <u>Inmates of Allegheny County Jail</u>, 612 F.2d at 762.  There is nothing in the record to suggest that Defendants did not at all times use their best medical judgment, and as such, the Court will not second guess the propriety or the adequacy of the course of treatment with which Plaintiff was provided even if it was unsuccessful.  Consequently, Plaintiff has failed to show that there is a genuine issue of material fact for trial as to his claim of deliberate indifference and Defendants' Motion For Summary Judgment will be granted accordingly.

### 2.  Ineffective medical treatment

Plaintiff takes issue with the effectiveness of the medical treatment with which he was provided, specifically pain medication which he claims was cheap, ineffective, and caused his pain to worsen.  He claims that Defendants acted with deliberate indifference by intentionally prescribing medications previously proven to be ineffective and which caused him additional pain.  He further claims that nothing has been effective at relieving his pain and that he is still in excruciating pain to this day.

Since his transfer to SCI-Greene in April 2005, Plaintiff has been prescribed the following medications to help relieve his pain: Motrin, Ultram, Indocin, Naproxen, Vicodin, Phenylgesic, Feldene, Tylenol #3, Methadone, Relafen, Neurontin, Toradol, Midrin, Excedrin, Medrol, Salsalate, Flexeril, Robaxin, Methotrexate, Prednisone, Plaquenil, and Lyrica, among

others.  Plaintiff's medical records reveal that Defendants did at times repeat medications, such as Motrin and Ultram, but there is nothing in the record that reveals that this was done intentionally to cause him harm or with reckless disregard to his health.  In fact, there were numerous occasions where Plaintiff reported that these medications, among others, helped to relieve his pain temporarily before later reporting that they were ineffective.  Once Plaintiff reported that the medications proved to be ineffective or made him sick, his medical needs were reassessed and the course of treatment was modified.

In this case, Plaintiff clearly disagrees over the preferred medication to treat his pain. Plaintiff's medical records reveal that he wanted a stronger narcotic such as Oxycodone and Dr. Jin explained that this was not permitted.  This difference of opinion does not support an Eighth Amendment claim.  *See* White, 897 F.2d at 110; Rochell v. Corr. Med. Servs., No. 4:05CV268, 2006 U.S. Dist. LEXIS 37943, at *10 (N.D. Miss. April 10, 2006) ("The constitution does not . . . guarantee pain-free medical treatment . . . .  While the plaintiff might have preferred stronger medication, his mere disagreement with his medical treatment does not state a constitutional claim.")  Moreover, Plaintiff is not constitutionally entitled to the treatment of his choice and it cannot be assumed that Oxycodone, or any other pain medication, would have successfully relieved his pain.  In fact, all indication points to the contrary.  Given Plaintiff's condition, it is unlikely that any medication available would render him completely free of pain.

There is no evidence that Defendants continued to pursue a course of treatment they knew to be ineffective or withheld necessary medical treatment that they knew to be more effective.  Despite repeated attempts to alleviate Plaintiff's pain by a variety of medications, Plaintiff contends that he failed to obtain relief.  However, this does not establish deliberate indifference.  The Court is sympathetic to Plaintiff's situation and his many medical conditions

that he must live with.  Lupus can be a debilitating disease and many people with the diagnosis must live with chronic pain that pain medication cannot alleviate.  However, the undisputed evidence in this case shows that Defendants responded to Plaintiff's complaints and prescribed him numerous pain relievers in an effort to alleviate his pain.  Medical staff at SCI-Greene and outside specialists have experimented with and modified Plaintiff's medications in an effort to make him more comfortable and unfortunately nothing has proven to be effective to Plaintiff's satisfaction.  Prior to his diagnosis of Lupus, Plaintiff was treated with a variety of medications and claimed that he still had pain.  Since his diagnosis, specialists have still been unable to stop his pain.

As stated *supra*, this is a classic case in which Plaintiff disputes the adequacy of his treatment.  However, evidence of unsuccessful medical treatment, such as the inability to reduce pain, is insufficient to establish deliberate indifference.  *See* Thomas v. Coble, 55 F. App'x 748, 749 (6th Cir. 2003) (summary judgment properly granted to prison physician despite inmate's disagreement with physician over adequacy of pain medication and allegation that he suffered in excruciating pain for six months); *see also* Heigelmann v. Prince, No. 5:11cv130, 2012 U.S. Dist. LEXIS 31523, at *17-18 (E.D. Tex. Jan. 27, 2012) (no deliberate indifference where inmate was repeatedly given various types of pain medication and steroid injections in an effort to relieve his back pain and inmate complained that nothing was effective).  Plaintiff has been prescribed various types of pain medication and the fact that these medications were not as effective as he would have liked does not establish that Defendants were deliberately indifferent to his medical needs.  *See* Goodson v. Browne, No. 6:05cv4, 2005 U.S. Dist. LEXIS 33900, at *9 (E.D. Tex. Apr. 29, 2005) (no deliberate indifference by prison doctor who proscribed inmate numerous pain medications that were not the narcotic medications the inmate specifically

requested and which the inmate claimed were ineffective because "there is no constitutional right

to a non-existent miracle cure").  Even if the medications given were not the best money could

buy, it falls far short of establishing deliberate indifference.  *See* Mayweather v. Foti, 958 F.2d

91 (5th Cir. 1992).  As such, Defendants' Motion will also be granted as to this claim.

### 3.  Failing to show up for sick call

Plaintiff claims that since arriving at SCI-Greene, Defendants have repeatedly failed to

show up for sick call in deliberate disregard to his medical needs.  Throughout his voluminous

filings, Plaintiff points to specific days in which he filed sick call slips and was not seen by a

medical provider. Of most concern is the allegation that he was not seen for a two-and-a-half

month period, from the end of November 2005 through the beginning of February 2006, during

which time he claims he was left in his cell to suffer in excruciating pain.[5]

The Court finds Plaintiff's situation to be very similar to that of the plaintiff in

Heigelmann v. Prince, No. 5:11cv130, 2012 U.S. Dist. LEXIS 31523 (E.D. Tex. Jan. 27, 2012),

adopted by 2012 U.S. Dist. LEXIS 31470 (E.D. Tex. Mar. 7, 2012).  In Heigelman, the plaintiff

had an accident in which he "sustained serious head and lower back injuries."  Id. at *2.  He

complained that prison medical staff would not give him the pain medication which had been

prescribed by the doctors at the hospital emergency room and that they intentionally ignored his

sick call requests which he submitted every day.  Id.  He stated that he "cried and begged the

---

[5]     The Court does not find it necessary to address each and every instance whereby Plaintiff alleges medical
providers failed to show up for sick call following submission of his request.  Due to the fact that Plaintiff frequently
submitted sick call requests for the same complaints, it appears that the times Plaintiff was not seen for sick call
were due to the fact that he had either recently seen a medical provider for the complaints for which he requested
medical care and his symptoms had not changed or he was scheduled to see a medical provider in the near future for
existing complaints during a follow-up or routine bi-weekly visit.   However, the Court notes that if Plaintiff
submitted a sick call slip requesting medical care for a new acute medical issue that had not previously been
addressed, he was seen by a medical provider for those complaints.  Because of this, the Court feels that it is only
necessary to address Plaintiff's claim that he was not seen for the aforementioned two-and-a-half month period
despite requesting medical care.

medical staff every day for almost a year to do something to help his back to stop hurting" but they only gave him medication which did nothing for his pain. Id. Finally, almost a year after the accident, he was taken back to the hospital where he received steroid injections and told by the hospital doctors that something should have been done much sooner. Id. at *2-3. They ordered that he be seen by a pain control specialist but the prison physician would not allow it, nor would prison medical staff allow him to have Vicodin, which had been prescribed by the hospital doctors. Id. at *3-4. The court held that the plaintiff had failed to show that the medical defendants were deliberately indifferent to his serious medical needs because, despite the fact that he was not seen by medical for every sick call request he submitted, and was not even seen by the prison physician but perhaps three or four times that year, his medical records revealed that he was repeatedly given various types of pain medication (which included Tylonol #3, Ibuprofen, Mobic, Ultrama, Flexeril, Prednisone and steroid injections). Id. at *17-18. The fact that the medications were ineffective and not costly did not establish otherwise, as it was unlikely that any medication available would have rendered him free of pain. Id.

As an initial matter, the Court notes that Plaintiff submitted sick call slips frequently, to say the least, and most often times requesting medical care for the same medical complaints for which he was already being evaluated and treated. Just in 2005 alone, Plaintiff submitted approximately 66 sick call slips since arriving at SCI-Greene on April 28, 2005. In addition, Plaintiff submitted countless more request slips to medical staff and prison administrators seeking medical care. This pattern continued throughout the following years.

When Plaintiff was examined for his continuing complaints of chest and stomach pain on November 28, 2005, Dr. Jin noted that Plaintiff's pain was most likely caused by a hypersensitive scar from the tissue biopsy that had been performed at SCI-Graterford and which

showed benign fibrofatty tissue.  Dr. Jin offered to perform a re-excision of the affected area with subsequent steroid injections to relieve his discomfort but Plaintiff refused stating that he did not trust Dr. Jin to do anything for him.  Dr. Jin then stated that he would follow-up with Plaintiff in two months concerning his complaints of chest and stomach pain and Plaintiff's medical visits would be limited to monitoring his complaints unless something changed. Following this visit, Plaintiff continued to submit sick call slips requesting medical treatment for his chest and stomach pain.  Medical providers reviewed each request and noted that his symptoms had not changed and that he would be seen in two months per Dr. Jin's recommendation.  On December 4, 2005, Plaintiff submitted a sick call slip for the same complaints, and it was returned to him the following day with an explanation that he would be seen in two months concerning his complaints but that he could continue to utilize sick call for all other medical conditions.  Nevertheless, Plaintiff still continued to submit sick call slips regarding his chest and stomach pain.

On December 13, 2005, Plaintiff grieved that he was not being provided sick call when requesting to be seen.  In denying his grievance, Defendant Manson, the Healthcare Administrator, stated that Plaintiff had been seen eight times in October and twice in November, his issues were being addressed, and a treatment plan had been provided informing him that the doctor had determined it was not necessary to see him every day for his reoccurring complaints. Plaintiff continued to submit sick call requests, and on December 21 and 23, 2005, Defendant Gress noted that there had been multiple attempts to explain to Plaintiff his treatment plan, all of which he ignored.  Plaintiff was examined by Dr. Jin on January 25, 2006, at which time Dr. Jin again discussed steroid injections to relieve Plaintiff's pain.  Although he initially agreed, Plaintiff refused the injections when Dr. Jin went to perform them on February 1, 2006.

Plaintiff has argued on numerous occasions that he was never provided with a treatment plan nor informed of what it entailed.  However, it is clear to the Court that the treatment plan at this point was to monitor Plaintiff's condition and routinely follow-up as necessary because, at that time, Dr. Jin was operating under the assumption that Plaintiff's pain was caused by a hypersensitive scar for which Plaintiff received no relief by pain medication and had refused surgery and steroid injections.  Despite the fact that Dr. Jin may have been incorrect in his assessment and diagnosis, Plaintiff's condition was being monitored and treatment was offered and refused.  Given this, the Court finds that no reasonable factfinder could conclude that Defendants were deliberately indifferent to Plaintiff's medical needs when they did not respond to every one of Plaintiff's virtual daily sick call requests during this period.  As such, Plaintiff has not demonstrated the existence of a genuine issue of material fact for trial and Defendants' Motion will be granted accordingly.

### 4.  Laughter and inappropriate comments

Plaintiff asserts that Defendants' laughter and inappropriate comments evidenced their deliberate indifference to his medical needs.  Specifically, Plaintiff states that Defendants trivialized his complaints, laughed in his face, and verbally abused, yelled at, mocked, antagonized, and provoked him.  He maintains that they considered him a nuisance due to his constant complaining and that they did not believe he was in pain, often calling him a liar or words to that effect.

This conduct alone, while rude and insensitive if true, does not establish that Defendants were deliberately indifferent to Plaintiff's medical needs, particularly in light of the fact that Plaintiff was consistently provided with medical care and treatment.  *See* Potter v. Deputy Attorney Generals, 304 F. App'x 24, 27 (3d Cir. 2008) (holding that district court properly

dismissed claim that officer mocked inmate while he suffered from an eye infection because verbal abuse of a prisoner by a prison official is insufficient to establish a violation of a federal right); Lyons v. Wall, No. 08-498, 2012 U.S. Dist. LEXIS 108641, at *17 (D. R.I. Aug. 1, 2012) (allegation that Captain taped a helmet to inmate's head and laughed at him was not enough to draw a reasonable inference that the Captain's mind was one of deliberate indifference); Brown v. Darnold, No. 09-240, 2011 U.S. Dist. LEXIS 104001, at *12 (S.D. Ill. Sept. 14, 2011) (finding no deliberate indifference when prison nurses yelled at inmate and laughed at his pain); Ekene v. Cash, No. 10-7878, 2011 U.S. Dist. LEXIS 155244, at *11 (C.D. Cal. Sept. 13, 2011) (no deliberate indifference when correctional officers laughed and said that plaintiff was "the correct candidate for this punishment" when plaintiff told the officers that he suffered from anemia and could not be placed in a cold cell); Goodwin v. Burge, No. 08-CV-660A, 2011 U.S. Dist. LEXIS 57255, at *22 (W.D. N.Y. March 7, 2011) (laughing at inmate when he fell after sitting on a chair that collapsed does not violate the Eighth Amendment); Lewis v. Jehua, No. 2:08cv398, 2010 U.S. Dist. LEXIS 142850, at *15-16 (E.D. Va. Dec. 14, 2010) (allegation that jail nurse laughed at plaintiff when plaintiff complained of rectal bleeding and said "this is what I gave you extra toilet tissue for" is not, without more, indicative of deliberate indifference); Savage v. Brue, No. 9:05-CV-0857, 2007 U.S. Dist. LEXIS 99934, at *31 (N.D. N.Y. Sept. 19, 2007) (finding no deliberate indifference while after falling out of bed and being taken to the infirmary inmate found various nurses and correctional officers gathered together laughing and saying "the paralyzed man can walk"), adopted by 2007 U.S. Dist. LEXIS 77643 (N.D. N.Y. Oct. 18, 2007); Sampay v. Griffin, No. 06-CV-0360, 2007 U.S. Dist. LEXIS 44111, at *3 (M.D. La. May 8, 2007) (prison doctor's laughter at prisoner who stated he was in pain "from his head to his toes" after his unsuccessful suicide attempt was not, in and of itself, deliberate indifference), adopted

by 2007 U.S. Dist. LEXIS 40401 (M.D. La. June 4, 2007); <u>Smith v. Crose</u>, No. 06-3168, 2006 U.S. Dist. LEXIS 64250, at *17-18 (D. N.J. Sept. 7, 2006) (mockery and statement made by doctor that nobody dies from symptoms of methadone withdrawal did not qualify as an Eighth Amendment violation); <u>Barad v. Comstock</u>, No. 03-CV-0736, 2005 U.S. Dist. LEXIS 38418, at *30 (W.D. N.Y. June 30, 2005) ("[Plaintiff] alleges that defendant laughed at him and told the guards that it was a 'false alarm' [when plaintiff complained he was going to die from a kidney-stone attack] but plaintiff has not established that defendant wantonly intended to cause plaintiff to suffer [in order] to establish the subjective element of the deliberate indifference claim."); <u>Owens v. Cuyler</u>, No. 81-1722, 1989 U.S. Dist. LEXIS 8071, at *12 (E.D. Pa. July 14, 1989) (finding no deliberate indifference when doctor laughed while inmate showed him his medical problems).

In response, Defendants argue that, in addition to not stating an Eighth Amendment claim, such allegations are not supported by the record.  Giving Plaintiff the benefit of the doubt on this issue, the Court concludes that even if Defendants *may* have been frustrated with Plaintiff and his frequent medical requests, and *may* have expressed their frustration through improper expressions such as laughter and mockery, this is not enough, in and of itself, to plausibly suggest deliberate indifference.  Moreover, given the totality of the underlying circumstances, and the fact that Plaintiff was frequently and consistently provided with medical care and treatment, the Court finds that no reasonable factfinder could conclude that these isolated instances of inappropriate behavior- if true- taken alone or collectively, amount to deliberate indifference.  Therefore, Defendants' Motion will be granted with respect to any statement, mockery, laughter, or expression by Defendants which Plaintiff found unpalatable.

**5.  Failure to diagnose and delay in making referral to a specialist**

Plaintiff claims that Defendants acted with deliberate indifference by failing to diagnose him with Lupus and seek outside consultation earlier.  He contends that Defendants should have been able to diagnose him when he first arrived at SCI-Greene and during the following years or they should have sent him to see a specialist capable of diagnosing his condition prior to June of 2006, when he first saw Dr. Seaman.  He claims that Defendants deliberately chose not to diagnose him in order to avoid having to send him to specialists and provide him with effective treatment.  He claims this was done for non-medical reasons, such as cost-savings and retaliation, which will be discussed *infra*.  He also claims that when he was finally referred to Dr. Seaman, Defendants purposely failed to provide Dr. Seaman with his medical records in order to make it impossible for Dr. Seaman to diagnose his condition.

In <u>Bramson v. Sulayman</u>, 251 F. App'x 84 (3d Cir. 2007), the plaintiff alleged that prison doctors prescribed medication for his lung infections, but that those treatments were ineffective because the doctors failed diagnose him with heart disease.  <u>Id</u>. at 85.  He further alleged that they delayed his access to an outside specialist, and that, by the time he saw the specialist and was properly diagnosed with heart disease, he required immediate hospitalization and the installation of a pacemaker and electric defibrillator, resulting in permanent heart and lung damage.  <u>Id</u>.  The Third Circuit affirmed the dismissal of his Eighth Amendment claim because his allegations showed only negligence.  <u>Id</u>. at 86.  "[The plaintiff's] complaint makes clear that the defendants treated him on many occasions.  He claims that those treatments proved ineffective and that defendants negligently failed to diagnose his heart condition, but those allegations do not state an Eighth Amendment claim."  <u>Id</u>.

The instant case is very similar to that of <u>Bramson</u>.  Plaintiff claims that at the time of his arrival at SCI-Greene, his medical records indicated abnormal lab results (from 2003 and 2004) and that he had been experiencing excruciating chest, heart, and stomach pain since December 2004.  He claims that despite this objective evidence that suggested he was suffering from a serious medical condition Defendants conducted no further testing and ignored his complaints in an effort to avoid diagnosis.  However, Plaintiff ignores the fact that, as early as one week after his arrival, Defendants conducted numerous tests in an effort diagnose his condition and determine the cause of his pain, including blood studies, x-rays and EKGs.  Even though Plaintiff's tests returned normal and his examinations were negative for any abnormality, Defendants continued to conduct diagnostic tests.  Plaintiff complains that Defendants should have been able to diagnose him when he presented with an elevated ESR in June 2005, elevated protein levels in September 2005, and elevated protein and globulin levels in October 2005.  However, Dr. Jin and Dr. Seaman testified that an elevated ESR is not diagnostic for anything in particular, it is just a gauge of inflammation in the body from any cause (ECF No. 205-9 at 22; No. 205-11 at 54), and both parties agree that Lupus can be a very difficult disease to diagnose.  Indeed, Dr. Seaman, a board certified rheumatologist, testified that there is no one diagnostic test for Lupus as "it's really putting pieces of the puzzle together to come up with the diagnoses." (ECF No. 205-11 at 12.)  Dr. Seaman further testified that in Plaintiff's case it is a hard diagnosis to make even for a rheumatologist and he himself was unable to make a diagnosis of SLE following Plaintiff's visit on June 29, 2006 and subsequent visit on April 16, 2008.  (ECF No. 205-11 at 49, 65-66.)  Moreover, he agreed that rheumatologists who are experts in Lupus often disagree about whether someone has Lupus.  (ECF No. 205-11 at 66.)

70

Nevertheless, during the entirety of the time of which Plaintiff complains that Defendants should have been able to diagnose his condition he was consistently examined and provided with medication.  Defendants continued to order diagnostic testing in an attempt to uncover the cause of his pain.  When Plaintiff finally presented with a positive ANA test in March 2006, Dr. Falor immediately ordered a rheumatology consult and additional testing, and when these tests came back positive duplicate testing was ordered at the request of Plaintiff.  The rheumatology consult was approved in May 2006 and Plaintiff was seen by Dr. Seaman the following month. Although Defendants may not have referred Plaintiff to a rheumatologist as quickly as hindsight perhaps allows us to think they should have or as quickly as Plaintiff would have liked, their actions were not deliberately indifferent because he consistently received medical care and treatment prior to the consultation.  *See* Logan v. Clarke, 119 F.3d 647 (8th Cir. 1997) (plaintiff who alleged that prison doctors waited three months before referring him to a dermatologist for his serious skin infection could not demonstrate that the doctors were deliberately indifferent by waiting that long because they "made efforts to cure the problem in a reasonable and sensible manner" during that time).

The Court cannot conclude that a reasonable factfinder would find that Defendants knew that Plaintiff was suffering specifically from Lupus, or any other serious medical condition which they could identify, and deliberately chose not to diagnose.  At best, Plaintiff *might* have a claim for negligence- although that is far from clear- that is not actionable under the Eighth Amendment. *See* Estelle, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")

As to Plaintiff's claim that Defendants deliberately chose not to send his medical records to Dr. Seaman in order to make it impossible for Dr. Seaman to diagnose his condition, Dr. Falor testified at Plaintiff's preliminary injunction hearing on May 6 and 7, 2008, that they did, in fact, send with Plaintiff the necessary medical background information in the consult request and that this information included: (1) a description of Plaintiff's pain and where it was located, (2) a description of the results from the biopsy tissue that was taken at SCI-Graterford just prior to his transfer, (3) a description and the results of the serum protein electrophoresis test, and (4) the results from the ANA and the double stranded DNA tests.  (ECF No. 205-8 at 10.)  Dr. Seaman testified that he received this information at the time of Plaintiff's examination and reviewed it prior to issuing his report.  (ECF No. 205-11 at 19-20.)  This is evidenced by Dr. Seaman's notation in his report that Plaintiff's prior labs reportedly showed a higher titer ANA and double-stranded DNA.  (ECF No. 205-5 at 9.)  The fact that Defendants did not send *all* of Plaintiff's medical records to the consultation but instead provided Dr. Seaman only with the relevant information and test results does not establish deliberate indifference, or as Plaintiff suggests, that they did so with the intention of preventing Dr. Seaman from diagnosing his condition.  Dr. Seaman testified that he was unable to make a specific diagnosis from a rheumatologic standpoint based on Plaintiff's history and physical examination.  (ECF No. 205-11 at 36-37.)  Lab and x-ray results from tests performed after Plaintiff's initial visit, and with which he was provided before issuing his report following Plaintiff's second visit, did not help him make any further conclusion or diagnosis.  (ECF No. 205-11 at 67.)  Although he did not have Plaintiff's cervical and lumbar spine x-ray results, which he did later receive and showed no significant findings, and he could not locate SS-A/SS-B antibody results at that time, Dr. Seaman testified that they would not have aided in confirming a diagnosis of SLE.  (ECF No. 205-11 at 67-69.)

Because Plaintiff voiced frustration and agitation with the lack of adequate explanation of his symptoms, Dr. Seaman suggested considering a second rheumatology opinion to which Dr. Jin agreed.  (ECF No. 205-11 at 67.)

Plaintiff's allegations that Defendants intentionally failed to diagnose his condition and delay him access to an outside specialist are essentially rebutted by the record.  The record demonstrates that Defendants attempted to diagnose his condition and determine the cause of his pain and they sent him to see a rheumatologist as soon as he presented with positive test results that indicated a possible diagnosis of Lupus.  Even after Dr. Seaman was unable to make a specific diagnosis, Dr. Jin sent him to another rheumatologist for a second opinion.  Given this evidence and the fact that Lupus can be a particularly difficult disease to diagnose, the Court concludes that no reasonable factfinder could conclude that Defendants deliberately chose not to diagnose his condition or delayed him access to a specialist.  As such, Defendants' Motion will be granted accordingly.

### 6. Failure to follow recommendations of specialist

Plaintiff alleges that Dr. Jin failed to follow the recommendations of the specialists  and that this caused significant delay in the diagnosis and treatment of his condition, undue suffering, and lasting injury.  As an initial matter, the Court finds that most of the recommendations of the specialists were carried out, but Plaintiff specifically takes issue with Dr. Jin's failure to return him to see to Dr. Seaman within one month after his initial visit and Dr. Jin's failure to refer him to a gastroenterologist, cardiologist, and dermatologist as recommended by Dr. Seaman.

### a.  Follow-up visit with Dr. Seaman

With respect to Plaintiff's first contention, Dr. Seaman recommended that Plaintiff be returned for a follow-up visit within one month after his initial visit.  However, according to the

file Dr. Seaman maintained for Plaintiff, a follow-up visit was scheduled for July 26, 2006, and then later rescheduled for September 6, 2006, because Dr. Seaman had ordered a DES test for Plaintiff in August.   A note in Plaintiff's file stated that "Vicki" from SCI-Greene called to cancel the September 6, 2006 office visit because Plaintiff refused to consent to a CT scan and that if Plaintiff signed the consent form the visit would be rescheduled.   Plaintiff signed the consent form and the CT scan was performed on November 8, 2006; however, Plaintiff was not returned for a second visit with Dr. Seaman until one-and-a-half years later.   Although Dr. Jin acknowledged that there was a delay in returning Plaintiff to see Dr. Seaman due to Plaintiff's failure to consent to the CT scan, the record is silent as to why the follow-up visit did not take place until a year-and-a-half after the CT scan was performed.   (ECF No. 205-9 at 80-89.)

Where, as here, a plaintiff alleges a delay in receiving medical treatment, the "objective seriousness of the deprivation should . . . be measured by reference to the effect of the delay in treatment."   Mantz v. Chain, 239 F. Supp. 2d 486, 504 (D. N.J. 2002) (quoting Beyerbach v. Sears, 49 F. 3d 1324, 1326 (8th Cir. 1995) (overruled on other grounds)).   Plaintiff alleges that Dr. Jin's failure to return him to see Dr. Seaman caused significant delay in diagnosing his condition and subjected him to needless suffering and lasting injury.   However, the record indicates that Dr. Seaman's conclusion as to whether Plaintiff had SLE did not change after his follow-up appointment.   He was still unable to make a specific diagnosis and he did not recommend any treatment.   While it is true that had Plaintiff been returned to see Dr. Seaman earlier Dr. Jin may have sent him to see a specialist at the Lupus Center of Excellence perhaps a year or more prior to his first visit on February 20, 2009, the Court cannot turn a blind eye to the fact that Plaintiff contends he is still in the same amount of pain today despite his regular visits to the Lupus Center and following the course of treatment recommended there.   Given this, and the

74

fact that Plaintiff has failed to point to evidence demonstrating what lasting injury he endured due to this delay or how his condition would have improved had he been returned to see Dr. Seaman within one month, the Court cannot conclude that there is a material issue of fact as to deliberate indifference. *See* Beyerbach, 49 F.3d at 1326 (a plaintiff "who complains that a delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed") (overruled on other grounds); Hill v. Dekalb Regional Youth Detention Ctr., 40 F.3d 1176, 1191 (11th Cir. 1994) (finding no deliberate indifference where plaintiff "submitted no medical evidence explaining how the four-hour delay in taking [him] to the hospital detrimented or worsened his medical condition") (overruled on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 (2002)); Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990) (*per curiam*) (while hospital records showed that arrestee displayed multiple bruises to the forehead, left ribs, right flank and left shoulder, and was suffering from abrasions to the cornea and upper back, consistent with plaintiff's allegations that he had been assaulted by police officer, there was "nothing in the record to suggest" that a ten-hour delay in medical treatment exacerbated these injuries "in the slightest"); Martin v. Tyson, 845 F.2d 1451, 1458 (7th Cir. 1988) (rejecting allegations of deliberate indifference arising out of alleged delay in providing medical treatment based, in part, on plaintiff's failure to produce any evidence of injury caused by the delay); Mantz, 239 F. Supp. at 504 (plaintiff must provide "medical evidence, beyond his own subjective testimony, that [the] alleged delay . . . caused him to suffer harm which he would not have suffered had an ambulance been immediately called to the scene."); Brown v. Cohen, No. 09-2909, 2012 U.S. Dist. LEXIS 81115, at *15 (E.D. Pa. June 12, 2012) (summary judgment

granted to prison officials where inmate failed to present evidence establishing that his injuries were exacerbated or caused by a delay in treatment).

Regardless of the fact that Plaintiff has failed to direct the Court's attention to evidence indicating that his condition was exacerbated by the aforementioned delay, he has also failed to carry his burden by coming forward with evidence demonstrating deliberate indifference in that Dr. Jin acted with a sufficiently culpable state of mind, knowing of and disregarding an excessive risk to Plaintiff's health, when he did not return him to see Dr. Seaman within the time recommended.  *See* <u>Farmer</u>, 511 U.S. at 837.  There is nothing in the record to suggest that Dr. Jin believed that a follow-up visit with Dr. Seaman was medically necessary and that he delayed the visit for non-medical reasons.  Although the Court is cognizant that there is also nothing in the record to suggest the contrary, Defendants argue that the record is insufficient to establish deliberate indifference and the Court finds that Plaintiff has not identified any specific facts, supported by evidence, which demonstrate a genuine issue of material fact for trial.

b.  <u>Referrals to specialists</u>

Plaintiff's next contention is that Dr. Jin failed to follow Dr. Seaman's recommendation to refer Plaintiff to gastroenterology, dermatology, and cardiology specialists.  Dr. Seaman noted in his report that he was going to defer this decision to Dr. Falor.[6]

With respect to the gastroenterology and cardiology consults, Dr. Seaman testified that Plaintiff could use a more general evaluation for his complaints of rectal bleeding and abdominal pain.  However, he did not believe that these complaints were related to Lupus, that the consultations could aid in the diagnosis of Lupus, or that he was in any better position than Dr.

---

[6]      Due to Dr. Falor's illness, Dr. Jin was the acting medical director at SCI-Greene as of August 2005 and took over as medical director on October 1, 2006.  As such, this decision was deferred to Dr. Jin and not Dr. Falor.

Falor or Dr. Jin to make a determination as to whether Plaintiff needed to be seen by a gastroenterologist or cardiologist. (ECF No. 205-11 at 70-72, 83-84, 87-88.) He stated that he would have no basis to criticize Dr. Jin if he felt that Plaintiff did not need to see a gastroenterologist and that he could treat Plaintiff's symptoms.

Dr. Jin stated that he relied on his medical judgment when deciding not to authorize the gastroenterology and cardiology consults because he did not feel that it was necessary (ECF No. 205-10 at 3), and that based on his experience as a surgeon, he felt that he could treat Plaintiff's abdominal and rectal bleeding complaints (ECF No. 205-10 at 17). He acknowledged that Plaintiff complained of rectal bleeding on a few occasions. (ECF No. 205-10 at 13.) He had one positive occult blood test, and Dr. Jin testified that a positive occult blood test could be caused by too much NSAID, gastritis, irritation, excessive Vitamin C, or ulcerations. (ECF No. 205-9 at 70.) Dr. Falor testified that Plaintiff's positive occult blood indicated that there was some bleeding but that the extent of Plaintiff's bleeding was not serious because the blood counts did not change appreciably. (ECF No. 205-7 at 9.) Because there were no objective signs of significant gastrointestinal bleeding, Dr. Falor felt as though Plaintiff's condition was not clinically severe enough to require a gastroenterology evaluation. (ECF No. 205-7 at 10-11.) He further stated that if Plaintiff was having significant gastrointestinal bleeding then there would be other signs and symptoms of bleeding which were not present in Plaintiff's case. (ECF No. 205-7 at 11.) Dr. Jin testified that when Plaintiff later complained of rectal bleeding, rectal and stool exams were performed and there was no evidence of blood found. (ECF No. 205-10 at 13-14.)

Dr. Seaman also recommended that Dr. Jin consider a dermatology referral because he suspected that Plaintiff may have Subacute Cutaneous Lupus or some other form of skin lupus. (ECF No. 205-11 at 73, 75.) Dr. Seaman testified that the treatment for Subacute Cutaneous

Lupus is somewhat individualized but treatment options would include topical creams, including steroid creams, and oral medications.  (ECF No. 205-11 at 74.)   He stated that if Subacute Cutaneous Lupus is not treated, the skin rash could just go away or it could leave a permanent scar.  (ECF No. 205-11 at 74.)   Although he did not examine Plaintiff's entire body when Plaintiff was returned for his follow-up visit on April 16, 2008, Dr. Seaman stated that he did not see any scars on the body parts he did observe.  (ECF No. 205-11 at 74.)  He also stated that he did not know of any injury that Plaintiff experienced due to the delay in seeing a dermatologist.  (ECF No. 205-11 at 76.)

Dr. Jin testified that he relied on his medical judgment in deciding not to authorize the dermatologist consult that Dr. Seaman recommended.   (ECF No. 205-10 at 3.)   He further testified that Plaintiff has a rash that comes and goes (ECF No. 205-9 at 78) and that he believed Plaintiff has received appropriate treatment for his rash (ECF No. 205-10 at 20).  However, Dr. Jin later changed his mind and authorized the dermatology consult.  Plaintiff was seen by Dr. Schleicher for a dermatology consultation via teledermatology on August 8, 2008.  Photographs were taken of Plaintiff's scalp and neck and forwarded to Dr. Schleicher.  He reviewed the photographs and Plaintiff's medical records prior to the consultation.  Following the consult, Dr. Schleicher issued a report stating that he did not detect a rash during the exam but the session was terminated because Plaintiff was belligerent and uncommunicative.   Dr. Schleicher recommended an ANA test every quarter and a lupus band test, which was authorized by Dr. Jin and performed on December 8, 2008.  The results from that test were non-specific for Lupus or any other ANA-related autoimmune disorder.  Even after these results were forwarded to Dr. Seaman, he still could not state conclusively that Plaintiff had Lupus or any other systemic autoimmune disorder.   However, on Dr. Seaman's recommendation, Dr. Jin arranged for

Plaintiff to see a specialist at the University of Pittsburgh Medical Center, Lupus Center of Excellence.

As a basic premise, a prisoner has no independent constitutional right to medical care outside of prison. Roberts v. Spalding, 783 F.2d 867, 870 (9th Cir. 1986), *cert. denied*, 479 U.S. 930 (1986). However, where medical personnel within an institution prescribe treatment, including consultations with outside specialists, failure to abide on the part of prison officials may indicate deliberate indifference towards the prisoner's needs. *See* Freeman v. Lockhart, 503 F.2d 1016 (8th Cir. 1974) (plaintiff who made repeated attempts to follow-up on optometrist's recommendation of surgery but was denied access to a physician had valid cause of action); Sawyer v. Sigler, 320 F. Supp. 690 (D. Neb. 1970), *aff'd*, 445 F.2d 818 (8th Cir. 1971) (three consolidated cases) (treatment of emphysema adequate as it was in accord with prison doctor's recommended treatment; prison official's overruling recommendation of doctor that medication be administered in uncrushed form violated Eighth Amendment; failure to provide recommended treatment at an outside facility for cancer victim constituted inadequate medical treatment). The Third Circuit has held, however, that "no [Eighth Amendment] claim is stated when a doctor disagrees with the professional judgment of another doctor." *White*, 897 F.2d at 110 (emphasis removed); *see also* DeFranco v. Wolfe, 387 F. App'x 147, 158 (3d Cir. 2010) ("disagreement of professional opinion among doctors does not equal deliberate indifference"); Sawyer, 320 F. Supp. at 698 ("While the opinion of a specialist might be highly desirable, this court must leave to the prison physicians the exercise of good judgment regarding medical treatment."). "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990).

Here, there is no evidence in the record to suggest that Dr. Jin did not authorize the recommended consults out of disregard to Plaintiff's health. Rather, based on his medical judgment, he believed that they were not necessary at that time. Plaintiff has shown, at most, mere disagreement among professional opinions, which is insufficient to establish deliberate indifference. *See* Stewart v. Murphy, 174 F.3d 530, 535 (5th Cir. 1999) (no deliberate indifference when prison doctor did not follow the recommendation of local surgeon to transfer inmate to another facility to receive physical therapy because it was nothing more than a difference in opinion as to the appropriate method of treatment); Owens v. Ayalew, No. 11cv2926, 2012 U.S. Dist. LEXIS 123669, at *14-15 (D. Md. Aug. 30, 2012) (prison doctor's disagreement with orthopedic surgeon's recommendation that inmate should see a neurosurgeon and be evaluated for possible cervical surgery did not demonstrate deliberate indifference); *Harris v. Epps*, No. 3:11cv26, 2012 U.S. Dist. LEXIS 106396, at *10-11 (S.D. Miss. July 31, 2012) (no deliberate indifference by prison doctor who disagreed with neurosurgeon's recommendation that patient be given Neurontin, physical therapy, and an MRI). As such, Defendants' Motion will be granted as to this claim.

### 7. PHS

PHS is a private corporation that entered into a contract with the Pennsylvania Department of Corrections to provide medical services to inmates. Plaintiff claims that PHS has a custom, policy, or practice of providing inmates with ineffective medical treatment and delaying or denying access to specialists even if recommended by other specialists. Plaintiff suggests that he did not receive effective medical treatment or access to outside specialists, timely or otherwise, in part, due to financial considerations and his status as a capital case inmate.

A private corporation such as PHS may be held liable under section 1983 only if "it knew of and acquiesced in the deprivation of the plaintiff's rights."  Roach v. SCI Graterford Med. Dep't., 398 F. Supp. 2d 379, 388 (E.D. Pa. 2005); see also Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories).  To meet this burden, "the plaintiff must show that the corporation, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [plaintiff's] constitutional harm.'"  Roach, 398 F. Supp. 2d at 388. (quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989)).

"Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)).  "A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law."  Id. (quoting Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978)).  The Third Circuit has held that

> [t]here are three situations were acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983.  The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy.  The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.  Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that

the policymaker can reasonably be said to have been deliberately indifferent to the
need.

Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotation
marks and citations omitted).  The plaintiff bears the burden of proving that a "policymaker" is
responsible for either the policy or the custom that caused the alleged constitutional violation.
See id.

### a.  Costs

Plaintiff asserts that PHS has a custom, policy, or practice in place to limit medical
treatment or effective medical treatment to inmates in order to reduce costs, such as providing
inmates with cheap, ineffective medications and limiting access to outside specialists.  However,
the record evidence fails to establish that PHS had a custom, policy, or practice of placing cost
decisions over appropriate treatment or providing inmates such as Plaintiff with inadequate
medical care due to financial considerations.  Plaintiff directs the Court to a document entitled
"PA DOC Proposal: Annual Aggregate Cap" as evidence of a policy or custom that he was not
provided with necessary medical treatment, including effective medications and referrals to
specialists.  However, this document does not support Plaintiff's position as it merely notes that
PHS has budgeted an annual aggregate cap of $20,500,000 to cover outside medical services for
the year (unspecified in the document), and it proposes a 50/50 sharing between PHS and the
DOC of any costs incurred between $20,500,000 and $22,500,000 with all costs that exceed
$22,500,000 to be borne by the DOC.  The Court cannot glean how this document is relevant to
establishing a custom or policy of placing cost decisions over appropriate treatment decisions.
Furthermore, such general statements regarding the allocation of health care expenses, simply do
not, without more, establish a policy or practice of placing expense considerations over

considerations of appropriate medical care.  *See* <u>Ozoroski v. Maue</u>, No. 1:08-CV-0082, 2011 U.S. Dist. LEXIS 34588, at *19 (M.D. Pa. Mar. 31, 2011).

Defendants dispute that financial considerations played any role in their decisions regarding Plaintiff's medical care and the record does not suggest any finding to the contrary. Nevertheless, the Third Circuit recently held in <u>Winslow v. Prison Health Services</u>, 406 F. App'x 671 (3d Cir. 2011), the naked assertion that a defendant considered or operated based on an effort to contain costs does not set forth an adequate factual basis to support a claim predicated on deliberate indifference.  <u>Id</u>. at 674.   In <u>Winslow</u>, the prisoner alleged that he had been diagnosed with a hernia and that the decision to treat his hernia with a belt instead of with surgery was improperly motivated by non-medical factors, principally cost.  <u>Id</u>. at 672-73, 675. The plaintiff alleged that he was harmed by PHS "policies to save money[.]"  <u>Id</u>.  at 674.   The Third Circuit held as follows:

> For one thing, the complaint's allegation that Winslow was harmed by "policies to save money" is exceedingly conclusory; the complaint does not provide any indication either of (1) what the relevant policies are, (2) what basis he has for thinking that "policies to save money" affected his medical treatment, or (3) what specific treatment he was denied as a result of these policies.   More fundamentally, the naked assertion that Defendants considered cost in treating Winslow's hernia does not suffice to state a claim for deliberate indifference, as prisoners do not have a constitutional right to limitless medical care, free of cost constraints under which law-abiding citizens receive treatment.  *See* <u>Reynolds v. Wagner</u>, 128 F.3d 166, 175 (3d Cir. 1997) ("[T]he deliberate indifference standard of Estelle does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society."); <u>Johnson v. Doughty</u>, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The cost of treatment alternatives is a factor in determining what constitute adequate, minimum-level medical care, but medical personnel cannot simply resort to an easier course of treatment that they know is ineffective." (citations omitted)); <u>Caines v. Hendricks</u>, No. 05-1701, 2007 U.S. Dist. LEXIS 9453, 2007 WL 496876 at *8 (D. N.J. Feb. 9, 2007) ("[I]t is not a constitutional violation for prison authorities to consider the cost implications of various procedures, which inevitably may result in various tests or procedures being deferred unless absolutely necessary.").

Winslow, 406 F. App'x at 674-75.

As stated in Winslow, the deliberate indifference standard "does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society." Reynolds v. Wagner, 128 F.3d 166, 275 (3d Cir. 1997). "Resources are not infinite and reasonable allocation of those resources, taking into account cost, does not amount to deliberate indifference even if a prisoner does not receive the most costly treatments or his treatments of choice." Brightwell v. Lehman, No. Civ.A. 03-205J, 2006 WL 931702, at *8 (W.D. Pa. April 10, 2006). In this regard, the Court notes that the Eighth Amendment does not require a prison to provide an inmate "with the most sophisticated care money can buy." United States v. DeCologero, 821 F.2d 39, 42 (1st Cir. 1987). Nor are prison medical officers required to be blind to assessing the risks and costs of various treatment options. Furthermore, it is also clear that a dispute regarding whether doctors erred in this cost-benefit assessment, which is the essence of the medical art, sounds in negligence only and may not be cast as a constitutional violation. Thus, it is well-settled that an allegation of "mere malpractice of medicine in prison does not amount to an Eighth Amendment violation. This principle may cover . . . [an allegedly] erroneous calculus of risks and costs . . . ." Harrison v. Barkley, 219 F.3d 132, 139 (2d Cir. 2000).

Plaintiff has failed to present evidence of the existence of a PHS policy, practice, or custom of placing cost considerations over considerations of appropriate medical treatment, much less that Defendants even considered cost in treating his medical conditions. Nevertheless, given that cost is a factor in treatment of non-incarcerated individuals, the fact that PHS allegedly has a policy, which takes into account costs in its management of health care services

to incarcerated persons, simply does not, without more, evince the requisite deliberate indifference.  *See* <u>Glatts v. Lockett</u>, No. 09-29, 2011 U.S. Dist. LEXIS 19379, at *22-23 (W.D. Pa. Feb. 28, 2011).  As such, Defendants are entitled to a grant of summary judgment on this claim.

### b.  Capital case status

Plaintiff also asserts that PHS had a policy, practice, or custom of denying proper medical treatment to capital inmates such as him due to their capital case status.  While evidence of such an improper motive can support a conclusion that a defendant acted with deliberate indifference, *see* <u>Snow v. McDaniel</u>, 681 F.3d 978, 987 (9th Cir. 2012), such is not the case here as Plaintiff has presented no evidence apart from his conclusory allegations that he was refused medical treatment, including visits to specialists, due to his status as a capital inmate.  Such conclusory allegations will not suffice to establish a genuine issue of fact.  <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 902 (1990).  As such, Defendants are entitled to summary judgment as to this claim.

## B.   Retaliation

Plaintiff claims that Defendants acted out of retaliation by failing to, among other things, provide him with effective medical treatment, diagnose his condition, send him to specialists, follow specialist recommendations, and show up for sick calls.  Essentially, Plaintiff maintains that virtually *everything* Defendants have or have not done since his transfer to SCI-Greene has been out of retaliation for him seeking medical care, or more specifically, for filing over 600 sick call slips, 100 request slips, 200 grievances, legal complaints, and letters to numerous DOC officials and the Office of Professional Responsibility.

It is well settled that retaliation for the exercise of a constitutionally protected activity is itself a violation of rights secured by the Constitution, which is actionable under section 1983. Rauser v. Horn, 341 F.3d 330 (3d Cir. 2001); White v. Napoleon, 897 F.2d 103, 112 (3d Cir. 1990).   However, merely alleging the fact of retaliation is insufficient; in order to prevail on a retaliation claim, a plaintiff must show three things: (1) that the conduct in which he engaged was constitutionally protected; (2) that he suffered "adverse action"[7] at the hands of prison officials; and (3) that his constitutionally protected conduct was a substantial motivating factor in the defendants' conduct.   Rauser, 241 F.3d at 333 (adopting Mount Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).   The crucial third element, causation, requires a plaintiff to prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.   See Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007); Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997)).   Once a plaintiff has made his prima facie case, the burden then shifts to the defendant to prove by a preponderance of the evidence that he or she "would have made the same decision absent the protected conduct for reasons reasonably related to penological interest."   Rauser, 241 F.3d at 334 (incorporating Turner v. Safley, 482 U.S. 78, 89 (1987)).

As to the first element, Plaintiff identifies the filing of grievances, request slips, sick call slips, and legal complaints as the conduct that is protected by the First Amendment.   It has been clearly established that the filing of both lawsuits and grievances are protected activities for purposes of a retaliation claim.   See Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997);

---

[7]         An adverse action is one "sufficient to deter a person of ordinary firmness from exercising his rights." Bailey v. Lawler, No. 3:07-CV-2058, 2010 U.S. Dist. LEXIS 128271, at *12 (M.D. Pa. Aug. 11, 2010).

Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d Cir. 1981) (retaliation for exercising right to petition for redress of grievances states a cause of action for damages arising under the constitution).   Additionally, in cases within this circuit relating to prisoner retaliation claims, inmate requests slips – though cited less frequently – have been acknowledged within the range of activity that may fall within the ambit of First Amendment protection.   *See* Dickson v. McGrady, No. 1:CV-09-0195, 2010 U.S. Dist. LEXIS 30676, at *14 (M.D. Pa. March 30, 2010) (where the description of prisoners' protected conduct include the right to "make complaints, file grievances, request slips and legal actions."); *see also* Curtician v. Kessler, No. 07-286, 2010 U.S. Dist. LEXIS 142858, at *18 (W.D. Pa. Nov. 29, 2010) (finding plaintiff satisfied first prong of a retaliation claim "since filing grievances, requests to staff, and complaints are clearly protected forms of free speech under the First Amendment.").   While requests slips serve as a general avenue of expression relief upon by prisoners, they also serve as an important step within the grievance process.   *See* Alexander v. Fritch, No. 07-1732, 2010 U.S. Dist. LEXIS 28905, at *40 (W.D. Pa. March 26, 2010) (describing that the prison administrative policy provides that, prior to utilizing the grievance system, prisoners are required to attempt to resolve problems on an informal basis through direct contact or by sending an inmate request slip to the appropriate staff member.).   Based on the inclusion of request slips as protected activity in similar cases and their significance in the grievance system within prisons, this avenue of communication may qualify as protected conduct under the First Amendment.   Similarly, the Court will assume, without deciding, that the filing of sick call slips may also qualify as a protected activity for purposes of retaliation.   *See* Horton v. Day, No. 1:10-cv-61, 2010 U.S. Dist. LEXIS 124439, at *2 (E.D. Ark. Nov. 22, 2010).

As to the second element, however, the Court cannot find that Plaintiff suffered an adverse action likely to prevent or otherwise discourage a person of ordinary firmness from engaging in the protected conduct.  While a delay or denial of medical treatment would likely deter an individual from making complaints or exercising his or her First Amendment rights, there is no evidence of record by which to support a finding that Defendants took such action or took any adverse action with respect to Plaintiff's medical care.  Defendants have produced all of Plaintiff's medical records dating back to his arrival at SCI-Greene.  The Court has painstakingly reviewed each page and cannot conclude that any action taken with respect to Plaintiff's medical care was adverse.  Plaintiff's medical records show that he was frequently and consistently seen by medical providers and provided with medical treatment, and Plaintiff has not provided evidence to suggest otherwise.  While Plaintiff may have not been satisfied with the medical care and/or lack of successful medical treatment he received, and while Defendants may have been incorrect in their medical judgment at times, Plaintiff has simply not established that Defendants' actions were at any time adverse.  Plaintiff has thus failed to show an adverse action sufficient enough to deter a person of ordinary firmness from exercising a personal constitutional right.

Furthermore, with respect to the third element, the Court cannot reasonably infer from Plaintiff's allegations that his frequent medical requests and criticisms influenced the Defendants actions with respect to his medical care.  Plaintiff has failed to demonstrate any nexus between his expressive conduct and the quality and type of medical treatment which he received.  Accordingly, Defendants' Motion will be granted as to this claim.

## V.      PLAINTIFF'S MOTION FOR EMERGENCY MEDICAL CARE AND MOTION TO COMPEL

Plaintiff recently filed a Motion for Emergency Medical Care (ECF No. 233) and a Motion to Compel Defendants to Provide Necessary Medical Care (ECF No. 234).   Plaintiff requests that the Court order Defendants to send him to a hospital to receive necessary medical care for his Lupus and many other medical conditions because he is in "severe and excruciating" pain.   He also wants the Court to order all medical personnel to provide him adequate treatment. He asserts that, without this Court's intervention, he will continue to suffer unnecessary pain which could possibly cause his condition to worsen and shorten his life.   The Court hereby construes Plaintiff's Motions as requests for preliminary injunctive relief.

In determining whether an injunction is warranted, a court must evaluate four factors: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest."   Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999) (quoting A.C.L.U. of New Jersey v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc)).

Based on Plaintiff's failure to prevail on the merits of his claims in the instant action, his Motions will be denied.   Moreover, the Court notes that Plaintiff was examined off-site at the University of Pittsburgh Medical Center, Lupus Center of Excellence as recently as May 22, 2012.   Dr. Levesque performed an examination and found no indication of a medical emergency. In fact, Plaintiff's lab tests were all normal and his double-stranded DNA test was negative.   He made several recommendations, which have been carried out by Dr. Jin.   Plaintiff has been seen

by specialists at the Lupus Center on a regular basis since February 20, 2009, and Dr. Jin has followed their recommendations.   The Court is confident that prison administrators at SCI-Greene, including Dr. Jin, will continue to follow this practice until they make a sound professional judgment that it is no longer medically necessary.

Again, the Court is sympathetic to Plaintiff's medical situation and the pain that he allegedly endures every day.   However, as Judge Shapiro stated in her May 4, 2009, Memorandum Order denying Plaintiff's initial motion for preliminary injunction, Plaintiff is receiving treatment in excess of the minimum required by the Eighth Amendment.   As such, the Court will not order the relief Plaintiff requests.

## VI.     DEFENDANT DIANE MANSON

Defendant Manson has yet to be properly served in this case; thus, Plaintiff's claims against her still remain.[8]   Nonetheless, the Court will *sua sponte* grant summary judgment to her for the following reasons.

The Supreme Court recognizes "that district courts . . . possess the power to enter summary judgment *sua sponte*, so long as the losing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); *see also* Gibson v. Mayor & Council of Wilmington, 355 F.3d 215, 222 (3d Cir. 2004); Chambers Dev. Co. v. Passaic Cnty. Utils. Auth., 62 F.3d 582, 584 n.5 (3d Cir. 1995).   Before a district court

---

[8]        The docket sheet reflects that service has not been accomplished on Defendant Diane Manson.   It further reveals that the United States Marshal attempted service on Defendant Manson but because she was no longer employed by the Department of Corrections at that time, SCI-Greene rejected service for her and the summons was returned unexecuted on April 25, 2007.   (ECF No. 23 at 8.)   However, counsel for the DOC Defendants mistakenly entered his appearance for Defendant Manson on August 21, 2007.   (ECF No. 30.)   This was done in error, and when Plaintiff's claims against SCI-Greene officials were severed and transferred from the Eastern District on July 23, 2009, counsel notified the Court that he would not be entering an appearance for her in this case because she had never been served.   (ECF No. 121.)

grants summary judgment to a non-moving party it must first place the adversarial party on notice that the court is considering such *sua sponte* action.   *See* <u>Gibson</u>, 355 F.3d at 222.   The Third Circuit explained that "notice" means "that the targeted party 'had reason to believe the court might reach the issue and receive a fair opportunity to put its best foot forward.'"   <u>Id</u>. at 223 (quoting <u>Leyva v. On the Beach, Inc.</u>, 171 F.3d 717, 720 (1st Cir. 1999) and <u>Jardines Bacata, Ltd. v. Diaz-Marquez</u>, 878 F.2d 1555, 1561 (1st Cir. 1989)) (quotations omitted).   Additionally,

> [w]here it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a sua sponte grant of summary judgment against that party may be appropriate if those materials show no material dispute of fact exists and that the other party is entitled to judgment as a matter of law.

<u>Id</u>. at 224 (quoting <u>Ramsey v. Coughlin</u>, 94 F.3d 71, 74 (2d Cir. 1996)).   Despite the general notice requirement to the nonmoving party, the Third Circuit has concluded that, notice to the adversarial party is not required in three circumstances: (1) when there exists a fully developed record; (2) when the adversarial party would not be prejudiced by a *sua sponte* grant of summary judgment; and (3) when the decision is based on a purely legal issue.   <u>Id</u>.[9]

Although a district court's *sua sponte* grant of summary judgment must be undertaken with the utmost caution given the serious consequences to the adversarial party, in this instance such action is appropriate.   Plaintiff's Eighth Amendment deliberate indifference claims against Defendant Manson are identical and arise from the same set of factual allegations as his claims against the moving Defendants, to which they responded extensively in their opposition briefs. Specifically, plaintiff maintains that Defendant Manson acted with deliberate indifference to his

---

[9]       The court in <u>Gibson</u> found all three circumstances present in upholding the district court's *sua sponte* grant of summary judgment.   <u>Gibson</u>, 355 F.3d at 224.   The court declined to address whether the presence of some, but not all three circumstances would be sufficient to except the court from the notice requirement.   <u>Id</u>.; *see also* <u>DL Resources, Inc. v. FirstEnergy Solutions Corp.</u>, 506 F.3d 209, 224 n.14 (3d Cir. 2007) (against declining to address the question).

medical needs by denying him medical treatment for his pain and persisting in an ineffective course of medical treatment for non-medical reasons. He also asserts that she acted with deliberate indifference by denying and/or delaying referrals to outside specialists for non-medical reasons, such as cost-savings or because of his capital case status. Plaintiff was on fair notice that the Court would consider summary judgment in favor of Defendant Manson on these claims because they are coexistent to the claims against the moving Defendants. In fact, even though she had not been served, Plaintiff still addressed his claims against Defendant Manson in his responses in opposition to the moving Defendants' Motion for Summary Judgment. Therefore, notice and an opportunity to be heard have already been provided. Additionally, and more importantly, the voluminous record before the court is fully developed. All evidence Plaintiff could potentially proffer in support of his deliberate indifference claims of record presently before the Court.

As with the moving Defendants, the record simply does not reflect that Defendant Manson was deliberately indifferent to Plaintiff's medical needs, and to the extent Plaintiff brings a retaliation claim against her the Court finds the same. Plaintiff was provided with extensive medical care and treatment, as he still is, and he clearly disagrees with the medical staff's assessment, diagnosis, and course of treatment for his conditions. Moreover, there is absolutely no evidence to support Plaintiff's claims that he was ever denied or delayed access to outside specialists or denied medical treatment, effective or otherwise, because of his custody status or financial considerations. Because of this and for the reasons stated *supra* with regard to

Plaintiff's claims against the moving Defendants, summary judgment in favor of Defendant

Manson is warranted.

A separate Order will be issued.

Dated:  September 24, 2012

<u>s/ Terrence F. McVerry</u>
Terrence F. McVerry
United States District Judge

cc:  Orlando Baez
     CB – 3721
     175 Progress Drive
     SCI Greene
     Waynesburg, PA  15370

     Counsel of record.